## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SAIMA ASHRAF-HASSAN,**<br>**7418 Vernon Square Drive, #102**<br>**Alexandria, VA 22306**<br><br>**Plaintiff,**<br><br>v.<br><br>**EMBASSY OF FRANCE IN THE**<br>**UNITED STATES,**<br>**4101 Reservoir Road, N.W.**<br>**Washington, D.C. 20007**<br><br>    **Serve to:**<br><br>    Mr. Alain Juppé,<br>    Ministre d'Etat, Minister of Foreign<br>        and European Affairs<br>    Private Office of the French Minister<br>        of Foreign Affairs<br>    Ministry of Foreign Affairs<br>    37, Quai d'Orsay<br>    F - 75351 PARIS<br><br>    Legal Directorate<br>    Ministry of Foreign Affairs<br>    57, Boulevard des Invalides<br>    F - 75700 PARIS<br><br>    Ambassador François Delattre<br>    Ambassador of France to the United States<br>    Embassy of France<br>    4101 Reservoir Road, N.W.<br>    Washington, D.C. 20007<br><br>    Mr. Michel Chanoux<br>    Secretary General<br>    Embassy of France<br>    4101 Reservoir Road, N.W.<br>    Washington, D.C. 20007 | Civil Action No. _____ |

Mr. Philippe Caillol                        )
Senior Liaison Legal Adviser                )
Embassy of France                           )
4101 Reservoir Road, N.W.                    )
Washington, D.C. 20007                      )
                                            )
**Defendant.**                              )
_____ )

### COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF

1. This is an action for equitable relief and damages, based on discrimination and harassment in the workplace due to Saima Ashraf-Hassan's ("Plaintiff") national origin, race, religion, pregnancy and in retaliation for protected activity in violation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

2. The Cultural Service of the Embassy of France in the United States ("Defendant" or "the Embassy") subjected Ms. Ashraf-Hassan to harassment on the bases of her national origin, race, religion, and pregnancy when Ms. Ashraf-Hassan's supervisors, including Chantal Manes and Dr. Christian Tual, and co-workers constantly referred to her as a "terrorist," a "Pakistani," a "Pashtoun" (a member of the Taliban), and a "dog." In addition, Dr. Tual referred to Ms. Ashraf-Hassan's children as "dogs" and, in writing, stated he wanted to place Ms. Ashraf-Hassan in a "rat-hole" during her last months at the Embassy. The Embassy also harassed Ms. Ashraf-Hassan on these above protected bases when Ms. Manes attempted to terminate Ms. Ashraf-Hassan after she became pregnant and repeatedly isolated her during her employment from February 1, 2002 to January 31, 2007.

3. Further, the Embassy discriminated against Ms. Ashraf-Hassan on the bases of national origin, race, religion, and retaliation when it terminated her contract on January 31, 2007. Ms. Ashraf-Hassan endured harassment from her supervisors and co-workers for over six years, as she was the primary wage-earner for her family which included two small children

and her husband.  It was only after she complained of this discriminatory treatment to the French Ministry of Foreign Affairs in November 2006 that the Embassy decided to terminate Ms. Ashraf-Hassan's contract.  Shortly after Ms. Ashraf-Hassan's termination, the Embassy hired a white, French male whom Ms. Ashraf-Hassan had trained as an intern to perform the same duties which Ms. Ashraf-Hassan had been performing under her contract.

## I.    JURISDICTION

4.  This Court has jurisdiction over Ms. Ashraf-Hassan's claims pursuant to 28 U.S.C. § 1330 as Defendant is a foreign state and has waived its immunity pursuant to 28 U.S.C. § 1605, both explicitly by stating that Ms. Ashraf-Hassan's employment contract was subject to the local legislation where it was signed and implicitly by engaging in a commercial activity in the United States.

## II.    VENUE

5.  At all times relevant to this complaint, Ms. Ashraf-Hassan was employed by the Embassy of France, which is located in Washington D.C.  Venue is proper in this district under 28 U.S.C. §§ 1391(f)(1) and (4), as the events or omissions giving rise to Ms. Ashraf-Hassan's claims occurred in the District of Columbia and  a civil action against a foreign state may be brought into the United States District Court for the District of Columbia.

## III.    PARTIES

6.  Ms. Ashraf-Hassan, Plaintiff, is an adult resident of Virginia and was, at all times relevant to this Complaint, an individual within the meaning of 42 U.S.C. § 2000e(a) and an employee within the meaning of 42 U.S.C. § 2000e(f).

7.  The Embassy of France, Defendant, was, at all times relevant to this Complaint, an employer within the meaning of 42 U.S.C. § 2000e(b).

## IV.   EXHAUSTION OF ADMINISTRATIVE REMEDIES

8. Ms. Ashraf-Hassan contacted the Equal Employment Opportunity Commission ("EEOC") Washington Field Office ("WFO") on December 26, 2006 regarding discrimination at the Embassy of France. On July 13, 2007, Ms. Ashraf-Hassan filed a charge of discrimination with the EEOC's WFO. After Ms. Ashraf-Hassan was notified by WFO that it had lost her charge of discrimination, she filed another charge of discrimination on February 15, 2008 reiterating her initial charge of discrimination.

9. On January 31, 2011, Ms. Ashraf-Hassan received her right to sue letter from the EEOC.

10. Ms. Ashraf-Hassan has exhausted all administrative remedies required to bring the instant complaint.

## V.   FACTUAL BACKGROUND

11. Plaintiff, Saima Ashraf-Hassan, a South-Asian female born in Pakistan, is a French citizen and a U.S. permanent resident.

12. In 2001, Ms. Ashraf-Hassan was a third-year graduate student for a Ph.D. in law at the Université Panthéon-Sorbonne in Paris, France. She was in the process of completing her thesis which concentrated on international law and terrorism, drug-trafficking, and money-laundering issues in Pakistan and Afghanistan. She became interested in an internship with the Embassy of France in the United States as this program would allow her to complete the research necessary for her thesis and gain valuable experience in the diplomatic field. Her fiancé, now husband, was also in the U.S. at the time, and the internship would allow them to be reunited.

13. Ms. Ashraf-Hassan contacted Emile Besse, who explained the internship application process with the French Foreign Ministry and helped expedite her hire as an intern. Ms. Ashraf-

Hassan was hired as an unpaid intern by the French Ministry of Foreign Affairs on or about October 2001.

14. Ms. Ashraf-Hassan arrived in the United States on an A-2 visa for her six-month unpaid internship from November 2, 2001 until April 30, 2002 with the Embassy.  Ms. Ashraf-Hassan's A-2 visa status would expire at the end of her internship.

15. During her internship, Ms. Ashraf-Hassan was supervised by Chantal Manes, Cultural Attaché and head of the Service for University, Language, and Education Cooperation ("SCULE" or "the Cultural Service").

