UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAIMA ASHRAF-HASSAN,<br><br>    Plaintiff,<br><br>    v.<br><br>EMBASSY OF FRANCE IN THE<br>UNITED STATES,<br><br>    Defendant. | Civil Action No. 11-805 (JEB) |

## MEMORANDUM OPINION

Plaintiff Saima Ashraf-Hassan, a citizen of France who was born in Pakistan, was employed by Defendant French Embassy here in Washington from February 2002 through January 2007. During her employment, she was responsible for administrative tasks for several Embassy programs. In bringing this suit under Title VII, Ashraf-Hassan claims that she was both subjected to a hostile work environment by her supervisors and colleagues and ultimately terminated illegally on the basis of national origin, race, religion (Islam), retaliation, and pregnancy. Defendant has now moved to dismiss the suit under Rule 12(b)(6) for failure to state a claim. Because the Court finds that her termination claims were not exhausted in a timely manner, it will grant Defendant's Motion as to those (Counts IV, V, VI & VII). Plaintiff's remaining claims (Counts I, II, III & VIII), however, which allege a hostile work environment, may proceed.

**I.     Background**

According to her Amended Complaint, which must be presumed true for purposes of this Motion, Plaintiff came to the United States in November 2001 to work as an unpaid intern at the

French Embassy. Amended Compl., ¶¶ 13, 14. While interning, she learned of a paid position at the Embassy that would allow her remain in the United States beyond her internship. Id., ¶¶ 16-24. Plaintiff was ultimately hired for this position, and she began managing the internship-placement program, effective February 1, 2002. Id., ¶¶ 26-27. In this position, Ashraf-Hassan was supervised by Chantal Manes, head of the Cultural Service at the Embassy. Id., ¶ 46. When Manes left the Embassy in December 2005, Robby Judes, Joint Cultural Advisor, supervised Ashraf-Hassan's internship-program responsibilities. Id., ¶ 48.

In addition to managing the internship program, Ashraf-Hassan also helped to coordinate the Embassy's institutional partnership with the French-American Cultural Exchange (FACE) University Partnership Fund (UPF), a program between American and French universities. Id., ¶¶ 39, 45. The UPF was replaced by the Partnership University Fund (PUF) in 2007, though Ashraf-Hassan's duties remained the same. Id., ¶ 42. In these duties, Plaintiff was supervised by Dr. Christian Tual, who managed the day-to-day administration of both the UPF and PUF in Washington. Id., ¶ 43.

Ashraf-Hassan claims that upon arriving at the Embassy she was subjected to a hostile work environment, including comments by Manes and co-workers at the Embassy regarding her national origin and ethnicity, such as:

- references by Manes to terrorists as "[y]our people," id., ¶ 55;

- comments by Manes that she "[didn't] know why your people do things like this," in reference to terrorist attacks, id., ¶ 56;

- comments by Manes in reference to a police raid following September 11th attacks that "[t]he Pakistani did it again!" id., ¶ 57;

- a comment by a colleague that "[n]ow we hire terrorists," directed at Ashraf-Hassan, id., ¶ 58;

- instructions by Manes that Ashraf-Hassan was "not to wear the hijab or any jewelry identifying [her] religion," id., ¶ 59; and

- a comment by Manes that "people like [Plaintiff] should go back to where they came from."

Id., ¶ 91 (all internal quotation marks omitted). Further, upon discovering that Ashraf-Hassan was pregnant, Manes lectured her about condoms and birth control. Id., ¶ 63. A month later, Manes informed her that she would be terminated at the end of her probationary period. Id., ¶ 65. The Ambassador subsequently intervened, reprimanding Manes and returning Ashraf-Hassan to her position. Id., ¶¶ 71-74. Ashraf-Hassan claims that after Manes was reprimanded, she continued to exclude her from meetings and treated her differently from her colleagues. Id., ¶¶ 76-80.

