UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAIMA ASHRAF-HASSAN,

    Plaintiff,

        v.

EMBASSY OF FRANCE IN THE
UNITED STATES,

    Defendant.

Civil Action No. 11-805 (JEB)

## MEMORANDUM OPINION

Shortly after September 11, 2001, Plaintiff Saima Ashraf-Hassan arrived in the United States and began working for the French Embassy. Ashraf-Hassan was born in Pakistan but is a French citizen who studied law at the Sorbonne. She is also a practicing Muslim. She brought this suit alleging that the Embassy subjected her to a hostile work environment on account of her national origin, race, religion, and pregnancy, all in violation of Title VII. Specifically, she recounts that she was called a terrorist and a "Pashtoun," which she regards as an ethnic slur; she and her children were referred to as dogs; she was admonished not to "wear any headscarves or wear any religious signs," despite never having done so at work; she was told that she should not have a child and lectured on the use of birth control; she was temporarily fired for being pregnant; she was terminated and was replaced by a French man; and, during her last weeks of employment, she was relegated to the intern room, forced to stand in the hallway for long stretches of time waiting for her supervisor to give her access to that room, and had her phone and email access taken away. Ashraf-Hassan's supervisors were allegedly responsible for these acts, all of which were allegedly motivated by discriminatory animus.

1

The Embassy now moves for summary judgment, claiming that, based on the evidence presented thus far, no reasonable jury would find that these acts created a hostile work environment. Alternatively, it argues that it should not be held vicariously liable for the actions of its employees. Although plaintiffs must meet a high bar to prove a hostile-work-environment claim, the evidence presented by Ashraf-Hassan is extreme enough to overcome summary judgment and merit a trial. Furthermore, because the harassment and her termination were carried out by her supervisors, who presumptively act on the Embassy's behalf, Defendant cannot avoid liability at this stage of litigation. The Motion for Summary Judgment will thus be denied. Ashraf-Hassan also separately moves for an adverse inference based on the alleged destruction of evidence, but the Court need not resolve that issue at this time.

**I.      Background**

Many of the facts in this case are disputed. On a motion for summary judgment, the Court must take the evidence of the non-movant – here, Plaintiff – as true and must view the facts in the light most favorable to her. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In setting forth these facts, therefore, the Court does not endorse them as true; instead, they are simply allegations for which Plaintiff provides record support.

Ashraf-Hassan, a former employee of the French Embassy in Washington, D.C., is a French citizen who was born in Pakistan. See Mot., Exh. 3 (Deposition of Saima Ashraf-Hassan, Part I) at 10:1-21, 217:11-12, 221:8-20. She is also a practicing Muslim. See id. at 31:7-39:7. She originally came to the United States to complete research for her Ph.D. in law, which she was pursuing at the Sorbonne. See id. at 10:1-21. After arriving in Washington, Ashraf-Hassan obtained an internship with the French Embassy, which later led to an offer of full-time employment. See id. at 10:1-11:3. From February 2002 to January 2007, she worked for the

Embassy. See id. at 10:1-12:17, 220:11-16. Her duties included supervising the Embassy's internship-placement program and coordinating the Embassy's partnership with the French-American Cultural Exchange (FACE) in New York. See Mot., Exh. 2 (Pl. Resp. to Int.) at 23.

During her five years of employment with the Embassy, Ashraf-Hassan alleges that she was subjected to discrimination on the basis of national origin, race, religion, and pregnancy. See id. at 6-12; see also Am. Compl., ¶¶ 142-75. Primarily, she claims that she was subjected to a hostile work environment permeated by harassment so severe or pervasive as to alter the conditions of her employment.

According to Ashraf-Hassan, the hostile treatment began almost the moment she arrived at the Embassy. Her supervisor, Chantal Manes, often "ask[ed] Plaintiff questions regarding her religion, race, and national origin," and commented on the fact that she was from the same region as the 9/11 terrorists – even though Ashraf-Hassan grew up in France. See Pl. Resp. to Int. at 6. When Manes, who oversaw the internship-placement program, read about a group of Pakistani terrorists who were arrested in New York, she waved a newspaper at Ashraf-Hassan and stated that "her people had done it again." Id. Manes also repeatedly instructed her that "she should not wear any headscarves or wear any religious signs, symbols or jewelry," despite the fact that Plaintiff had never done so inside the Embassy. Id. at 7.