16. During her internship, Ms. Ashraf-Hassan learned that the Cultural Service was creating a paid position with duties mirroring those she was already performing.  The vacancy was for locally-recruited employees and required applicants to be fluent in both English and French, with knowledge of French-American business.

17. Ms. Ashraf-Hassan learned of the new position when she read a flyer for the vacancy in an elevator and at the Embassy cafeteria.

18. The flyer stated that those interested should contact Chantal Manes, head of SCULE, for more information.

19. Ms. Ashraf-Hassan was surprised that no one had ever discussed the creation of this position with her as she was ideally and uniquely suited for the position.

20. On or about December 2001, Ms. Ashraf-Hassan met with Ms. Manes and expressed her interest in the paid position.

21. Ms. Manes seemed surprised that Ms. Ashraf-Hassan wanted the job, and replied that there were a lot of "American" candidates who were also interested.

22. Ms. Manes did not make a decision to hire Ms. Ashraf-Hassan until the vacancy announcement's deadline in January 2002. One night when Ms. Ashraf-Hassan was working late, Ms. Manes visited her office and said, "We need to talk."

23. Ms. Manes explained that she had interviewed many candidates, but that there were too many requirements for the new position. Candidates that fulfilled one requirement were deficient in another, and the few candidates that met all the criteria were not willing to work in such a demanding position for an annual salary of less than $25,000.

24. Ms. Ashraf-Hassan met all the criteria for the position and was willing to accept the job at the low salary because it would give her some financial stability and enable her to stay in the U.S.

25. Ms. Manes hired Ms. Ashraf-Hassan because she was the only qualified applicant willing to accept the salary offered.

26. Ms. Ashraf-Hassan became an Embassy employee effective February 1, 2002.

27. Defendant hired Ms. Ashraf-Hassan as a manager for the internship placement program in companies for SCULE in Washington, D.C., at the N2/E1 pay level.

28. At this level, Ms. Ashraf-Hassan received a monthly salary of $2,254.

29. She was not aware what this pay grade meant or that a salary chart existed when she was hired.

30. She did not obtain a copy of Defendant's salary chart until 2006.

31. According to Defendant's salary chart, entry level N2/E1 was equivalent to the pay grade of gardeners, maintenance workers, servers, or technicians, whereas managers typically entered at level N5 on the chart.

32. Ms. Ashraf-Hassan's employment contract, executed on March 7, 2002, was specifically for "locally recruited employees" and indicated that the contract and its enforcement were "subject to local legislation."

33. Ms. Ashraf-Hassan's original title was Internship Program Officer.  Her primary duty was to promote the internship program.  This included:

    a.  Visiting local American universities;

    b.  Receiving and tracking the applications of students;

    c.  Reviewing applications and interviewing candidates;

    d.  Placing applicants for internships in French companies, which involved searching for French complaint that needed interns and marketing the program and applicants to these companies;

    e.  Contacting the companies and negotiating the applicant's terms of employment, including any stipends, housing, or duties;

    f.  Establishing agreements with the French companies that would allow students to obtain their visas;

    g.  Working in collaboration with American universities and the French-American Chamber of Commerce to promote French-American relations;

    h.  Establishing an annual review of the program; and

    i.  Updating brochures, posters, business files, candidate files, different power point presentations and the website for the program

34. Ms. Ashraf-Hassan was the "marketing person" for this program.

35. Companies with business locations in France did not pay her any fees in order to obtain interns.  Ms. Ashraf-Hassan's job consisted of convincing these businesses to hire American

university students as interns and these businesses only paid visa fees and stipends for the interns' housing.

36. Ms. Ashraf-Hassan was also responsible for matching the students, who applied to the program and paid a fee to Defendant for the placement services, to the available internships. As a result, Ms. Ashraf-Hassan promoted the program at local universities, received and reviewed applications, interviewed candidates, and gauged applicants' proficiency in French. Ms. Ashraf-Hassan also assisted the candidates who were hired in transitioning to living and working in France.  It would often take as long as three months to place a student into an internship position.

37. The person who performed these duties while Ms. Ashraf-Hassan was an intern placed only 29 students in 2001.

38. In Ms. Ashraf-Hassan's first year as Internship Program Officer, she placed 53 students into internships.  During the last year before her removal, Ms. Ashraf-Hassan placed nearly 200 students into internships.

39. After October 2004, Ms. Ashraf-Hassan was also tasked with performing the duties of the Coordinator of French-American Cultural Exchange ("FACE") University Partnership Fund ("UPF").  FACE UPF was an institutional partnership between FACE and Defendant within the United States.

40. FACE is a non-profit organization located in New York.

41. The Embassy assisted FACE by providing the services of several attachés who either served as Program Officers of a given program or by giving administrative support to FACE in those departments.  These services were free administrative services provided by Defendant and fell within the institutional partnership between the two organizations.  Defendant hired,

supervised, and paid individuals who worked for several of the programs of FACE out of Defendant's premises in Washington, D.C. as well as in New York City.

42. The University Partnership Fund was replaced by the Partnership University Fund ("PUF") in 2007.  PUF's responsibilities mirrored those of the UPF.

43. Dr. Christian Tual was in charge of the day-to-day administration of both the UPF and PUF for Defendant in Washington, D.C.  Ms. Ashraf-Hassan worked with Dr. Christian Tual on a daily basis.

44. Ms. Ashraf-Hassan's duties as the coordinator of FACE UPF included:

    a.  Promoting the program by advertising in academic newspapers, such as "The Chronicle of Higher Learning" and sending documents to FACE UPF's webmaster in New York for the program's website;

    b.  Answering questions regarding the program from interested universities and students;

    c.  Receiving and classifying applications for grants from FACE UPF, which involved reading and summarizing the applications in English and French for the Program Officer (Dr. Christian Tual) and Jury members who selected the grant recipients;

    d.  Performing administrative tasks, such as organizing Jury meetings, issuing convocation letters for the Jury meetings to select grant recipients, coordinating travel arrangements for Jury members to FACE's location in New York, and ensuring the Jury members were reimbursed for their travel expenses;

    e.  Managing the paperwork for grant recipients, including the grant contracts;

    f.  Obtaining Dr. Tual's authorization to draft checks for FACE New York, and making appointments and travel arrangements for grant recipients and Dr. Tual;

    g.  Updating the database for the FACE UPF partnerships, payments, and contacts;

h. Organizing travel arrangements for Dr. Tual and other administrative work related to FACE.  This included taking messages, scheduling phone calls, writing letters, managing mail and email for each partnership, and maintaining points of contact related to each partnership; and

i. Training and supervising interns for FACE UPF.