In addition to the mistreatment from Manes and her colleagues, Ashraf-Hassan claims that she suffered similar abuse from another supervisor, Dr. Tual. See id., ¶¶ 92-115. Specifically, she claims Tual

- "made comments about how much he disliked Chinese, Indian, and Pakistani people," id., ¶ 93;

- "asked Ms. Ashraf-Hassan why she was not looking for a job at the Pakistani Embassy because she might be better there," id., ¶ 94;

- questioned Ashraf-Hassan's status "as a French national because she was a Pakistani and a Muslim and that it would be better for her to work at the Pakistani Embassy," id., ¶ 95;

- referred to Ashraf-Hassan and her children as "dogs," id., ¶ 98;

- sent an email in January 2007 referring to Ashraf-Hassan as a "Pashtoun," "a derogatory term to refer to the Taliban," id., ¶¶ 105-107, and asserted that she should be removed from her duties, have her contract terminated, and she should be "stuffed in a 'cagibi'" – "slang for a 'rat-hole,'" id., ¶¶ 109-110; and

- ultimately removed her to the smallest office in the Embassy (a "cagibi"), with no computer or telephone access.

3

Id., ¶¶ 113-14 (some internal quotation marks omitted).

In November 2006, on a visit to France, Ashraf-Hassan raised these issues with staff at the French Ministry of Foreign Affairs. Id., ¶¶ 117-123. On December 22, 2006, she received a letter stating that her contract would not be renewed and would end on January 31, 2007. Id., ¶ 124. Her last day of work was January 24, 2007. Id. At the time of her termination, the Embassy did not provide her with any reasons as to why her employment was ending. Id., ¶ 131.

On July 13, 2007, Ashraf-Hassan filed a charge of discrimination with the Equal Employment Opportunity Commission's Washington Field Office, and on January 31, 2011, she received her right to sue letter from the EEOC. Id., ¶¶ 8, 9. She subsequently filed this suit against the Embassy of France, asserting eight causes of action under Title VII: harassment on the basis of national origin (Count I), race (Count II), religion (Count III), and pregnancy (Count VIII); and unlawful termination on the basis of national origin (Count IV), race (Count V), religion (Count VI), and retaliation (Count VII). Conceding that immunity does not protect it here, Mot. at 1, the Embassy has now filed a Motion to Dismiss under Rule 12(b)(6).

**II.      Legal Standard**

In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v.

Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." Although the notice-pleading rules are "not meant to impose a great burden on a plaintiff," Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347 (2005), and "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (internal quotation omitted). Plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 556 (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)), the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 555.

## III. Analysis

In its Motion, Defendant asserts both procedural and substantive attacks on Plaintiff's Title VII claims. The former challenge Plaintiff's failure to administratively exhaust her claims, as well as defects in service. The latter challenge the merits of Plaintiff's claims, arguing that 1) she "has not offered any evidence in her Complaint to show that the Embassy knew or should have known of Dr. Tual's hostile conduct and therefore failed to stop it," Mot. at 18; and 2) she "failed to provide any evidence to show that the Embassy's legitimate reason to eliminate her position was pretextual." Id. at 20.

Addressing each argument in turn, the Court first finds that Plaintiff failed to file her EEO charge for her wrongful-termination claims within the required 180-day presentment window, thus requiring their dismissal; her hostile-work-environment claims, on the other hand, were timely filed and thus survive this Motion. Additionally, the Court finds that neither of Defendant's service arguments is availing. As to Defendant's challenges to the merits, the Court rejects without prejudice both arguments as it would be premature to engage in such fact-intensive inquiries before Plaintiff has been afforded an opportunity in discovery to develop her evidentiary support.