In March or April of 2002, Ashraf-Hassan discovered that she was pregnant and mentioned the pregnancy to a colleague and perhaps also to Manes. See id.; see also Mot., Exh. 18 (Letter to Secretary General). Shortly thereafter, Manes allegedly summoned Plaintiff to her office and began "lecturing [her] for an hour" about the pregnancy and "yelling at [her] like [she] was a criminal." Ashraf-Hassan Dep., Part I at 238:16-21. Ashraf-Hassan recollects Manes scolding, "You should not have this baby. You should have planned it. You should not accept a

3

job if you're planning [to have] a baby. You should take condoms, pills." Id. at 237:18-21.
Manes then fired Ashraf-Hassan for failing to "earn [her] trust." See Mot., Exh. 4 (Deposition of
Saima Ashraf-Hassan, Part II) at 13:13. Two white, French women in the office were also
pregnant at the time; neither was lectured or fired in the wake of her pregnancy. See Pl. Resp. to
Int. at 7; Ashraf-Hassan Dep., Part I at 248:1-9.

Ashraf-Hassan wrote letters to the Ambassador and Secretary General appealing Manes's
decision. See Pl. Resp. to Int. at 7. A few days later, the Ambassador's assistant contacted
Ashraf-Hassan and asked her to return to work. See id.; Ashraf-Hassan Dep., Part I at 140:3-19.
The Ambassador himself later apologized, confirming that she should not have been fired. See
Ashraf-Hassan Dep., Part I at 140:3-19. The Embassy does not dispute that Ashraf-Hassan was
fired, but it claims she was terminated for failure to disclose her pregnancy to Manes – for a lack
of candor – rather than as a result of discrimination. See Mot. at 4-7, 19-21.

As Ashraf-Hassan recounts, after she returned to work, she was treated differently from
Manes's other employees. She "was frequently informed of meetings after they had begun"; was
"required to fulfill other employees' responsibilities while they were on vacation" or lunch,
while no one did the same for her; "was denied vacation days even though she had vacation days
left"; and was not welcome at events or annual meetings that all other employees attended. See
Pl. Resp. to Int. at 7-8. When a colleague spotted Ashraf-Hassan walking down the hall and
commented to Manes, "Now we hire terrorists," Plaintiff recalls Manes smiling and nodding, as
if she were not even there. Id. at 8. After this incident, she "spent hours . . . crying in [her]
office." Ashraf-Hassan Dep., Part I at 229:18.

In October of 2004, Ashraf-Hassan began to work as an assistant to Christian Tual, who
oversaw the FACE cultural-exchange program; this was in addition to her duties under Manes.

See Pl. Resp. to Int. at 8. Tual, as Ashraf-Hassan describes, created a racially charged work environment. He allegedly "told Plaintiff that he did not like Pakistanis, Indians, and Chinese." Id. at 9. He also "asked Plaintiff on several occasions why she was not working at the Pakistani Embassy and told her that she would be better off there." Id. In addition, Ashraf-Hassan claims that Tual referred to her and her children as "dogs." See Ashraf-Hassan Dep., Part II at 141:11-14.

Eventually, Robby Judes, who is black, replaced Manes as Ashraf-Hassan's primary supervisor. See Pl. Resp. to Int. at 9. Judes and Tual had a difficult working relationship; Tual allegedly "did not believe Mr. Judes was qualified" for the job "because of Mr. Judes['s] race." Id. Distraught by the mounting tension at work, her low salary, and the discriminatory work environment, Ashraf-Hassan sought help. In the spring of 2005, she recalls that she contacted Virginie Pont, a representative of the Ministry of Foreign Affairs, and discussed the situation. See id. at 8. Nothing came of that meeting. In September 2006, Ashraf-Hassan wrote to Kareen Rispal, Tual's supervisor in New York, to complain about her working conditions. Id. at 9; see Mot., Exh. 21 (Letter to Kareen Rispal) at 2-9. Again, nothing was done. See Pl. Resp. to Int. at 9.