45. Ms. Ashraf-Hassan performed the administrative tasks involved in establishing an exchange program between American and French universities to create new programs and degrees, as well as reviewing proposals for projects from students and universities that needed funding. Ms. Ashraf-Hassan's office was in the Embassy of France in Washington, D.C. and she worked with FACE employees located in New York.

46. Ms. Manes (white, French, non-Muslim) was Ms. Ashraf-Hassan's second-level supervisor when she became the Internship Program Officer on February 1, 2002.  Ms. Manes was responsible for completing Ms. Ashraf-Hassan's annual performance evaluations.  Ms. Manes did not supervise any other employees in the Internship Program.

47. In October 2004, Dr. Christian Tual (white, French, non-Muslim) became Ms. Ashraf-Hassan's first-line supervisor.  Dr. Tual was the Program Officer for the FACE UPF.  At that time, Ms. Ashraf-Hassan was no longer under Ms. Manes' supervision.

48. Ms. Manes left the Embassy in December of 2005.  After Ms. Manes' departure, Robby Judes (black, French, non-Muslim), Joint Cultural Advisor, became Ms. Ashraf-Hassan's second-line supervisor until she was dismissed on January 31, 2007.

**Hostile Work Environment**

49. Ms. Ashraf-Hassan became an intern for the Embassy just after the terrorist attacks of September 11, 2001.  Ms. Ashraf-Hassan's family was concerned about her leaving France

for the U.S. at such a critical time for South-Asian and Muslim people.  Nevertheless, Ms. Ashraf-Hassan thought it presented a great opportunity for her to conduct research for her thesis project.

50. When Ms. Manes first met Ms. Ashraf-Hassan in December 2001 during her internship, she seemed shocked that Ms. Ashraf-Hassan had been selected as an intern and pointedly asked her, "You are Pakistani?"  Ms. Ashraf-Hassan replied that she was in fact French.  Ms. Manes repeated, "But you are from Pakistan."  Ms. Ashraf-Hassan explained that she had been born in Pakistan, but had moved to France at an early age and was a French citizen.

51. At the time, Ms. Ashraf-Hassan was the only Pakistani employee at the Embassy's Cultural Service, and although there were other Muslim employees at the Embassy, Ms. Ashraf-Hassan was the only Muslim employee under Ms. Manes' supervision.

52. Ms. Manes would commonly introduce Ms. Ashraf-Hassan to other colleagues at the Embassy as, "This is Saima; she is Pakistani."  In contrast, Ms. Manes would introduce other co-workers by their names only, making no reference to their national origin or ethnicity.

53. Ms. Manes was always very cold towards Ms. Ashraf-Hassan.  She did not greet Ms. Ashraf-Hassan in the hallways, make eye-contact, or engage in friendly conversation with her like she did with other employees.

54. Many of the employees at the Embassy told Ms. Ashraf-Hassan that they were surprised she had been hired as an intern given her national origin and religion.

55. Ms. Manes would often participate in office conversations about the events surrounding September 11th and attempt to link Ms. Ashraf-Hassan to the terrorist groups by identifying them as, "Your people."

56. One day, during a casual conversation in the hall, Ms. Besse, who had helped Ms. Ashraf-Hassan secure her internship at the Embassy, offered to help her with the research for her thesis project on terrorism by introducing Ms. Ashraf-Hassan to a friend that was a police attaché for the Embassy during their lunch break.  Ms. Manes overheard this conversation, and rudely interrupted by stating, "I don't know why your people do things like this," referring to the terrorist attacks.

57. One morning, Ms. Manes read a newspaper article regarding the September 11th attacks which referred to a police raid that had occurred recently in New York and caused several Pakistani people to flee to Canada for safety.  As Ms. Ashraf-Hassan walked by Ms. Manes' office, she called out, "The Pakistani did it again!" and waved the newspaper at Ms. Ashraf-Hassan.

58. One afternoon during the spring of 2003, Ms. Ashraf-Hassan was returning to her office after her lunch break and overheard a conversation between Ms. Manes and a colleague from the Cultural Service, Francoise Planchenault.  Ms. Planchenault was in the copy room with Ms. Manes and said, "Now we hire terrorists," precisely when Ms. Ashraf-Hassan walked by on her way to check her mail.  Ms. Manes smiled and nodded.  Ms. Ashraf-Hassan was shocked and immediately made her way to her own office, shutting the door to send an e-mail her sister about what had just occurred and how terrible the comment had made her feel.

59. At the same time, Ms. Ashraf-Hassan had been receiving harassing phone calls at her home in Alexandria, Virginia.  The phone calls had a recording shouting, "Middle Eastern, go home!"

60. Two weeks after the incident with Ms. Planchenault and Ms. Manes, Ms. Manes summoned Ms. Ashraf-Hassan to her office.  Ms. Manes told Ms. Ashraf-Hassan, "You know that the

Embassy of France is French territory.  As we are in France, I would just like to remind you that you are not to wear the hijab or any jewelry identifying your religion."  Ms. Ashraf-Hassan responded by stating that she only wore the hijab outside of the Embassy, removing the garment before even arriving at the Embassy's gates.  This conversation lasted approximately twenty minutes.

61. On March 15, 2002, Ms. Ashraf-Hassan called the office to advise that she would be arriving to work late due to an unexpected doctor's appointment.  She spoke with Estelle Goodman, Ms. Manes' receptionist.  At her doctor's appointment, Ms. Ashraf-Hassan learned that she had become pregnant and was approximately four weeks into the pregnancy.

62. Once Ms. Ashraf-Hassan arrived at work that day, Ms. Goodman asked her if she was feeling any better.  Ms. Ashraf-Hassan could not resist sharing the good news with her, and just as she was making the announcement that she was pregnant to Ms. Goodman, Ms. Manes walked out of her office.  Ms. Goodman asked Ms. Manes excitedly if she had heard Ms. Ashraf-Hassan's news and Ms. Manes just nodded her head , walking past Ms. Ashraf-Hassan and saying, "Uh-oh!" in an upset tone, followed by, "We need to talk."

63. On March 16, 2002, Ms. Ashraf-Hassan was working in her office when Ms. Goodman called her and told her to report to Ms. Manes' office immediately.  Ms. Manes proceeded to tell Ms. Ashraf-Hassan that she had put her in a very difficult situation by getting pregnant and that she was reconsidering her decision to hire her.  Ms. Manes gave Ms. Ashraf-Hassan an hour-long lecture, telling her that she did not know how to plan her family or financial life and asking her if she was aware that condoms and birth control pills were available to her and her husband.

64. When Ms. Manes finally reached the end of this lecture, she told Ms. Ashraf-Hassan that she was either free to go home immediately or to begin preparing everything for the person who would replace her.