    A. Procedural Challenges

       *1. Exhaustion*

Title VII complainants may file an action in federal court only after exhausting their administrative remedies. See Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010); Gupta v. Northrop Grumman Corp., 462 F. Supp. 2d 56, 58 (D.D.C. 2006). Title VII's exhaustion requirements, however, are not jurisdictional. Artis v. Bernanke, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (citing Menominee Indian Tribe of Wis. v. United States, 614 F.3d 519, 527 (D.C. Cir. 2010)). Accordingly, a "12(b)(6) motion to dismiss for 'failure to state a claim upon which relief can be granted' is the appropriate vehicle to challenge an alleged failure to exhaust" administrative remedies under Title VII. Rosier v. Holder, 2011 WL 2516152, at *2 (D.D.C. 2011) (citing Artis, 630 F.3d at 1034 n.4). "Because untimely exhaustion of [Title VII] administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it." Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997) (citation omitted).

In ruling upon a motion to dismiss, a court may ordinarily consider only "the facts alleged in the Complaint, documents attached as exhibits or incorporated by reference in the

complaint, and matters about which the Court may take judicial notice." Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted). Generally, where "matters outside the pleadings are presented to and not excluded by the court, the motion [to dismiss] must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). The Court here, however, may rely on Plaintiff's EEO Intake Questionnaire and her Equal Employment Opportunity Commission charge, which she has attached to her Opposition as Exhibits 1 and 4, without converting the motion to dismiss into one for summary judgment. See Fennell v. AARP, 770 F. Supp. 2d 118, 124 n.3 (D.D.C. 2011); Felder v. Johanns, 595 F. Supp. 2d 46, 58-59 (D.D.C. 2009) (consideration of charge of discrimination proper because, when presented with a motion to dismiss, a court may consider "any documents attached to [the non-movant's pleadings] or incorporated by reference") (citing Equal Empl. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997)). Furthermore, "[a] court may consider an EEOC complaint and Notice of Charge without converting a motion to dismiss into a motion for summary judgment because such records are public document[s] of which a court may take judicial notice." Ndondji v. InterPark Inc., 768 F. Supp. 2d 263, 272 (D.D.C. 2011) (internal quotation marks omitted).

          a.    Timeliness of Administrative Exhaustion

In contending that Plaintiff failed to exhaust her administrative remedies, Defendant begins with an argument about timeliness. The timeliness of Plaintiff's exhaustion here revolves around two central questions. Defendant first argues that "Plaintiff's entire Complaint should be dismissed for failure to file the EEOC charges within 180 days of the Embassy's last employment decision." See Mot. at 6. Plaintiff responds that a 300-day window – and not a 180-day window – governs the date by which she was required to file a charge of discrimination

with the EEOC; as a result, she contends, all claims were timely filed. See Opp. at 3-6. After resolving this dispute, the Court must next determine when the alleged discriminatory practices – *i.e.*, Plaintiff's termination and the hostile work environment – took place in order to calculate the deadline for filing.

An individual seeking to challenge an unlawful employment practice under Title VII must file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). This window, however, may be extended to 300 days where a worksharing agreement exists between the EEOC and a state or local Fair Employment Practices (FEP) agency. Carter v. George Washington Univ., 387 F.3d 872, 879 (D.C. Cir. 2004) (citing 29 C.F.R. § 1601.13(a)(4)(ii)(A)). As the District of Columbia Office of Human Rights (DCOHR) has entered into such an agreement with the EEOC, Plaintiff argues that the applicable time limitation for filing a charge of discrimination in the District of Columbia should be extended to 300 days. See Opp. at 3. Defendant, however, contends that the extension of the presentment window is only triggered where a plaintiff has initially instituted proceedings with the state. See Reply at 3. Here, it argues that Plaintiff cannot invoke the exception as she "has never sought to present her grievances before the D.C. administration and . . . the D.C. administration has never taken jurisdiction over them." Id.