While in France in November 2006, Ashraf-Hassan also recalls having spoken to Phillipe Righini and Roger Wilhelm at the Ministry of Foreign Affairs, who then contacted Rispal in New York. Id. at 10. Rispal reached out to Tual in early December. Mot., Exh. 8 (Letters from Christian Tual) at 2. Tual later relayed to Ashraf-Hassan that Rispal had resolved her complaints related to salary, but he did not mention anything about discrimination. See id. Ashraf-Hassan believes that her discrimination complaints may have trickled down to Tual and caused him to retaliate against her. See Pl. Resp. to Int. at 10-11.

5

Later in December 2006, Ashraf-Hassan found out that her contract was not being renewed at "the discretion of Mr. Tual and Ms. Rispal." Id. at 11. Different employees at the Embassy gave her different reasons for why her employment was ending – some said that the internship and exchange programs were being restructured and her position was thus being eliminated; Tual allegedly claimed it was "because she had complained to the Ministry"; and Judes contended "that it was due to discrimination." Id. Ashraf-Hassan claims that the position was not eliminated, but that she was replaced by an intern, Pierre de Souffron. See id. The Embassy maintains that she was let go when the office was restructured. See Mot. at 15.

Plaintiff's contract expired at the end of January 2007, and she continued to work with Tual and Judes during her last weeks at the Embassy. See Pl. Resp. to Int. at 10-12. In early January, Judes showed her an email from Tual that referred to her as "the Pashtoun" and commented that "as long as the Pashtoon [*sic*] occupies . . . the FACE secretary office I have no desire to have her underfoot each time I look at a file . . . . Let's hope that her phone and computer will be taken away from her or she will keep on wreaking havoc until she leaves and that she will be confined in a box room for interns . . . ." Letters from Tual at 11-12. Plaintiff is not Pashtun. See Ashraf-Hassan Dep., Part II at 130:14-15. She testified that, in this context, she understood "Pashtoun" to mean "terrorist" because Pashtuns are an ethnic group in Pakistan often associated with the Taliban. See Pl. Resp. to Int. at 11; Ashraf-Hassan Dep., Part I at 58:11-59:3. Moreover, the French word that Tual used for "box room" or storage room – "cagibi" – means a "rat hole," according to Ashraf-Hassan. Ashraf-Hassan Dep., Part I at 58:11-19.

In the end, Ashraf-Hassan was, in fact, confined to the small office typically used for interns, and her phone and computer privileges were taken away. See Pl. Resp. to Int. at 12. No

6

one disputes that fact or the authenticity of Tual's email – although Defendants claim that her office and phone number were reassigned because she misinformed applicants that the internship program might be ending rather than being restructured. See id.; Mot. at 24-25. Ashraf-Hassan, of course, claims that the demotion was discriminatory. By her account, she had to "ask [Tual's] permission each day before settling in the smaller office" and "would wait in front of his office to request permission" for long periods of time, even when he was out of the office and there was no one to let her into the intern room. See Pl. Resp. to Int. at 12. Throughout her last weeks of employment, then, Ashraf-Hassan was without a permanent office, without a phone, without a computer, and was being supervised by her own interns. See id. Her last day at the office was January 24, 2007, and her contract expired on January 31, 2007. See id.

Toward the end of January, Ashraf-Hassan wrote to the Ambassador asking for the termination decision to be reconsidered and to union representatives in France seeking help. See Mot., Exh. 22 (Email of Jan. 30, 2007); ECF No. 16-3 (Letter to Ambassador). When neither approach bore fruit, she began discussions with the Equal Employment Opportunity Commission's Washington Field Office. See ECF No. 14-1 (EEOC Intake Questionnaire). After receiving an EEOC right-to-sue letter, she filed this suit against the Embassy of France, asserting eight causes of action under Title VII: harassment on the basis of national origin (Count I), race (Count II), religion (Count III), and pregnancy (Count VIII); and unlawful termination on the basis of national origin (Count IV), race (Count V), religion (Count VI), and retaliation (Count VII).

In July 2012, the Court ruled that Ashraf-Hassan's wrongful-termination claims were barred for failure to exhaust her administrative remedies with the EEOC. The Court, however,

7

allowed her harassment claims (Counts I-III and VIII) to proceed. See Ashraf-Hassan v. Embassy of France (Ashraf-Hassan I), 878 F. Supp. 2d 164 (D.D.C. 2012).