65. On April 16, 2002, Ms. Manes told Ms. Ashraf-Hassan that she would be terminated at the end of her probationary period. Ms. Manes stated that Ms. Ashraf-Hassan had "failed to earn her trust." Ms. Ashraf-Hassan asked Ms. Manes what she meant when she made this comment, but Ms. Manes refused to elaborate.

66. Ms. Ashraf-Hassan met with Ms. Besse that day. Ms. Besse told her that she had heard about what had happened with Ms. Manes and that she agreed with Ms. Manes' comment that Ms. Ashraf-Hassan should have been aware that birth control pills and condoms were available on the market.

67. Another of Ms. Ashraf-Hassan's colleagues saw her crying in a hallway and told her not to leave without writing a letter to the Ambassador first. He helped Ms. Ashraf-Hassan write the letter and suggested she contact a lawyer because he knew she was being mistreated by Ms. Manes.

68. That same day, Ms. Ashraf-Hassan submitted a letter to the Secretary General (equivalent of a Human Resources office) in New York, Mr. Bernard Hechenberger, asking for reconsideration of the termination.

69. Ms. Ashraf-Hassan also delivered her letter to the French Ambassador, Mr. Bujong de L'Estang.

70. Ms. Ashraf-Hassan never received a response from Mr. Hechenberger.

71. On or about April 23, 2002, the Ambassador's assistant called Ms. Ashraf-Hassan, requesting that she return to work. The assistant stated that Ms. Manes did not have the authority to

terminate Ms. Ashraf-Hassan and that Ms. Manes was wrong for the way she had spoken to her.

72. During this time, a representative from the Embassy, Ms. Gehan, also visited Ms. Ashraf-Hassan to personally apologize on behalf of the Embassy.  Ms. Gehan also sought to verify the quality of Ms. Ashraf-Hassan's work, as Ms. Manes had accused her of being incompetent.

73. Ms. Gehan determined that Ms. Ashraf-Hassan was competent and qualified to work.

74. Ms. Manes was reprimanded by the Ambassador and ordered to accept Ms. Ashraf-Hassan back into the Cultural Service.

75. When Ms. Ashraf-Hassan returned to work, she learned from the receptionist for the Cultural Service that both Ms. Goodman (white, French, non-Muslim) and Ms. Besse (white, French, non-Muslim) had also become pregnant during their employment with the Embassy at the same time as she had, but had not been terminated from employment or lectured about birth control.

76. Ms. Manes never apologized to Ms. Ashraf-Hassan for her wrongful termination or mistreatment.  In fact, Ms. Manes began to retaliate against Ms. Ashraf-Hassan and isolate her once she returned to the Embassy after Ms. Manes' foiled attempt to terminate her employment.  For example, Ms. Manes excluded and attempted to exclude Ms. Ashraf-Hassan from general staff meetings for the Cultural Service by calling her in at the last minute for unscheduled meetings or by calling her in after the meetings had already began.

77. Ms. Manes would not invite Ms. Ashraf-Hassan to parties or other social gatherings outside the office, but she would invite other co-workers.  Ms. Manes would not celebrate Ms.

Ashraf-Hassan's birthday, although it was customary at the Embassy for the supervisor or another colleague in the service to organize a birthday party for other employees.

78. When Ms. Manes returned from trips to other states or countries, either on official or unofficial business, she would bring small gifts for some of the employees in the service or bring a shared gift (such as a box of chocolates) for the group, but she would never bring gifts for Ms. Ashraf-Hassan or even offer her part of a group gift.

79. Ms. Manes would often ask about the well-being of other co-workers' families, but she never asked Ms. Ashraf-Hassan about her family.

80. Ms. Manes also required Ms. Ashraf-Hassan to perform other employees' duties while they were on their lunch breaks, even if it was also Ms. Ashraf-Hassan's lunch break. When other employees went on vacation, Ms. Ashraf-Hassan also had to perform their duties, even though she did not know what their duties were. However, no one ever covered Ms. Ashraf-Hassan's duties while she was at lunch or on vacation.

81. Ms. Manes refused to allow Ms. Ashraf-Hassan to take vacation on the days she requested it, making excuses that the Embassy was too busy at the time, while allowing other employees to take off.   For example, because Ms. Ashraf-Hassan is Muslim, she did not take vacation during the month of December, as most of the Embassy's other employees did. Ms. Ashraf-Hassan asked for two-week periods of vacation, usually in April. Ms. Manes attempted to dissuade Ms. Ashraf-Hassan from taking the exact times she requested or delay her decision on Ms. Ashraf-Hassan's requests.

82. In March 2003, Ms. Ashraf-Hassan requested a Friday off so she could pick up her sister, who was visiting from France, from the airport. Ms. Ashraf-Hassan made the request to Ms.

Manes for the entire day off, and if it wasn't possible, to be able to leave early. Ms. Manes refused Ms. Ashraf-Hassan's request.

83. Ms. Manes also allowed Ms. Ashraf-Hassan's co-workers, including Meghan Merwin (white, French, non-Muslim), to work from home every other day. However, Ms. Manes would make Ms. Ashraf-Hassan account for every minute she was out of the office. For example, at the end of the summer in 2002, two to three months after she was "re-hired," Ms. Ashraf-Hassan called to advise that she was running a few minutes late to work. When Ms. Ashraf-Hassan arrived at the Embassy, she found Ms. Manes standing outside her office door. Ms. Manes said, "It's 9:04 AM, you are supposed to be here at 9:00 AM."

84. On or about November 2005, before Ms. Manes' departure from the Embassy, she requested that Celine Camus, her assistant, call and notify her if Ms. Ashraf-Hassan arrived to work late or left work early. Ms. Manes did not request this for any of the other employees.

85. Ms. Manes did not allow Ms. Ashraf-Hassan to participate in training programs or continue her education, despite allowing other employees to do so. For example, she authorized another Embassy employee, Alessandra Benedicty (white, French, non-Muslim), to work as an assistant French teacher at a nearby university. Ms. Benedicty was completing her doctorate through the Cultural Services' Scholarship Program while running the program itself. Ms. Benedicty left the Embassy in 2004.

86. During her time at the Embassy, Ms. Ashraf-Hassan was not allowed to attend the annual meetings regarding the Cultural Services' Internship Program held in New York, even though she was the Program Officer and the only employee who knew about the progress of the work relating to the program.

87. Ms. Ashraf-Hassan asked Ms. Manes why she could not attend these meetings and received the response that there was not enough money in the budget to send her to the meetings. However, when Ms. Ashraf-Hassan was on maternity leave in the fall of 2002, a white intern was sent to the annual meeting and participated on her behalf.  Other years, Ms. Manes, Dr. Tual or Mr. Judes would attend on Ms. Ashraf-Hassan's behalf.  Ms. Ashraf-Hassan was required to brief them on the program's status beforehand.