Plaintiff responds that the existence of the worksharing agreement opens the 300-day window, regardless of whether an employee ever files a charge with the D.C. agency. See Opp. at 3. In support of her position, Plaintiff points to a District of Columbia Court of Appeals decision, Griffin v. Acacia Life Ins. Co., 925 A.2d 564 (D.C. 2007). In Griffin, the court found an employee's claims to be timely where he had filed with the EEOC within 300 days of the unlawful employment practice, even though he had never instituted a claim with the state

8

agency. Id. at 568-69.  In so holding, it affirmed the Superior Court's determination that

"'[e]ven though plaintiff did not file a claim with the D.C. agency, claims were instituted with the state agency on her behalf, by virtue of the work-share agreement' . . . 'When plaintiff filed her claim with the EEOC, it was automatically cross-claimed with the [OHR]; therefore, plaintiff instituted a claim with the state agency, and the 300-day filing period applies.'" Id.; see also Tucker v. Howard Univ. Hosp., 764 F. Supp. 2d 1, 6 (D.D.C. 2011) (citing Griffin to support its determination that plaintiffs had 300 days to file an EEOC charge, but providing no analysis as to why such window was appropriate).

As the Court is not interpreting an issue of D.C. law, it is not bound to follow Griffin, particularly since the D.C. Circuit has opined differently in Simpkins v. Washington Metro. Area Transit Auth., No. 96-7188, 1997 WL 702349 (D.C. Cir. Oct. 10, 1997). In Simpkins, admittedly an unpublished opinion without precedential value, see D.C. Cir. Rules 32.1(b)(1)(A), 36(e)(2), the D.C. Circuit reasoned that the 300-day period only applied where a party had initiated proceedings with the state or local agency:

> The Supreme Court has explained that the purpose of the longer filing period in "deferral states" (*i.e.*, those with a local agency empowered to address discrimination) is "to prevent forfeiture of a complainant's federal rights while participating in state proceedings." Mohasco Corp. v. Silver, 447 U.S. 807, 821 (1980). If the complainant is not participating in a state proceeding, then there is no reason to extend the 180-day filing period.  "To allow a Title VII litigant the benefit of the extended limitations period merely because she fortuitously works in a deferral state would ignore the plain language of the statute and its legislative purpose." Kocian v. Getty Refining & Mktg. Co., 707 F.2d 748, 751 (3d Cir. 1983).

Id. at *3; see also Berger v. Medina Cty. Ohio Bd. of Cty. Comm'rs, 295 Fed. Appx. 42, 46 (6th Cir. 2008) (300-day limitations period did not apply where aggrieved party did not first file with appropriate Tennessee agency); Tate v. Shelby Cty. Road Dept., No. 93-5358, 1994 WL 91687,

9

at *1 (6th Cir. March 22, 1994) (180-day filing period applied and plaintiff's charge was untimely where plaintiff failed to file charges with state agency).  This seems the more convincing rationale.  Where Plaintiff has failed to pursue her grievances through the state's administrative processes, as here, she cannot invoke the longer presentment window and must file her claims within the 180-day window to be timely.

The Court must next determine the dates of the alleged unlawful employment practices so that it may apply the 180-day window and resolve the timeliness question.  In Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court provided guidance on what constitutes an "unlawful employment practice" and when such an act can be understood to have "occurred," both for discrete discriminatory acts and hostile-work-environment claims.  Id. at 110.  For purposes of timeliness, discrete discriminatory acts occur on the day that they "happened."  Id.  In the event of an employee's discharge, it is the "date that the parties understood the termination to be final."  Id. at 111.  Plaintiff claims that she received a letter on December 22, 2006, "stating that her contract would not be renewed and would end on January 31, 2007."  See Am. Compl., ¶ 124.  Defendant, conversely, asserts that Plaintiff was verbally informed of the decision on December 14, 2006.  See Mot. at 7.  In either event, Plaintiff's completion of the EEOC Intake Questionnaire on July 6, 2007, see Opp., Exh. 1 (EEO Intake Questionnaire), falls outside of the 180-day window.  While Plaintiff's last day of work at the Embassy was January 24, 2007, Am. Compl., ¶ 124 – a date that would make her discharge claim timely – this date cannot be considered as the date that the discriminatory act "occurred," since both parties understood the termination to be final in December 2006.  See Delaware State College v. Ricks, 449 U.S. 250, 258 (1980) (alleged discrimination occurred and statute-of-limitations period commenced at time that termination was decided and communicated to