The Embassy now moves for summary judgment, contending that the record does not support Plaintiff's allegations of a hostile work environment and that, in any event, it cannot be held liable for its employees' actions. In addition to opposing such Motion, Ashraf-Hassan separately moves for an adverse inference, claiming that the Embassy negligently destroyed emails that would have shown both further discriminatory treatment and awareness of and failure to respond to her complaints of discrimination.

## II.     Legal Standard

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor."

Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The nonmovant is required to provide evidence that would permit a reasonable jury to find in its favor. See Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

**III.    Analysis**

In seeking summary judgment, the Embassy contends that (1) no reasonable jury would find the evidence in this case sufficient to constitute a hostile work environment under Title VII; (2) Ashraf-Hassan's testimony should not be believed; (3) Tual's and Manes's actions were nondiscriminatory or the result of business necessity; and (4) even if there were a viable claim for harassment here, the Embassy should not be held liable for the discriminatory acts of its employees. Ashraf-Hassan, by contrast, argues that her evidence of a hostile work environment entitles her to a trial and that the Embassy is vicariously liable for the actions of its employees. She also moves for an adverse inference based on the destruction of Judes's and Tual's emails. The Court first examines the hostile-work-environment issue and then collectively looks at the Embassy's other defenses.

A. Hostile Work Environment

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Discrimination on the basis of pregnancy is considered discrimination on the basis of sex. Id. § 2000e(k). The Supreme Court has held that these provisions make it unlawful for an employer to "requir[e] people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

To prevail on a hostile-work-environment claim, "a plaintiff must show that his employer subjected him to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (quoting Harris, 510 U.S. at 21). "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Id. at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)). "The Supreme Court has made it clear that 'conduct must be extreme to amount to a change in the terms and conditions of employment.'" George v. Leavitt, 407 F.3d 405, 416 (D.C. Cir. 2005) (quoting Faragher, 524 U.S. at 788). By adhering to these standards, the Court "ensure[s] that Title VII does not become a general civility code" requiring courts to police "the ordinary tribulations of the workplace." Faragher, 524 U.S. at 788 (citation and internal quotation marks omitted).

Looking at the totality of the circumstances – and crediting Ashraf-Hassan's account of the relevant events, as the Court must on summary judgment – a reasonable jury could find that

10

the harassment here was "sufficiently severe or pervasive to alter the conditions of" her employment. To begin with, the harassment was frequent enough to pervade Ashraf-Hassan's work environment on a regular basis. See, e.g., Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1082 (3d Cir. 1996) (conduct severe or pervasive where managers and coworkers repeatedly made coded racial remarks, and managers required employees to do tasks outside their job description, yelled at them, withheld important information, refused to deal with them, and falsely accused them of misconduct). When Manes was her primary supervisor, Ashraf-Hassan claims that she "was frequently informed of meetings after they had begun"; was "required to fulfill other employees' responsibilities while they were on vacation" or lunch; "was denied vacation days even though she had vacation days left"; and was not welcome at events or annual meetings that all other employees attended. See Pl. Resp. to Int. at 7-8. Her account paints a picture of frequent slights, which she reasonably believes were related to her national origin, race, religion, pregnancy, or a combination of all four. By the end of her employment, she was without a phone, computer, or office and had to "ask [Tual's] permission each day before settling in the smaller [intern] office" and "would wait in front of his office" for long periods of time "to request permission" to enter the intern room. See Pl. Resp. to Int. at 12. This, too, according to Ashraf-Hassan, was because of her protected traits, and this also establishes a level of frequency sufficient to change "the terms and conditions of" her employment. George, 407 F.3d at 416.

In addition, several of the incidents Ashraf-Hassan recounts were severe and offensive. Although Title VII is not meant to act as "a general civility code," this Court has taken the use of racial epithets by supervisors quite seriously. See Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577-78 (D.C. Cir. 2013) (use of racial epithet by supervisor may be particularly severe); see also