88. Other employees who served as program officers were permitted to attend the meetings that concerned their programs.  Both Megan Merwin (white, French, non-muslim) and Alessandra Benedicty (white, French, non-muslim), who ran the Cultural Services' Scholarship Program, attended the annual meetings for their program.  Their meetings were held in different cities and states in the United States as well as in France.  The Embassy paid for all of Ms. Merwin's and Ms. Benedicty's travel expenses.

89. In the spring of 2004, during a Cultural Services general staff meeting, one of the agenda items was the selection of new interns coming to the Embassy from French universities.  One of the internship candidates had an Arabic last name.  Ms. Manes openly rejected his application during the meeting by stating, "No, these people are from the lower class."  The Arabic student was ultimately hired for an internship position, after the dean of the student's university contacted Ms. Manes and told her that it would be discriminatory behavior if this candidate was not accepted by the Embassy and would reflect badly on the Embassy's reputation.  Ms. Manes ultimately accepted the candidate, after being forced to do so by the dean.

90. Ms. Ashraf-Hassan feared retaliation from Ms. Manes if she reported the incidents to the Secretary General's office.  At the time, Ms. Ashraf-Hassan was the primary wage-earner in

her household, and had to provide for her children.  If Ms. Ashraf-Hassan was terminated, her family would have very little money and would possibly be forced to leave the country.

91. Upon Ms. Manes' departure in December of 2005, she visited Ms. Ashraf-Hassan's office and told her that the Embassy "was not her property."  Ms. Ashraf-Hassan believes that Ms. Manes meant that she should not consider her job at the Embassy as permanent and that she should look for another position.  As a final derogatory comment, Ms. Manes told Ms. Ashraf-Hassan that people like her should go back to where they came from.

92. In October 2004, Dr. Christian Tual (white, French) became Ms. Ashraf-Hassan's primary supervisor and was the Program Officer for the FACE UPF.  From the very beginning, Dr. Tual's actions indicated he did not like Ms. Ashraf-Hassan because she was of Pakistani origin and was Muslim.

93. Dr. Tual openly made comments about how much he disliked Chinese, Indian, and Pakistani people while in Ms. Ashraf-Hassan's presence.  For example, in January 2005, when selecting the new interns for that semester, Dr. Tual looked at the pictures on the applications and openly commented on their race and ethnicity to Ms. Ashraf-Hassan.  Dr. Tual said, "You are placing these people in France and I hate it because this person is Chinese" or "because this person is Pakistani."

94. Beginning in February 2005, Dr. Tual often asked Ms. Ashraf-Hassan why she was not looking for a job at the Pakistani Embassy because she might "be better off there."

95. When Ms. Ashraf-Hassan told him that she worked for the Embassy of France because she was a French national, Dr. Tual stated that he did not accept Ms. Ashraf-Hassan as a French national because she was a Pakistani and a Muslim and that it would be better for her to work at the Pakistani Embassy.

96. In December 2005, Dr. Tual's wife planned a going-away dinner for an intern under Ms. Ashraf-Hassan's supervision and stopped by Ms. Ashraf-Hassan's office to invite her.

97. Ms. Ashraf-Hassan expressed to Mrs. Tual that there may be difficulty in obtaining a baby-sitter.  Ms. Tual told Ms. Ashraf-Hassan to bring her children to dinner.

98. At the end of the day, Ms. Ashraf-Hassan was alone in her office, finishing up her work.  Dr. Tual walked by Ms. Ashraf-Hassan's office and told her, "You can come to the dinner if you want with your husband, but forget about what my wife said to you.  She does not know what she is talking about, because I usually do not allow dogs into my home and their children are not welcome either."  Ms. Ashraf-Hassan was shocked and paralyzed by Dr. Tual's comment and comparison to her and her children as "dogs."

99. Although Ms. Ashraf-Hassan no longer wanted to attend the dinner, her husband convinced her that they should go anyway, with the hope of reconciling their differences.

100. Unfortunately, Ms. Ashraf-Hassan and her husband felt unwelcome in the Tual home, and were surprised to find that the Tuals served food they could not eat because of their religion, even though Dr. Tual knew Ms. Ashraf-Hassan was Muslim.

101. Dr. Tual also made comments regarding Mr. Judes' skin color.  In September 2005, when Dr. Tual learned that Mr. Judes would be arriving at the Embassy to replace Ms. Manes, he told Ms. Ashraf-Hassan that he was not happy to learn that a black man would be his supervisor.

102. Prior to Mr. Judes' arrival at the Embassy, Dr. Tual and Ms. Ashraf-Hassan received the resumes for a research intern position under Dr. Tual.  The photographs of the applicants were attached to their resumes, and Dr. Tual chose a black female candidate stating, "She is like Judes, and he will be happy to see one of his own in when he arrives."

103.   Ms. Ashraf-Hassan did not report Dr. Tual's comments to anyone because she feared

retaliation.

104.   Once Mr. Judes arrived, there was an obvious animosity between him and Dr. Tual.  In

September of 2006, this animosity reached its peak, with Mr. Judes imploring Ms. Ashraf-

Hassan to report Dr. Tual's harassing behavior to the Ambassador.  At the time, Mr. Judes

was Ms. Ashraf-Hassan's supervisor for the Internship Program.

105.   On January 3, 2007, Dr. Tual wrote an email to Mr. Judes in which he referred to Ms.

Ashraf-Hassan as a "Pashtoun."  In commenting on the maintenance FACE website, Dr. Tual

wrote that "the Pashtoun" has "royally neglected to update" the "English drafts for the FACE

website."

106.   The term "Pashtoun" refers to ethnic Afghans who are an Eastern Iranian ethno-linguistic

group with populations primarily in Afghanistan, but also in provinces of western Pakistan.

Pashtouns became known for being the primary ethnic group that comprise the Taliban.

107.   In France, the word "Pashtoun" is used as a derogatory term to refer to the Taliban.

108.   In this same email, Dr. Tual also wrote that he would "stay at home to write [his] reports,

since the Pashtoun is also in the administrative office of FACE, and [he had] no desire to

have her between [his] legs like a dog whenever [he] review[ed] a file."

109.   In this same email, Dr. Tual also detailed his plans to remove Ms. Ashraf-Hassan's duties

and terminate her contract.  He wrote, "Can I expect that her telephone and computer will be

disposed of or will she continue to wreak havoc until she leaves or is stuffed in a "cagibi?"[1]

110.   In French, the term "cagibi" is slang for a "rat-hole" or a very small closet.

---

[1] This e-mail was in French and translated for this complaint.  The word "cagibi" was left as stated in the original
document.

111.    Ms. Ashraf-Hassan did not become aware of this offensive email until Mr. Judes showed

it to her.  Mr. Judes told her that Dr. Tual would also make these types of comments during

meetings and conversations and that, "[Dr. Tual] is the most racist and vicious person I ever

known and seen."