employee, not at "the time at which the consequences of the acts became most painful" (internal citations omitted)); Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (limitations period began to run when employees received letters notifying them of decision to terminate their employment, not on date on which employment terminated); Rattigan v. Gonzales, 503 F. Supp. 2d 56, 69-70 (D.D.C. 2007) (same).  Plaintiff's termination claims must thus be dismissed.

While Plaintiff's claims of discrimination based on her termination may be untimely, her claims based on a hostile-work-environment theory are not.  As the Supreme Court noted in Morgan, hostile-work-environment claims by "their very nature involve[] repeated conduct." Id. at 115.  For purposes of timeliness, the "unlawful employment practice" "cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id.  Because a hostile-work-environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice,"

> [t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

Id. at 117 (emphasis added).  Because Plaintiff need only file a charge within 180 days "of any act that is part of the hostile work environment," id. at 118 (emphasis added), the Court finds that the allegations set forth in Plaintiff's Intake Questionnaire of July 6, 2007, are sufficient.  See Opp., Exh. 1 (Intake Questionnaire).

In the intake form, Plaintiff describes discrimination spanning a five-year period, including two specific acts of discrimination in 2007.  Id.  These acts include being "compared to

11

a terrorist" by colleagues and receiving "racial comments" in an email from her supervisor in January of 2007. Id. Although the exact date in January is not mentioned, because Defendant bears the burden to prove untimeliness and has not alleged that these comments occurred more than 180 days before her July filing, the Court finds that claims based on this theory are timely. The Court will thus dismiss Plaintiff's discrimination claims based on her termination as untimely (Counts IV, V, VI & VII), but find that her claims based on a hostile work environment were timely filed.

                b.     Scope of Exhaustion

Defendant next raises two other exhaustion arguments in its Motion, which it asserts should limit the scope of Plaintiff's claims. Specifically, the Embassy maintains that Plaintiff failed to put it on notice of 1) claims based on the conduct of employees other than Tual, and 2) a claim that it retaliated against Plaintiff. See Mot. at 11. In its Reply, Defendant mentions an additional exhaustion argument for the first time, challenging Plaintiff's pregnancy-based claim (Count VIII). See Reply at 8. The Court will address each exhaustion argument in turn.

When an individual files suit in federal court following the exhaustion of her administrative remedies, her claims are limited to those that are "like or reasonably related to the allegations of the charge and growing out of such allegations," so the agency may have fair notice of the claims against it. Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995) (internal citation omitted). To be "like or reasonably related to" claims that have been exhausted, they must "'[a]t a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" Payne v. Salazar, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal citations omitted). A party may also present claims that "arose out of same basis for discrimination alleged" in the administrative proceedings below. Jones v.

Billington, 12 F. Supp. 2d 1, 7 (D.D.C. 1997). In Jones, the court determined that a hostile-work-environment claim was properly before the court, even though the administrative claims did not formally allege the charge, as "[t]he hostile work environment alleged in the complaint is not based on conduct that is different from that alleged in the EEOC charge. Furthermore, the basis for the hostile-work-environment is race, which is the same basis alleged in the EEOC charge." Id.