11

Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001) (same); Rodgers v. Western-Southern Life Insurance Co., 12 F.3d 668, 675 (7th Cir. 1993) (same). Here, Tual – who Ashraf-Hassan alleges supervised her work – referred to her multiple times as "the Pashtoun," an ethnic slur that she believes equated her with the Taliban. Letters from Tual at 11-12; see Pl. Resp. to Int. at 11; Ashraf-Hassan Dep., Part I at 58:11-59:3. In addition, when a co-worker commented "now we hire terrorists" based on Ashraf-Hassan's presence in the office, her supervisor Manes actively affirmed the sentiment. See Pl. Resp. to Int. at 8. When terrorists were captured in the United States, Manes waved a newspaper and claimed Ashraf-Hassan's "people had done it again." See id. at 6. And, of course, Ashraf-Hassan claims that Tual referred to her and her children as "dogs." See Ashraf-Hassan Dep., Part II at 141:11-14. Whether targeted at Plaintiff's national origin, race, religion, or all three, these incidents would all likely have had a severe impact on her work environment. Add to the mix Manes's lecture on why Ashraf-Hassan "should not have [her] baby" and should have used "condoms" or "pills," and you have discriminatory conduct that is both severe and offensive. Ashraf-Hassan Dep., Part I at 237:18-21.

Finally, the conduct alleged here also "interfere[d] with [Ashraf-Hassan's] work performance." Baloch, 550 F.3d at 1201. Specifically, at least two of Defendant's actions deprived Ashraf-Hassan of her ability to do her job. When Manes fired her, it obviously affected Ashraf-Hassan's work performance: she could do no work while she was gone. And when Tual moved her to the intern room, took away her phone, and curtailed her email access, it also undermined her efforts to perform. That action literally changed "the terms and conditions of [her] employment." George, 407 F.3d at 416. She was, in essence, demoted to intern status for the last several weeks of work.

12

While mindful that a single, isolated incident of offensive behavior generally does not create a hostile work environment, the Court finds that Plaintiff has proved much more here. See, e.g., Faragher, 524 U.S. at 788 ("isolated incidents (unless extremely serious) will not amount to" a hostile work environment); Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002) ("Except in extreme circumstances, courts have refused to hold that one incident is so severe to constitute a hostile work environment. Even a few isolated incidents of offensive conduct do not amount to actionable harassment.") (citation omitted). The conduct here was frequent, severe, and offensive, and it affected Ashraf-Hassan's performance. Cf. Baloch, 550 F.3d at 1201. A reasonable jury, accordingly, could find the conduct so "extreme [as] to amount to a change in the terms and conditions of employment.'" George, 407 F.3d at 416.

### B. Embassy's Defenses

Defendant musters several counter-arguments as to why the evidence should not be credited or regarded as discriminatory and why the Embassy should not be held liable. Each contention, however, is ultimately flawed.

#### 1. *Credibility*

The Embassy spends most of its brief arguing that Ashraf-Hassan's allegations are not credible because her accounts of some details of these episodes have varied over time. On a motion for summary judgment, however, the Court may not make "credibility determinations" or "weigh[] the evidence." Czekalski, 475 F.3d at 363. That burden is ultimately borne by the finder of fact. Rather, when a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, 477 U.S. at 255. Here, Plaintiff has offered competent evidence to support each of her allegations – namely, her deposition testimony and answers to

13

interrogatories, as well as several letters and emails. The Court may not question the veracity of that evidence at this juncture, but must accept all of Ashraf-Hassan's testimony as true.

That is not to say that the Court, hypothetically, must ignore inconsistencies between, for example, Plaintiff's testimony and a hard copy of a letter she is describing. The inconsistencies the Embassy points to, however, are not material to this case – that is, they do not prevent Ashraf-Hassan from surviving this Motion. See Liberty Lobby, 477 U.S. at 248. Those details include the exact date Ashraf-Hassan discovered she was pregnant; why exactly the Ambassador claimed her position was terminated; on what date she first read Tual's email calling her a "Pashtoun"; and whether or not she commented on revisions to the Embassy's employee handbook, which described how to report discrimination. None of these inconsistencies contradicts the fact that, for example, she was lectured on the use of birth control, essentially demoted and then ultimately terminated, or referred to as a "Pashtoun" and a terrorist. In other words, any inconsistency that the Embassy identifies would not change the Court's decision that this case must be resolved at trial.

      2. *Business Necessity*

The Embassy also contends that Tual's email alone is not enough to create a hostile work environment and that, in any event, his actions were the result of business necessity. See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 496 (D.C. Cir. 2008) (employer's unrebutted non-discriminatory reason for employment action may merit summary judgment). As the Court has already noted, however, there is much more evidence of discrimination and hostility here than Tual's email or even his particular actions. In other words, even if Tual's reasons for shutting Ashraf-Hassan in an intern room were race-neutral – *i.e.*, even if he truly thought she was harming the internship program by answering the phone in her last few weeks of work – the

remaining evidence in this case would still suffice to overcome a motion for summary judgment. In addition, Tual's reason was rebutted. Plaintiff has provided sufficient evidence for a jury to determine that his decision was based on animus, not business necessity.