112.    At the time, Mr. Judes told Ms. Ashraf-Hassan that he had been aware of the

discrimination taking place against her.  Mr. Judes told her, "I can't do anything for you; I

know he wrote more than [what was in that e-mail] and made many racial remarks regarding

you."  Mr. Judes did not provide Ms. Ashraf-Hassan with a copy of Dr. Tual's email for fear

of retaliation.

113.    In January 2007, Dr. Tual carried through with his stated intention of moving her to a rat-

hole ("cagibi").  Dr. Tual moved Ms. Ashraf-Hassan into the smallest office in the Embassy

which was ordinarily reserved for interns.

114.    He also did not allow Ms. Ashraf-Hassan to gather her files or other project materials

from her former office and instead had her work from the intern office with no computer or

telephone access and without access to her files.

115.    During the last month of her employment, Ms. Ashraf-Hassan had to wait outside of Dr.

Tual's office until he arrived at work to ask for permission to use the intern office in order to

complete her work.  As Dr. Tual was often absent from the office, Ms. Ashraf-Hassan would

wait outside his office for hours without having an office space to work from, causing her

great humiliation.

116.    During his absences, Ms. Ashraf-Hassan had to carry out Dr. Tual's responsibilities of

Program Officer for FACE UPF with the help of only one intern.  When Dr. Tual returned to

work, he delegated more responsibilities to the intern than to Ms. Ashraf-Hassan.

## Termination

117.   Ms. Ashraf-Hassan travelled to France from November 1 to November 22, 2006 to visit her family in a rare use of her vacation time.   While in France, she visited the French Ministry of Foreign Affairs to discuss her employment at the Embassy of France in the United States.

118.   Ms. Ashraf-Hassan had requested an appointment with Mr. Philippe Righini at the Executive Office of the Administration: Office of Locally-Recruited Employees.

119.   Ms. Ashraf-Hassan had learned from Ms. Virginie Pont, an employee of the French Ministry of Foreign Affairs who visited the Embassy in the United States in 2005, that this office dealt with all personnel matters regarding locally-hired employees abroad.

120.   During her visit, Ms. Ashraf-Hassan complained about the harassment and discrimination issues she had undergone with Ms. Manes and Dr. Tual to Roger Wilhelm, Mr. Righini's assistant, before speaking to Mr. Righini himself.

121.   She received the following response from Mr. Righini, "You have a lot of charges, and even have proof and facts against the Embassy.   We need to find a solution for you.  If you want, we can keep this conversation confidential, but I can only do something for you if you give me permission to reveal these issues to the superiors at the Embassy.  I am not guaranteeing anything will come of it though."

122.   Ms. Ashraf-Hassan recalls that Mr. Righini seemed more concerned about the Embassy and Ministry of Foreign Affairs being attacked and facing a lawsuit rather than the actions and behavior she described to him.

123.   Ms. Ashraf-Hassan conceded to Mr. Righini's request to move forward in the hopes of finally obtaining resolution in her matter.

124.    On December 22, 2006, Ms. Ashraf-Hassan received a letter from Mr. Andre LeClerc

stating that her contract would not be renewed and would end on January 31, 2007, and to

"please use your remaining vacation time which amounts to three days" before that date.  Ms.

Ashraf-Hassan's last day at work was January 24, 2007.

125.    Ms. Ashraf-Hassan later learned that Dr. Tual had known of her meeting with Mr.

Righini at the French Ministry of Foreign Affairs in November 2006.

126.    After Mr. LeClerc issued the letter terminating her contract in December 2006, Ms.

Ashraf-Hassan met with Dr. Tual and asked him why she was being terminated.

127.    At first, Dr. Tual denied knowing anything about the matter.

128.    When Ms. Ashraf-Hassan confronted him and stated that she knew it was because of her

race and national origin, Dr. Tual did not deny the accusation.  Ms. Ashraf-Hassan then told

him that she would "seek justice" against the Embassy, and Dr. Tual responded, "No no!

Maybe it is because they knew you reported them to the Ministry."

129.    After this meeting with Dr. Tual, as Ms. Ashraf-Hassan left his office he yelled at her

down the hallway, "Yes, go ahead, go find justice" and threatened, "I will see how you can

have it."

130.    Ms. Ashraf-Hassan's employment was terminated without her receiving any benefits or

severance package.  Ms. Ashraf-Hassan was shocked that she was being terminated after

receiving an "Excellent" performance rating as the Internship Program Officer in 2006 and

placing over 200 students in internships with French companies, while simultaneously

performing her duties as coordinator of the FACE UPF.

131.    At the time of her termination, Defendant failed to articulate any reason to Ms. Ashraf-

Hassan as to why it was ending her employment.

132.    Prior to her contract being terminated, Dr. Tual had hired an intern (white, French) that Ms. Ashraf-Hassan had previously trained to replace her.

133.    Ms. Ashraf-Hassan's learned that Dr. Tual hired Pierre de Souffron (white, French, non-muslin) to replace her.

134.    A few months after Ms. Ashraf-Hassan's termination, a friend of Ms. Ashraf-Hassan's from the Embassy called her regarding a vacancy at a different section of the Embassy. Ms. Ashraf-Hassan asked her friend to provide her with more information before she applied, fearing that she would be treated unfairly. Her friend spoke with someone at the Secretary General's office and they told him that Ms. Ashraf-Hassan should "forget about trying to work for the Embassy from now on." Ms. Ashraf-Hassan suspected that the information about her complaint with the French Ministry of Foreign Affairs had reached the Secretary General's office and that is why she would not be considered for any position.

135.    On June 21, 2010, Ms. Elisabeth Hayes, Executive Director for FACE wrote in a statement that FACE UPF had received a major contribution from an American donor, Robert Wilmers, CEO of M&T Bank, towards the end of 2006 or beginning of 2007 and that the Embassy's responsibility was to match the amount donated with contributions from the French government. On April 9, 2007, Robert Wilmers (the American donor), the Ambassador of France, and the representative for FACE signed the agreement, expanding the FACE UPF and renaming it the FACE PUF.

136.    Ms. Hayes also wrote in her statement that the Embassy accomplished their responsibility to match the amount donated when Ms. Ashraf-Hassan's position was eliminated and her responsibilities were delegated to FACE's employees in New York. However, the Embassy hired Pierre de Souffron, an intern whom Ms. Ashraf-Hassan had personally trained, to

manage the PUF a few months after Ms. Ashraf-Hassan's termination.  Mr. Souffron

performed his duties at the Embassy at Washington, D.C.

137.    Had Ms. Ashraf-Hassan's contract with the Embassy been renewed, she would have

continued to receive a salary.

138.    Ms. Ashraf-Hassan's reputation has been irreparably harmed, and she was publicly

embarrassed by the Embassy's conduct.