Defendant first claims that Plaintiff failed to "put the Embassy on notice that she was being harassed by employees other than Dr. Tual." See Mot. at 13. Plaintiff, however, points out that her EEO Charge clearly indicated that the discrimination she faced was not limited to Tual. See Opp. at 12. The Charge specifically stated that she had "endured various discriminatory acts by my colleagues and supervisors who subjected me to work in a hostile environment because of my race, color, national origin and religion" and that "colleagues make fun of my religion and national origin by comparing me to a terrorist." See Opp., Exh. 4 (EEO Charge) (emphases added). While the Charge identifies only Tual by name, the Court finds that it nonetheless provided Defendant with sufficient notice that Plaintiff faced discrimination from her colleagues and supervisors, not just Tual.

Defendant also argues that Plaintiff failed to give notice in her EEO Charge of any retaliatory-termination claim (Count VII). See Mot. at 13. Plaintiff explains that her employer was on notice that she was alleging a retaliatory discharge based on a January 24, 2007, letter she sent to the French Ambassador. Mot., Exh. 3 ("Letter to the Ambassador"). The Court however, need not address this argument, as it has already found all termination claims to be untimely. See Section III(A)(1)(a), *supra*. In other words, this claim has already been dismissed on other grounds.

Defendant's final exhaustion argument challenging Plaintiff's pregnancy-based hostile-work-environment claim (Count VIII) is raised for the first time in its Reply. See Reply at 8. Nowhere in its Motion does Defendant make this argument, despite the fact that it asserts similar points with regard to Plaintiff's retaliation claim. See Mot. at 11-18. As the D.C. Circuit has consistently held, the Court should not address arguments raised for the first time in a party's reply. See, e.g., Am. Wildlands v. Kempthorne, No. 07-5179, 2008 WL 2651091, at *8 (D.C. Cir. July 8, 2008) ("We need not consider this argument because plaintiffs . . . raised it for the first time in their reply brief."). Therefore, the Court will not address Defendant's exhaustion argument with regard to Plaintiff's pregnancy-based claim.

  *2. Service*

Defendant's remaining procedural objections relate to service, and they cover two areas: service of the EEOC charges and service of the Complaint. In challenging the timely service of the EEOC charges, Defendant contends that Plaintiff failed to serve charges on the Embassy within ten days of the filing, as required by 42 U.S.C. § 2000e-5(e). See Mot. at 9. Plaintiff rejoins that it is the EEOC's duty to serve the employer, not the Plaintiff's; as such, "it would be contrary to the remedial purposes of Title VII and federal courts" to penalize Plaintiff where it is "the EEOC, and not Plaintiff, [who] failed to comply with its statutorily mandated duties." See Opp. at 6. As Defendant provides no authority for its argument in the Motion and fails to respond to Plaintiff's point in its Reply, the Court will deem it abandoned at least for now.

Defendant further challenges the timeliness of the service of the Complaint. While acknowledging that Federal Rule of Civil Procedure 4(m), which voids a summons if not served within 120 days, does not apply where Defendant (as here) is an agency of a foreign state, the Embassy nonetheless argues that the summons and the Complaint must be served "within a

reasonable amount of time." See Mot. at 11.  It further maintains that 120 days is a reasonable limit "since the method of service did not present any unusual difficulties." Id.  Plaintiff responds that it served the Amended Complaint within the 120-day deadline and that even if the Court were to determine that service of the original Complaint was outside of the 120-day window, that service was reasonable as Defendant was not harmed in any way by the delay.  See Opp. at 7-11.  The Court agrees with Plaintiff.

As both parties recognize, the 120-day window for service does not apply to Defendant given its status as a foreign entity.  Mot. at 10; Opp. at 7.  Instead, the Court should apply a standard of "flexible due diligence."  See Overseas Partners, Inc., v. Progen Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti, et al., 15 F. Supp. 2d 47, 49-50 (D.D.C. 1998) (recognizing "flexible due diligence" standard for determining whether service of process on foreign national was timely); James v. Rutil, No. 95-530, 1997 WL 151174, at *5 (S.D. Ind. March 14, 2007) (elaborating on standard as "measured by the reasonableness of Plaintiff's effort as well as the prejudice to the defendant from any delay").  Plaintiff here attempted to serve defendant through its representative, who refused service.  See Opp. at 9-11.  Eventually, Plaintiff served Defendant with the Amended Complaint within 120 days of its filing and within seven months of the filing of the original Complaint, see Opp. at 7, a timeframe that the court does not find unreasonable.  Further, as Defendant has not shown any prejudice from the delay, the Court finds that service here meets the "flexible due diligence" standard.