The Embassy makes a similar argument about Plaintiff's termination in 2002, claiming that Manes did not fire her because she was pregnant, but rather for the gender-neutral reason of failing to "earn [her] trust." See Ashraf-Hassan Dep., Part II at 13:13. The evidence is sufficient, however, for a reasonable jury to conclude that the termination occurred because of Ashraf-Hassan's pregnancy, and, in any event, the slew of other harassing incidents would still be sufficient to preclude summary judgment here.

3. *Vicarious Liability*

Finally, the Embassy maintains that it should not be vicariously liable for the hostile work environment created by Tual and Manes – that is, it should not be legally responsible for its employees' actions. When an employee is harassed by a co-worker, she must prove that the employer was at least negligent in not preventing or correcting the harassment for the employer to be vicariously liable under Title VII. See Faragher, 524 U.S. at 789; Ayissi-Etoh, 712 F.3d at 577. When an employee is harassed by her supervisors, conversely, the supervisors are treated as the employer's proxy, and the employer is generally vicariously liable unless it asserts an affirmative defense. See Faragher, 524 U.S. at 807; Ayissi-Etoh, 712 F.3d at 577-78. That affirmative defense is available only when no tangible adverse employment action has been taken and the employer proves: "(i) that it exercised reasonable care to prevent and promptly correct the hostile behavior, and (ii) that the employee unreasonably failed to take advantage of the employer's preventive or corrective opportunities." Ayissi-Etoh, 712 F.3d at 578; see Faragher, 524 U.S. at 807; Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

15

Here, Ashraf-Hassan alleges she was harassed primarily by her supervisors, not by her co-workers. As outlined by the Supreme Court, a supervisor is someone empowered "to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Vance v. Ball State University, 133 S. Ct. 2434, 2443 (2013) (quoting Ellerth, 524 U.S. at 761). The Embassy does not appear to dispute the fact that Manes was Ashraf-Hassan's supervisor. See Mot. at 33. Indeed, as Manes succeeded in firing Plaintiff for a period of time, this can hardly be gainsaid. The Embassy contends, however, that Tual was not one of Ashraf-Hassan's supervisors. See id. at 32. Viewed in the light most favorable to Ashraf-Hassan, however, the evidence shows that Tual did exercise supervisory powers over her. After all, her contract was not renewed, and she was terminated at "the discretion of Mr. Tual and Ms. Rispal." Pl. Resp. to Int. at 11. In addition, she was "reassign[ed] with significantly different responsibilities" when Tual moved her to the intern room, took away her phone, and curtailed her email access. Vance, 133 S. Ct. at 2443. She alleges, in essence, that Tual had the power to demote her during her last weeks of employment as well as to fire her, and only a supervisor could do that. For purposes of summary judgment, Ashraf-Hassan has provided evidence sufficient to consider Tual a supervisor.

To escape vicarious liability, then, the Embassy must prove both that it did not take any tangible employment action against Ashraf-Hassan and that it was not negligent. See Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765; Ayissi-Etoh, 712 F.3d at 578. The Embassy fails to surmount the first hurdle, however, because it terminated her, which is a quintessential "tangible employment action." Faragher, 524 U.S. at 808. The Embassy therefore cannot escape liability at the summary-judgment stage.

C. Motion for an Adverse Inference

Finally, Ashraf-Hassan moves for an adverse inference based on the fact that the Embassy, pursuant to its usual practice, destroyed Judes's and Tual's email accounts when they left their jobs. See Mot. for Adverse Inference at 1-2, 6-7. Emails that may have corroborated Plaintiff's allegations were therefore potentially lost. See id. At this juncture, however, it would be premature to address the issue, as the emails are not necessary to resolve the Motion for Summary Judgment. If Ashraf-Hassan wishes to renew the Motion *in limine* prior to trial, she is free to do so. For now, the Court denies the Motion for an Adverse Inference without prejudice.

## IV. Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order denying Defendant's Motion for Summary Judgment and denying Plaintiff's Motion for an Adverse Inference without prejudice.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date: November 19, 2013