139.    Ms. Ashraf-Hassan has experienced anxiety, depression, sleeplessness, weight loss,

agitation, and nervousness as a result of the actions described above.  Ms. Ashraf-Hassan has

also suffered damage to her professional reputation and development as a result of the actions

described above.

140.    Ms. Ashraf-Hassan has had problems paying rent, as well as problems financially helping

her children and her husband.

141.    Ms. Ashraf-Hassan has taken all appropriate actions to mitigate her damages.

## COUNT 1: HARASSMENT ON THE BASIS OF NATIONAL ORIGIN IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

142.    Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 141 as if

stated herein.

143.    Under Title VII of the Civil Rights Act of 1964 ("Title VII"), it is unlawful employment

practice for an employer to allow  its employees to harass a coworker on the basis of national

origin, thereby affecting the terms, conditions, or privileges of her employment.

144.    Defendant's actions described above constitute unlawful harassment on the basis of Ms.

Ashraf-Hassan's national origin.  Throughout her employment, Ms. Ashraf-Hassan was

subjected to a severe and pervasive hostile work environment on the basis of her national

origin as evidenced by pervasive, negative statements made to and about her.  These

statements include, but are not limited to, her supervisors and co-worker's repeatedly calling

Ms. Ashraf-Hassan a "Pakistani," "a terrorist," "a Pashtoun," and "a dog."  Further, Ms.

Ashraf-Hassan's supervisor, Ms. Manes, chastised Ms. Ashraf-Hassan for becoming

pregnant and failing to use condoms and other contraceptives and attempted to terminate her

employment.  Also, Ms. Ashraf-Hassan's last supervisor, Dr. Tual, called her children "dogs"

and expressed his desire to stuff Ms. Ashraf-Hassan into a "rat-hole" during her last month of

employment.  Finally, Defendant took numerous employment actions against her, including

but not limited to, the denial of leave, the denial of training and career development, and the

termination of Ms. Ashraf-Hassan's contract.  These conditions were sufficiently severe or

pervasive to change the terms and conditions of her employment.

145.     As a direct and proximate result of the hostile work environment based on national

origin, Ms. Ashraf-Hassan suffered lost wages, lost benefits, and lost interest on earnings,

investment opportunities, and retirement benefits; mental anguish, anxiety, stress, loss of

enjoyment of life, inconvenience, and humiliation; and harm to her professional reputation

and development.

## COUNT 2: HARASSMENT ON THE BASIS OF RACE IN VIOLATION OF TITLE VII

## OF THE CIVIL RIGHTS ACT OF 1964.

146.     Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 145 as if

stated herein.

147.     Under Title VII, it is unlawful employment practice for an employer to allow  its

employees to harass a coworker on the basis of race, thereby affecting the terms, conditions,

or privileges of her employment.

148.    Defendant's actions described above constitute unlawful harassment on the basis of Ms.

Ashraf-Hassan's race.  Throughout her employment, Ms. Ashraf-Hassan was subjected to a

severe and pervasive hostile work environment on the basis of her race as evidenced by

pervasive, negative statements made to and about her.  These statements include, but are not

limited to, her supervisors and co-worker's repeatedly calling Ms. Ashraf-Hassan a

"Pakistani," "a terrorist," "a Pashtoun," and "a dog."  Further, Ms. Ashraf-Hassan's

supervisor, Ms. Manes, chastised Ms. Ashraf-Hassan for becoming pregnant and failing to

use condoms and other contraceptives and attempted to terminate her employment.  Also,

Ms. Ashraf-Hassan's last supervisor, Dr. Tual, called her children "dogs" and expressed his

desire to stuff Ms. Ashraf-Hassan into a "rat-hole" during her last month of employment.

Finally, Defendant took numerous employment actions against her, including but not limited

to, the denial of leave, the denial of training and career development, and the termination of

Ms. Ashraf-Hassan's contract.  These conditions were sufficiently severe or pervasive to

change the terms and conditions of her employment.

149.    As a direct and proximate result of the hostile work environment based on race, Ms.

Ashraf-Hassan suffered lost wages, lost benefits, and lost interest on earnings, investment

opportunities, and retirement benefits; mental anguish, anxiety, stress, loss of enjoyment of

life, inconvenience, and humiliation; and harm to her professional reputation and

development.

## COUNT 3: HARASSMENT ON THE BASIS OF RELIGION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

150.    Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 149 as if

stated herein.

151.    Under Title VII, it is unlawful employment practice for an employer to allow its

employees to harass a coworker on the basis of religion, thereby affecting the terms,

conditions, or privileges of her employment.

152.    Defendant's actions described above constitute unlawful harassment on the basis of Ms.

Ashraf-Hassan's religion.  Throughout her employment, Ms. Ashraf-Hassan was subjected to

a severe and pervasive hostile work environment on the basis of her religion as evidenced by

pervasive, negative statements made to and about her.  These statements include, but are not

limited to, her supervisors and co-worker's repeatedly calling Ms. Ashraf-Hassan a

"Pakistani," "a terrorist," "a Pashtoun," and "a dog."  Further, Ms. Ashraf-Hassan's

supervisor, Ms. Manes, chastised Ms. Ashraf-Hassan for becoming pregnant and failing to

use condoms and other contraceptives and attempted to terminate her employment.  Ms.

Manes also criticized Ms. Ashraf-Hassan's wearing of the hijab and religious jewelry while

at the Embassy, even though Ms. Ashraf-Hassan did not wear any of these items while she

was at the Embassy.  Also, Ms. Ashraf-Hassan's last supervisor, Dr. Tual, called her children

"dogs" and expressed his desire to stuff Ms. Ashraf-Hassan into a "rat-hole" during her last

month of employment with the Embassy.  Finally, Defendant took numerous employment

actions against her, including but not limited to, the denial of leave, the denial of training and

career development, and the termination of Ms. Ashraf-Hassan's contract.  These conditions

were sufficiently severe or pervasive to change the terms and conditions of her employment.

153.    As a direct and proximate result of the hostile work environment based on religion, Ms.

Ashraf-Hassan suffered lost wages, lost benefits, and lost interest on earnings, investment

opportunities, and retirement benefits; mental anguish, anxiety, stress, loss of enjoyment of

life, inconvenience, and humiliation; and harm to her professional reputation and development.

## COUNT 4: UNLAWFUL TERMINATION ON THE BASIS OF NATIONAL ORIGIN IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

154.    Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 153 as if stated herein.

155.    Under Title VII it is unlawful employment practice for an employer to discharge an employee due to that individual's national origin.