    B.  Merits Challenges

In addition to its procedural challenges, the Embassy also asserts two arguments that address the merits of Plaintiff's suit.  Defendant styles both arguments as appropriate for review under a motion-to-dismiss standard, Mot. at 18-25; however, as Plaintiff correctly observes, both

involve fact-based inquiries that are more appropriately resolved at the summary judgment stage. See Opp. at 14. Despite Defendant's contention that its challenges can be resolved based solely on allegations in the Complaint, its very language contradicts this claim. See, e.g., Mot. at 20 ("Plaintiff failed to provide any evidence to show that the Embassy's legitimate reason to eliminate her position was pretextual.") (emphasis added). A decision now would thus be premature.

Defendant first argues that in order to hold the Embassy responsible for the conduct of one of its employees, Plaintiff must "allege evidence showing that the Embassy knew about the harassing conduct of Dr. Tual and that it failed to stop it." See Mot. at 18. The Court agrees with Plaintiff that it would be unduly hasty to grant summary judgment before she has been afforded any opportunity to develop facts supporting her claim of discrimination. See, e.g., Gordon v. Napolitano, 786 F. Supp. 2d 82, 86 (D.D.C. 2011) (reasoning that plaintiff's retaliation claims "are certainly thin and may well not survive a future summary judgment motion. Nevertheless, to dismiss them or convert this into a motion for summary judgment is premature at this time because Plaintiff has not had the benefit of any discovery to bolster her claims."); McWay v. LaHood, 269 F.R.D. 35, 37-38 (D.D.C. 2010) ("[T]he D.C. Circuit has directed that because it is difficult for a plaintiff to establish proof of discrimination, the court should view [pre-discovery] summary-judgment motions . . . with special caution.") (citing Aka v. Washington Hosp. Ctr., 116 F.3d 876, 879-80 (D.C. Cir. 1997), overturned on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*)); Gray v. Universal Serv. Admin. Co., 581 F. Supp. 2d 47, 56 (D.D.C. 2008) (recognizing that summary judgment "must be approached with special caution" in discrimination cases) (internal citations omitted). As the Court agrees that Plaintiff is

entitled to conduct discovery, it will deny this part of Defendant's Motion without prejudice to be renewed subsequently.

Defendant's second merits-based argument challenges Plaintiff's failure to provide evidence to show that the Embassy's proffered legitimate reason to eliminate her position was pretextual. See Mot. at 20-25. Plaintiff responds with the same point it made to the prior merits challenge, contending that such arguments are premature prior to any discovery. See Opp. at 14. For the reasons just mentioned, the Court finds summary judgment at this stage is not warranted. See also Richardson v. Gutierrez, 477 F. Supp. 2d 22, 31 (D.D.C. 2007) (rejecting similar pretext argument as premature as "the question of pretext 'is necessarily fact intensive and granting a motion for summary judgment on this issue prior to providing the parties with any opportunity for discovery is clearly contrary to this Circuit's precedent'" (internal citations omitted)); Amiri v. Hilton Washington Hotel, 360 F. Supp. 2d 38, 42 (D.D.C. 2003) (same). Once discovery has taken place, Defendant is certainly free to file a summary judgment motion that repeats these (or adds new) bases for judgment.

## IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order that will grant Defendant's Motion to Dismiss Plaintiff's untimely termination claims (Counts IV, V, VI & VII) and otherwise deny Defendant's Motion as to the remaining claims (Counts I, II, III & VIII).

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: July 20, 2012