156.    On January 31, 2007, Defendant terminated Ms. Ashraf-Hassan's contract.  Prior to her termination, Defendant had subjected Ms. Ashraf-Hassan to a hostile work environment on the bases of national origin, race, and religion.  Throughout her employment, Ms. Ashraf-Hassan was subjected to a hostile work environment on these bases as evidenced by pervasive, negative statements made to and about her.  In addition, Defendant took numerous employment actions against her, including but not limited to, the denial of leave, the denial of training and career development, and the termination of Ms. Ashraf-Hassan's contract.

157.    As a direct and proximate result of Defendant's termination of Ms. Ashraf-Hassan's contract due to her national origin, Ms. Ashraf-Hassan suffered lost wages, lost benefits, and lost interest on earnings, investment opportunities, and retirement benefits; mental anguish, anxiety, stress, loss of enjoyment of life, inconvenience, and humiliation; and harm to her professional reputation and development.

**COUNT 5: UNLAWFUL TERMINATION ON THE BASIS OF RACE IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.**

158.     Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 157 as if stated herein.

159.     Under Title VII it is unlawful employment practice for an employer to discharge an employee due to that individual's race.

160.     On January 31, 2007, Defendant terminated Ms. Ashraf-Hassan's contract.  Prior to her termination, Defendant had subjected Ms. Ashraf-Hassan to a hostile work environment on the bases of national origin, race, and religion.  Throughout her employment, Ms. Ashraf-Hassan was subjected to a hostile work environment on these bases as evidenced by pervasive, negative statements made to and about her.  In addition, Defendant took numerous employment actions against her, including but not limited to, the denial of leave, the denial of training and career development, and the termination of Ms. Ashraf-Hassan's contract.

161.     As a direct and proximate result of Defendant's termination of Ms. Ashraf-Hassan's contract due to her race, Ms. Ashraf-Hassan suffered lost wages, lost benefits, and lost interest on earnings, investment opportunities, and retirement benefits; mental anguish, anxiety, stress, loss of enjoyment of life, inconvenience, and humiliation; and harm to her professional reputation and development.

**COUNT 6: UNLAWFUL TERMINATION ON THE BASIS OF RELIGION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.**

162.     Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 161 as if stated herein.

163.   Under Title VII it is unlawful employment practice for an employer to discharge an

employee due to that individual's religion.

164.   On January 31, 2007, Defendant terminated Ms. Ashraf-Hassan's contract.  Prior to her

termination, Defendant had subjected Ms. Ashraf-Hassan to a hostile work environment on

the bases of national origin, race, and religion.  Throughout her employment, Ms. Ashraf-

Hassan was subjected to a hostile work environment on these bases as evidenced by

pervasive, negative statements made to and about her.  In addition, Defendant took numerous

employment actions against her, including but not limited to, the denial of leave, the denial of

training and career development, and the termination of Ms. Ashraf-Hassan's contract.

165.   As a direct and proximate result of Defendant's termination of Ms. Ashraf-Hassan's

contract due to her religion, Ms. Ashraf-Hassan suffered lost wages, lost benefits, and lost

interest on earnings, investment opportunities, and retirement benefits; mental anguish,

anxiety, stress, loss of enjoyment of life, inconvenience, and humiliation; and harm to her

professional reputation and development.

## COUNT 7: UNLAWFUL TERMINATION ON THE BASIS OF RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

166.   Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 165 as if

stated herein.

167.   Under Title VII it is unlawful employment practice for an employer to discriminate

against an employee because she has opposed any practice made unlawful under Title VII.

168.   Ms. Ashraf-Hassan engaged in protected activity by opposing Defendant's discriminatory

practices when in November 2006, she notified the French Ministry of Foreign Affairs'

Human Resources Offices for locally-recruited employees of the constant harassment she had undergone at the hands of her supervisors and co-workers.

169.    Defendant and Defendant's managers were aware of Ms. Ashraf-Hassan's opposition to its discriminatory practices.

170.    Because of Ms. Ashraf-Hassan's opposition to Defendant's discriminatory practices, Defendant terminated Ms. Ashraf-Hassan's contract on January 31, 2007.

171.    As a direct and proximate result of Defendant's termination of Ms. Ashraf-Hassan's contract, Ms. Ashraf-Hassan suffered lost wages, lost benefits, and lost interest on earnings, investment opportunities, and retirement benefits; mental anguish, anxiety, stress, loss of enjoyment of life, inconvenience, and humiliation; and harm to her professional reputation and development.

## COUNT 8: HARASSMENT ON THE BASIS OF PREGNANCY IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

172.    Ms. Ashraf-Hassan incorporates all the allegations contained in paragraphs 1 – 171 as if stated herein.

173.    Under Title VII, it is unlawful employment practice for an employer to allow its employees to harass a coworker on the basis of sex, thereby affecting the terms, conditions, or privileges of her employment.  The Pregnancy Discrimination Act of 1978 modified the term "basis of sex" to include "because of or on the basis of pregnancy, childbirth, or related medical conditions."

174.    Defendant's actions described above constitute unlawful harassment on the basis of Ms. Ashraf-Hassan's pregnancy.  When Ms. Ashraf-Hassan became pregnant in 2002, the Embassy subjected her to a severe and pervasive hostile work environment on the basis of

her pregnancy as evidenced by pervasive, negative statements made to and about her by her supervisor, Ms. Manes. These statements included, but are not limited to, counseling her on the use of birth-control and condoms and stating she "lost her trust in" Ms. Ashraf-Hassan after she became pregnant. Further, Ms. Manes attempted to terminate Ms. Ashraf-Hassan's employment after she became pregnant. These statements and actions were sufficiently severe or pervasive to change the terms and conditions of Ms. Ashraf-Hassan's employment.

175.    As a direct and proximate result of the hostile work environment based on pregnancy, Ms. Ashraf-Hassan suffered lost wages, lost benefits, and lost interest on earnings, investment opportunities, and retirement benefits; mental anguish, anxiety, stress, loss of enjoyment of life, inconvenience, and humiliation; and harm to her professional reputation and development.

**WHEREFORE,** Ms. Ashraf-Hassan prays this Court to:

a.    Grant judgment in her favor against Defendant;

b.    Grant her declaratory and injunctive relief, including but not limited to reinstating Ms. Ashraf-Hassan to her position with the Defendant;

c.    Award her back pay, compensate her for lost benefits, and otherwise make her whole;

d.    Award her compensatory damages in an amount to be shown at trial, but in no event less than $300,000;

f.    Award her reimbursement of the attorneys' fees and costs she has expended in litigating this matter; and

g.    Grant her such other and further relief as justice may require.

April 29, 2011

Ari M. Wilkenfeld
Bar No. 461063
The Law Offices of Gary M. Gilbert & Associates, P.C.
8401 Colesville Road, Suite 300
Silver Spring, MD 20910
Tel:    (301) 608-0880
Fax:    (301) 608-0881
Email: AWilkenfeld@GGilbertLaw.com

Attorney for Plaintiff, Saima Ashraf-Hassan