**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SAIMA ASHRAF-HASSAN, | ) | |
| **Plaintiff** | ) | |
| **v.** | ) | **CIVIL ACTION** |
| | ) | **NO.:1:11-CV-00805-JEB** |
| **EMBASSY OF FRANCE IN THE** | ) | |
| **UNITED STATES,** | ) | |
| **Defendant.** | ) | |

**THE EMBASSY OF FRANCE'S MOTION
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 52(b)**

Pursuant to Federal Rule of Civil Procedure 52(b), the French Embassy, through its
attorneys, respectfully moves the Court to make certain additional findings of fact supplementing
those announced from the bench on February 11, 2016, and accordingly to also amend its
interlocutory judgment issued the same day.

Most critically, it has now come to light that Chantal Manes was in Paris on March 15,
2002 and March 16, 2002, the very days that Plaintiff Saima Ashraf testified during trial (and
alleged in her Amended Complaint) were the days on which Manes, while at the Embassy in
Washington, D.C. (a) overheard Ashraf disclosing her pregnancy for the first time and (b)
lectured Ashraf on contraception and failure to prevent the pregnancy. (See Manes 2002 Agenda,
attached hereto as Exhibit 1). It also has come to light that March 16, 2002 was a Saturday. (See
id.). The details regarding this new evidence are set forth in a declaration attached to the
Embassy's companion Motion for Estoppel or In the Alternative For a New Trial.[1]

---

[1] As discussed herein and in the companion motion, this new evidence alternatively warrants (a)
reopening discovery for the limited purpose of discovering Ashraf's medical record as to the
precise date on which she discovered her pregnancy, and (b) a new trial to take additional
testimony on these material issues.

## I.      Procedural Background

On February 11, 2016, this Court announced its judgment in favor of Ashraf in open

court. A Minute Order issued that same day states: "For reasons stated in open Court on

2/11/2016, JUDGMENT is entered in favor for the PLAINTIFF against the DEFENDANT, in

the amount of $30,000.00." The Court decided, however, to postpone the entry of judgment until

after a determination of "the appropriate amount of attorney fees." (Minute Order of 2/11/16).

The posture of this case, then, is that the Court has decided in Ashraf's favor but judgment has

not been formally entered for purposes of appeal. (Tr. of Verdict on 2/11/16, attached hereto as

Exhibit 2, at 21-22).

## II.     Argument

### A.      Standard of Review

Under Federal Rule of Civil Procedure 52(b), which governs actions tried without a jury,

a court "may amend its findings – or make additional findings – and may amend the judgment

accordingly." Fed. R. Civ. P. 52(b). The rule permits a trial court to "make additional findings or

take other action that is in the interests of justice." Bigwood v. Defense Intelligence Agency, 770

F. Supp. 2d 315, 318 n.2 (D.D.C. 2011).[2]

As we show below, in the interests of justice, this Court should make, pursuant to Rule

52(b), certain additional findings of fact, which, once made, necessarily require the Court to

reconsider inferences made from the findings and to amend the Court's interlocutory judgment

of February 11, 2016.

---

[2] In addition, given that judgment has not formally been entered, this Court also could rely on
Rule 54(b) to amend its findings of fact and conclusions of law. Rule 54(b) gives a court
flexibility to reconsider "interlocutory judgments as justice requires" at any time before entry of
final judgment. Cobell v. Jewell, 802 F.3d 12, 19, 25 (D.C. Cir. 2015). See also id. at 25 (finding
reconsideration motion should have been treated as filed under Rule 54(b) where the court's oral
ruling had not yet been reduced to writing and judgment had not yet been entered).

**B.     The Court Should Make Certain Additional Findings**

Respectfully, we ask the Court to make the following additional findings of fact:

1. The Court found that Ashraf discovered and reported her pregnancy in mid-March 2002. (Ex. 2 at 7-9). Flowing from this specific finding, the Embassy respectfully requests the Court to find that Ashraf represented and argued before the Court, for more than two years, a position that she knew to be false.  Indeed, in discovery in 2013, Ashraf *expressly disclaimed* the initial position set forth in her Amended Complaint that she learned of and first reported her pregnancy on March 15, 2002 and then discussed it with Manes on March 16, 2002 (Dkt. 5 at ¶¶61-63). Instead, Ashraf insisted in her sworn deposition testimony that she learned of and first reported the pregnancy on April 16, 2002, the same day (she claimed at that time) that she was lectured on contraception and wrote and faxed the letter to the Secretary General. (Trial Tr. 1/28/16, attached hereto as Exhibit 3, at 95:11-102:7). She also stated, in response to an interrogatory, that she discovered she was pregnant in "March/April 2002" and that it "was on April 16, 2002" that Manes lectured her about contraception. (Def. Ex. 27 at 7). Ashraf maintained her position that she discovered her pregnancy and was lectured on contraception on April 16, 2002 expressly in her response to the Embassy's undisputed statement of facts for the motion for summary judgment (Dkt. 34-1, ¶¶7-9), in her own undisputed statement of facts (Def. Ex. 17, ¶¶6-9), in her argument in opposition to the motion for summary judgment (Dkt. 34 at 3), in her opposition to the motion to compel discovery as well as the motion to reopen discovery (Tr. Hr'g of 6/19/13, attached hereto as Exhibit 4, at 4-5, and Tr. Hr'g of 12/17/13, attached hereto as Exhibit 5, at 5), and in the Joint Pretrial Statement (Def. Ex. 26, Dkt. 76, at 2 ¶¶5-6).[3]

---

[3] In Plaintiff's Statement of Claims in the Pretrial Statement (Dkt. 76), she makes no mention of *any* meeting in March 2002 or even of multiple meetings with Manes.

Thus, Ashraf advanced the April 16, 2002 position as the truth to this Court for more than two years.

2. If Ashraf in fact had first learned of her pregnancy on April 16, 2002, as she insisted in her deposition and multiple court filings, including the Pretrial Statement, then *a fortiori* Ashraf would not have known about her pregnancy in the preceding mid-March.  Thus, the Embassy respectfully requests the Court to find that, during the time (from her deposition in 2013 to the Pretrial Statement, Dkt. 76, filed on November 9, 2015) that Ashraf maintained to this Court that she discovered her pregnancy on April 16, 2002, Ashraf implicitly admitted that her written statement to the Secretary General on April 16, 2002 that "in mid-March . . . I informed Mrs. Manes of the beginning of my pregnancy" (Def. Ex. 5 at 2) was false, and, therefore, also implicitly admitted that she had lied to Manes on April 16, 2002.

3. The Embassy respectfully requests the Court to find that, in her direct examination at trial, Ashraf again reversed positions and expressly disclaimed the April 16, 2002 position that she had been advancing as the truth for nearly two years in this litigation and that Ashraf's position at trial also cannot be true.  Indeed, at trial, Ashraf testified that she first learned of her pregnancy "probably" on or "around" March 15, 2002[4] (Trial Tr. of 1/27/16, attached hereto as Exhibit 6, at 40:7, 41:9), was lectured by Manes on contraception "the next day," which would have been March 16, 2002, spoke in person with other Embassy personnel, including Florence Emile-Besse, Estelle Guttman, and Roland Celette, that day (Ex. 6 at 43:15-49:8), and was terminated on April 16, 2002 (Ex. 6 at 54:12-55:7). We ask the Court to find that this new

---

[4] Notably, Ashraf testified to other precise dates regarding events surrounding her pregnancy, for example, that she had her "period" or "spotting" "on February 11th" hence causing her to believe she could not be pregnant. (Ex. 6 at 42:10-42:13).  It is also worth noting again that, according to her Amended Complaint, she discovered her pregnancy precisely on March 15, 2002. (Dkt. 5 ¶61).

version of the story (which more closely mirrors the Amended Complaint) cannot be true based on the new evidence that Manes was in Paris on March 15 and 16, 2002 and that March 16, 2002 was a Saturday. (See Manes 2002 Agenda, Ex. 1).[5] Ashraf did not testify that she, Manes, or the other Embassy personnel with whom she spoke on the day of the supposed lecture (Celette, Guttman, and Emile-Besse) all worked on Saturdays, and in particular were working on Saturday, March 16, 2002. Even more damning, there is now concrete evidence proving that Manes was not even in Washington, D.C. on March 16.

4. Although the Court seemed to acknowledge (Ex. 2 at 8) that Ashraf had not discussed the contraception lecture in the letter she wrote to the Secretary General on April 16, 2002, just after her meeting with Manes, the Embassy respectfully requests the Court to find that Ashraf also did not mention being lectured on contraception in her January 2007 letter to the Ambassador (Def. Ex. 4), in her EEOC complaint, and in her EEOC request for reconsideration (Def. Ex. 25).  Ashraf admitted at trial that she did not mention any contraception lecture at each of these opportunities.  (Ex. 6 at 137-146).  It is only at the start of this litigation, more than ten years after the alleged lecture, that she mentioned it for the first time.

5. Although the Court noted that Ashraf believed that Christian Tual had a discriminatory animus against her, the Embassy respectfully requests the Court to find that Ashraf called on Tual for support when she felt harassed by others (Def. Ex. 2 at 2), that Ashraf admitted at trial that, in her contemporaneous emails with Tual or about Tual, there is no evidence of hostility (Def. Exs. 1 & 2), and that Ashraf never expressed any anger or hostility toward Tual in her emails. (Ex. 3 at 129:19- 133:14) (See also Ex. 6 at 194:12 – 194:16; 199:11 – 199:13).

---

[5]The Court also may take judicial notice of the fact that March 16, 2002 was a Saturday. See United States v. Barry, 938 F.2d 1327, 1330 (D.C. Cir. 1991) (approving of district court's taking of judicial notice that a particular day was a Friday, and was Veteran's Day, a federal and District of Columbia holiday).

6. Although there is no dispute that Ashraf was isolated from her team during her last days at the Embassy (Ex. 2 at 12-13), the Embassy respectfully requests the Court to also find that the Embassy's decision to isolate her was a legitimate business decision for which Ashraf has offered no rebuttal evidence, and that the business decision resulted from Ashraf's propagation of false information that Ashraf admitted in her letter of 2007 to the Ambassador (Def. Ex. 4, p. 4) as well as during her deposition and at trial. (Trial Tr. 2/4/16, attached hereto as Exhibit 7, at 21:18 – 35:4).

7. Finally, the Embassy respectfully requests the Court to find that Ashraf produced no evidence contradicting the Embassy's defense that the termination of Plaintiff's position was the result of a legitimate business decision to reorganize its activities, of which Ashraf admitted at trial to have been aware.  (Ex. 7 at 15:12 – 20:2).

### B.   The Proposed Additional Findings, Once Made, Necessarily Require Reconsideration of Certain Inferences Drawn from the Evidence and Accordingly Require Amendment of the Judgment

Respectfully, the Embassy seeks relief under Rule 52(b) for two reasons: (1) the portions of Ashraf's story that depend entirely on her own testimony should not be credited because they are internally inconsistent, the inconsistencies have not been explained, and her story is contradicted by objective evidence, and (2) the evidence, particularly considering the proposed additional findings, is insufficient to sustain a finding of a hostile work environment.

*First*, judgment should not be entered in favor of a plaintiff following trial where, based on the totality of the evidence, no "reasonable factfinder" would credit her story.  Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985).  Thus, courts of appeal "may well find clear error even in a finding purportedly based on a credibility determination" if "[d]ocuments or objective evidence. . .contradict the witness' story; or the story itself. . .may be so internally

inconsistent or implausible on its face[.]"  Id. See also Washington, Marlboro & Annapolis

Motor Lines, Inc. v. Maske, 190 F.2d 621, 621-622 (D.C. Cir. 1951) (reversing jury verdict that

lacked "substantial support"; objective witnesses contradicted plaintiff's story, which was

corroborated only by her own testimony, which was itself contradicted by a previous statement

she had made to her doctor).

A modified version of this principle applies even at the summary judgment stage, where

the evidence must be viewed in the light most favorable to the non-moving party.  As the

Supreme Court stated in Scott v. Harris, 550 U.S. 372 (2007):

> When opposing parties tell two different stories, one of which is blatantly contradicted by
> the record, so that no reasonable jury could believe it, a court should not adopt that
> version of the facts for purposes of ruling on a motion for summary judgment.

Id. at 380.[6]  Similarly, the D.C. Circuit has said:

> Judges may, under certain circumstances, lawfully put aside testimony that is so
> undermined as to be incredible. The removal of a factual question from the jury is most
> likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving
> testimony, unsupported by corroborating evidence, and undermined either by other
> credible evidence, physical impossibility or other persuasive evidence that the plaintiff
> has deliberately committed perjury.

Johnson v. WMATA, 883 F.2d 125, 128 (D.C. Cir. 1989).  Thus, where a party offers

inconsistent and contradictory statements and fails to explain or reconcile them, a court should

grant summary judgment against the inconsistent party. See Pyramid Sec. Ltd. v. IB Resolution,

Inc., 924 F.2d 1114, 1123-1124 (D.C. Cir. 1991); Rojas v. The Roman Catholic-Diocese of

Rochester, 660 F.3d 98, 105-106 (2d Cir. 2011) (per curiam); United States v. Henderson, 463

---

[6] In that case, a videotape "utterly discredited" the respondent's version of events so that "no
reasonable jury could have believed him." Id. The Supreme Court thus held that the lower court
had erred in relying on "such visible fiction" and should have instead "viewed the facts in the
light depicted by the videotape." 550 U.S. at 380-381.

F.3d 27, 32-45 (1st Cir. 2006); <u>Jeffreys v. The City of New York</u>, 426 F.3d 549, 554-555 (2d Cir. 2005).

 In this case, on this record, especially with the new evidence and proposed additional findings, the contradictions and inconsistencies in Ashraf's story on particular subjects render her testimony on those subjects incredible.  Said differently, looking at the entirety of the record, and considering the new evidence, this case presents one of those rare situations where certain parts of the plaintiff's story are internally inconsistent or implausible on their face, the internal inconsistencies have not been explained or reconciled, and the story has been contradicted by other objective evidence such that no reasonable factfinder should credit it as a matter of law.

 *Second*, as this Court recognized (Ex. 2 at 14-15), the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998).  A plaintiff must show that she faced discriminatory intimidation, ridicule, and insult that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment.  <u>Ayissi-Etoh v. Fannie Mae</u>, 712 F.3d 572, 577 (D.C. Cir. 2013).  The "conduct must be extreme to amount to a change in the terms and conditions of employment."  <u>Faragher</u>, 524 U.S. at 788. "[I]solated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Id</u>.

 On this record, and in particular considering the effect of the additional findings and evidence, the evidence is insufficient as a matter of law to find hostile work environment.[7]

---

[7] The Embassy makes this motion because of the new evidence, because certain facts were not addressed in the Court's oral ruling of February 11, and because accordingly additional findings should be made.  If those additional findings are made, we believe the judgment necessarily requires altering for the reasons explained herein.  However, to clarify, it is the Embassy's position that, even absent these additional findings, Ashraf has failed as a matter of law to show

**1. Ashraf's Story Is Full of Inconsistencies and Implausibilities and Is Contradicted by Documentary and Other Evidence**

*a. Ashraf's story regarding the date she discovered her pregnancy and her meeting with Manes is internally inconsistent, the inconsistencies are irreconcilable and unexplained, and is now contradicted by new evidence.  The letter that Ashraf wrote immediately after a meeting on April 16, 2002 with Manes, as well as other documentary evidence, does not support her testimony at trial, which is the only evidence of Manes' supposed contraception lecture and decision to terminate based on failure to prevent pregnancy.*

The Court found that Ashraf's version of events in March and April 2002 – that Ashraf discovered her pregnancy "probably" on March 15, 2002, was then lectured on contraception the next day, and was terminated on April 16, 2002 based on pregnancy – to be credible. But, as noted above, objective evidence now shows that Manes was not even in Washington, D.C. on March 15 or March 16, 2002, and that March 16, 2002 was a Saturday. Ashraf's testimony on this subject has been rendered incredible such that it should not, as a matter of law, be credited. See generally Martin v. Merrell Dow Pharm., Inc., 851 F.2d 703 (3d Cir. 1988) (affirming district court's decision to disregard plaintiff's affidavit where plaintiff had testified in a deposition and stated in answers to interrogatories that she first ingested a drug in the second month of her pregnancy but later in an affidavit swore she actually began taking the drug much earlier in the pregnancy and failed to satisfactorily explain the contradiction).

We note that the precise date on which Ashraf discovered her pregnancy could be easily resolved with access to her medical record on this limited subject.  If the relevance of the medical record was not previously apparent, it surely is apparent now. See, e.g., Mezu v. Morgan State Univ., 495 Fed. Appx. 286, 290 (4th Cir. 2012) (finding medical records relevant to plaintiff's claim that her employer interfered with her right to take leave under the Family Medical Leave Act; defendant had right to discover medical records to determine if plaintiff's hostile work environment, and, if necessary, the Embassy will demonstrate insufficiency of evidence on appeal.

daughter was incapable of self-care). Specifically, if the medical record shows that Ashraf in fact discovered her pregnancy on March 15, as she testified at trial and stated unambiguously in her Amended Complaint (Dkt. 5 ¶ 61), then it would make no sense that a lecture by Manes and discussions with Guttman, Emile-Besse, and Celette occurred "the next day" on Saturday March 16, as she testified at trial and stated unambiguously in her Amended Complaint (id. ¶63), given the new evidence that Manes was in Paris on March 15 and 16, 2002, and that March 16, 2002 was a Saturday.

We note too that Ashraf's testimony at trial on the letter to the Secretary General of April 16, 2002 is confusing. She testified that, on the same day as the lecture by Manes, March 16, she spoke with Celette, who encouraged her to write a letter to the Ambassador and Secretary General on the subject, and that she did in fact write such letters. Her counsel then questioned her about the April 16, 2002 letter as if that was the same letter she wrote immediately after the lecture. (Ex. 6 at 48:3-49:8; 50:22-52:17). She then testified that she *sent* the letter on April 16, following the termination, after Celette reminded her to "drop this letter." (Id. at 55:11-56:5). Therefore, according to her testimony and inferences drawn therefrom, she *wrote* the letter immediately after the lecture on March 16, but did not *send* the letter until a month later, on April 16. Of course, that she wrote the letter entirely on March 16, but only sent it on April 16, makes no sense, given that the letter refers to a meeting with Manes on April 16, 2002, and given that March 16 was a Saturday when Manes was in Paris.

At bottom then, Ashraf's testimony is the *only direct* evidence to support these findings. Although the Court found that Ashraf's contemporaneous letter (Def. Ex. 5), written immediately after the April 16 meeting, "bolsters her account" (Ex. 2 at 8:10 -8:14), in fact the letter says nothing about being subjected to a lecture on contraception on March 16 or about

being terminated for failure to prevent a pregnancy.  Rather, in the letter, Ashraf wrote that

Manes wanted to terminate her because "[she] did not succeed to win her trust."  (Def. Ex. 5 at

2).  The letter thus certainly could "bolster" Ashraf's account at trial that she met twice with

Manes, once in mid-March and then again on April 16, 2002, but it in no way bolsters Ashraf's

account that Manes subjected her to a lecture on contraception on March 16 and then terminated

her for becoming pregnant on April 16.

Ashraf offered no plausible explanation why, in the letter in which Ashraf first

documented and complained about the termination, she spoke only of the failure to "win"

Manes' "trust" as the reason for termination and did not mention the discrimination or a

supposed contraception lecture, which brought her to tears. (Ex. 6 at 45:1-45:3). Ashraf admitted

that she herself chose the words written in the letter.  (Ex. 6 at 146:17-146:22).  It is implausible

that an employee who felt wronged for being subjected to a lecture on contraception and then

terminated on the basis of failing to prevent a pregnancy did not mention the lecture or basis for

termination in the letter complaining about the very same termination.  It is particularly

implausible that Ashraf would, on the one hand specifically mention her pregnancy in the

complaining letter (Def. Ex. 5), but *omit* a lecture on contraception or being terminated based on

pregnancy.

In her Amended Complaint, she alleged that she never reported the incident of

harassment by Manes because she was too afraid to lose her job.  (Dkt. 5 ¶ 90).  This

explanation, however, was not advanced at trial and in any event holds no water for two reasons.

First, at the time she wrote her letter, Ashraf already had lost her job.[8]  Second, Ashraf clearly

_____

[8] Similarly, when she wrote to the Ambassador in 2007, her position had been terminated for
over a month.

did not fear negative repercussions by writing a letter regarding supposed wrongdoing by her supervisor, for the letter as written already accused Manes of wrongdoing.

Ashraf claimed that she sent a different letter to the Ambassador, which included a detailed description of the lecture on contraception.  (Ex. 6 at 50:22 -52:13).  As the Court found, however, "there is no trace of a second more detailed letter she claims to have sent to the Ambassador about the incident," and she represented during discovery that the substance of the two letters was the same.  (Ex. 2 at 8).

At trial, Ashraf took a different tack to explain why she did not report the lecture but which is equally not credible.  She testified that "Mr. Celette suggested I do not write details about our [sic] lecture, about pregnancy, and just send this fax to New York."  (Ex. 6 at 52:9-52:11).  This explanation is implausible because Ashraf also testified a few minutes before that she had not informed Celette about the lecture.  She stated: "I described [to Celette] a little bit that that –I didn't explain, you know, the talk, the lecture, but I only told him that actually Mrs. Manes wanted to fire me because I was pregnant."  (Ex. 6 at 48:24-49:2).

In fact, as Ashraf admitted at trial, the first time she claimed the occurrence of a lecture on contraception was in this case, more than ten years later.  (Ex. 6 at 137-146).  She did not mention the supposed contraception lecture in her January 24, 2007 letter to the Ambassador, even though she did mention being a "victim of discrimination when I was pregnant and Mrs. Chantal Manes. . .had to reinstate me" (Def. Ex. 4 at 4, ¶4) (See also Ex. 6 at 144:21–145:24), nor did she mention the supposed contraception lecture from 2008 to 2012 in her EEOC complaint and EEOC request for reconsideration, even though she did allege that she had been terminated on the basis of her pregnancy (Def. Ex. 25); (See also Ex. 6 at 137:6 -144:16).

"[C]redibility involves more than demeanor.  It apprehends the overall evaluation of testimony in light of its rationality or internal inconsistency and the manner in which it hangs together with other evidence."  Jackson v. United States, 353 F.2d 862, 866 (D.C. Cir. 1965).  Accord Anderson, 470 U.S. at 575.  Thus, if this case came down solely to a determination of demeanor, it would not be challengeable.  Id.  But as shown, this case involves more than demeanor.  Ashraf's testimony – the only direct evidence to support the Court's findings – is self-interested, and the Court found that Ashraf was prone to exaggeration or taking undue offense. (Ex. 2 at 5, 11, 17-18).  Her story was riddled with unexplained inconsistencies and contradicted by the objective evidence, as described above, in particular the new evidence showing that Manes was in Paris on March 15 and 16, 2002 and that March 16 was a Saturday.  Finally, her story is unlikely.  It makes little sense that Ashraf would endure a meeting in which she suffered a scathing discriminatory lecture on contraception, would be told she was being terminated because she had gotten pregnant, would cry after the meeting, would write a letter to complain about the termination to someone who could rectify the situation, and yet would restrain herself not to mention in that letter *anything* about the supposed lecture or the discriminatory animus, even though the letter *does* mention pregnancy.  That she so restrained herself is particularly unlikely given that Ashraf clearly had no problem complaining to authorities and documenting instances when she felt underpaid or wrongfully terminated.

This case thus resembles other cases in which a plaintiff's story was rejected as implausible.  In United States v. Prokupek, 632 F.3d 460 (8th Cir. 2011), for example, a video recording demonstrated that a police officer, Trooper Estwick, told Prokupek that he had been stopped because he signaled his "turn" but he did not signal "when you were getting on the exit."  Id. at 461.  Later, at a suppression hearing, Estwick testified that Prokupek had been stopped for

"failure to signal the vehicle's turn from the interstate exit ramp on to the county road." Id.  The

district court found that (a) a traffic violation occurred based on the officer's testimony at the

suppression hearing, which was credible, and (b) the contemporaneous statement on the

videotape was "an unintentional misstatement." Id. at 462.  The Eighth Circuit reversed, finding

the district court had clearly erred. The court wrote:

> The district court attempted to dismiss the contradiction by finding that Trooper
> Estwick's contemporaneous statement was "an unintentional misstatement."  However,
> we can find no evidence in the record that supports this finding, aside from the bare fact
> that Trooper Estwick contradicted the statement at the suppression hearing.  Although
> defense counsel pressed Trooper Estwick on the inconsistency during cross-examination,
> Trooper Estwick offered no explanation for the inconsistency, nor did he testify that his
> contemporary statement was a misstatement.  In the absence of any evidence in the
> record to support the district court's conclusion that Trooper Estwick misspoke at the
> time of the arrest, we conclude that this finding is clearly erroneous. . . .The district
> court's factual finding that "Prokupek failed to signal his turn before turning from the exit
> ramp on to the country road" is supported only by the court's determination that Trooper
> Estwick's testimony at the suppression hearing to that effect was credible.  Trooper
> Estwick's testimony at the hearing is so clearly and affirmatively contradicted by his own
> statement at the time of the events, in the absence of any explanation for this
> contradiction that is supported by the record, we conclude that Trooper Estwick's after-
> the-fact testimony at the suppression hearing is "implausible on its face[.]"

Id. at 463.

So here. Ashraf's contemporaneous statements showed that Manes terminated Ashraf

because Ashraf "did not 'succeed to win [Manes'] trust.'"  (Def. Ex. 5 at 2).  As in Prokupek,

Ashraf later attempted to downplay those contemporaneous statements as misstatements and that

in fact the termination was because she, a non-French Muslim, had gotten pregnant.  There is no

evidence in the record, however, to support a finding that Ashraf's contemporaneous statements

were misstatements aside from the bare fact that Ashraf contradicted that statement in years-later

after-the-fact recitations of events and testimony in support of her legal case.  As in Prokupek,

Ashraf's after-the-fact testimony regarding Manes' reason for termination should be deemed

implausible on its face.  Ashraf's trial version is even more implausible considering the new

evidence and the fact that the Court found that Manes "otherwise treated Plaintiff reasonably well and in a professional manner" (Ex. 2 at 17:14-17:16) and was "a fairly credible witness" (*id.* at 5:8-5:9).

Rojas, 660 F.3d 98, is likewise analogous.  In that case, plaintiff Rojas sued her employer, alleging that her co-worker, Pastor Enyan-Boadu, had sexually harassed her.  The Second Circuit affirmed the district court's entry of summary judgment against Rojas because Rojas' story – which was supported only by her own testimony – was internally inconsistent and the internal inconsistencies had not been reconciled.  Although Rojas testified that Enyan-Boadu had harassed her, contemporaneous letters and other evidence showed that Rojas had complained only of "general friction" between her and Pastor Enyan-Boadu, and had not, until her legal case, complained of sexual harassment. Id. at 105.  The court further rejected Rojas' argument that it was a question of credibility; Rojas had failed to reconcile the inconsistent statements, hence the issue "transcend[ed] credibility concerns."  Id. at 106.

The principles set forth in Rojas should apply with even more force here, because the case is no longer at the stage where the evidence must be construed in the light most favorable to plaintiff.  Here, objective evidence shows that Manes was in Paris on March 15 and 16, 2002, and that March 16, 2002 was a Saturday, and contemporaneous evidence shows that Ashraf had complained only of termination by Manes based on a lack of trust.  Ashraf did not begin complaining about a contraception lecture and accusing Manes of terminating her because she was a non-French, Muslim who had gotten pregnant until years after the incident in contemplation and after the EEOC had rejected her initial claim against the Embassy.  As in Rojas, because Ashraf has not plausibly explained the inconsistency, Ashraf's after-the-fact account should not be credited. That is, Ashraf is not credible as a matter of law; a factfinder,

presented with the same person making two contradictory statements, cannot resolve those

inconsistencies as a matter of "credibility" where the person provides no explanation for the

contradictions and objective evidence contradicts the person's story.

Moreover, the additional findings and new evidence should cause the Court to reconsider

its finding that Manes' "account of firing the plaintiff solely for loss of trust doesn't seem to hold

water" because, if true, "[i]t seems a very odd and disproportionate response" to the lie that

Manes perceived Ashraf as having told. (Ex. 2 at 9:6-9:7).  Although Manes' articulated reason

for terminating Ashraf may seem "disproportionate" (as the Ambassador also seemed to think,

given his reinstatement of Ashraf), it is not the role of the Court to sit as a "super-personnel

department."  Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999).  Thus, even if the

Court disagrees with the way Manes handled the situation, it may not find the Embassy liable

under Title VII unless there is evidence of discriminatory animus.  See Fischbach v. D.C. Dep't

of Corrections, 86 F.3d 1180,1182-1183 (D.C. Cir. 1996) (warning of using hindsight to

determine if employer's business decision was pretextual; court must look not at "the correctness

or desirability of the reasons offered. . .but whether the employer honestly believes in the reasons

it offers.") (internal citations and other marks omitted).  Because the only evidence of

discriminatory animus based on pregnancy is Ashraf's own inconsistent and implausible

testimony, the Embassy's articulated reason should not be questioned.

On this point, Asghar v. Geithner, 2010 U.S. App. LEXIS 13030 (D.C. Cir. June 22,

2010), is useful.  In that case, plaintiff alleged that he suffered a hostile work environment

because he was subjected to an investigation against him by the security office of his employer,

the Bureau of Engraving and Printing ("BEP"), upon his return from Afghanistan.  According to

BEP, there was a discrepancy between information he had provided regarding the reason he

traveled to Afghanistan, and the security office investigated that discrepancy.  The D.C. Circuit

held that this investigation could not serve as the basis for a hostile work environment claim.

> Asghar does not allege, must less proffer evidence, that the BEP Office of Security did
> not have a nondiscriminatory basis to launch an investigation, namely, the discrepancy
> between information he had previously provided stating that his parents were deceased
> and his stated reason for travel to a war zone in 2004.  Although Asghar explained the
> discrepancy, he failed to show the nondiscriminatory reason was pretextual in light of
> BEP policy and what the Office of Security knew at the time.

Id. at *4.  Here too.  There was, according to Manes, a discrepancy regarding the date on which

Ashraf disclosed her pregnancy.  Although the discrepancy may have been explained to the

satisfaction of the Ambassador after-the-fact, Ashraf has failed to show that Manes' reason was

pretextual *in light of what Manes understood to be Embassy policy and what she knew at the

time.*

   We note here that the fact that two of Ashraf's co-workers, who were also pregnant but

were white non-Muslim French-origin, were not temporarily fired (Ex. 2 at 16:4-16:6) is not, as a

matter of law, evidence of discriminatory animus. Ashraf presented no evidence to show that

those co-workers were similarly situated. That is, there is no evidence in the record that Manes

believed the other pregnant co-workers required disciplining for having been dishonest with her

regarding their pregnancies. See Burley v. AMTRAK, 801 F.3d 290, 301-302 (D.C. Cir. 2015)

(in case involving allegedly discriminatory discipline, noting that, to prove a plaintiff is similarly

situated to another employee, the plaintiff must show that he and the allegedly similarly situated

employee "were charged with offenses of comparable seriousness[,]" and finding that plaintiff's

proffered evidence "cannot permit a reasonable factfinder to conclude that Amtrak's

nondiscriminatory reason for disciplining Burley for passing a blue signal more harshly than it

disciplined other, white employees who committed different infractions was a pretext for

discrimination.") (internal citations and marks omitted).

Although not asked specifically if Manes ever said in 2001 "your people did it again," and "why are your people doing this" regarding terrorism (Ex. 2 at 7:1-7:8), or whether in 2003 or 2004, Manes endorsed another employee's statement "now we hire terrorists" (Ex. 2 at 10:1-10:4), Manes did deny saying anything negative about any Muslims and, *a fortiori*, against Ashraf.[9]  But in any event, these instances regarding terrorism and "your people" are insufficient as a matter of law to show hostile work environment.  See <u>George v. Leavitt</u>, 407 F.3d 405, 416-417 (D.C. Cir. 2005) (finding allegations that plaintiff "was thrice told to 'go back where she came from'" were not sufficiently severe or pervasive as a matter of law to constitute hostile work environment).  <u>See also Asghar</u>, 2010 U.S. App. LEXIS 13030, at *4 (finding that comment made by supervisor that plaintiff "could be a terrorist" and name-calling by a co-worker did not constitute hostile work environment as a matter of law because they were isolated

---

[9] In Manes' deposition, which the parties stipulated would be admissible at trial (see Ex. 6 at 201-204), Manes was asked:

> Q. You have made negative comments about Muslim in your life, correct?
> Mr. Chone: I'm sorry.  Can you repeat the question?
> Q. You have made negative comments about Muslims in your life correct?
> A.  It's absolutely not correct.
> Q. You have never made any comment disparaging Muslims in your entire life?
> A. Absolutely all my life, no negative commentary about Muslims in all my life. I would like to add something.
> Q. Please.
> A. That's one of the most offensive things that I find in the accusation made by Mrs. Ashraf towards me and I really resent the offensiveness of this accusation. The witness (in English): I didn't say I resent.  I said I'm very offended.
> The Interpreter: I'm sorry.
> The Witness: I don't begrudge her.  I have no vengeful feelings toward her for this but I'm offended that she made such accusations.
> Q. You are hurt?
> A. Yes (in English).

(Tr. of Manes' Depo., attached hereto as Exhibit 8, at 80:9 – 81:13).

and not "severe or pervasive").  That these instances were not sufficiently severe is bolstered by

this Court's finding that Ashraf is prone to exaggerate. (Ex. 2 at 5, 11, 17-18).

> b. *The evidence regarding Tual, particularly considering the proposed additional findings, is insufficient to constitute hostile work environment.*

Considering in particular the proposed additional findings set forth above, the evidence in

support of hostile work environment based on Tual's conduct is also insufficient as a matter of

law.

Although it is undisputed that Tual referred to Ashraf as "Pashtoun" in the January 3,

2007 email,[10] Ashraf failed to show that, based on this reference alone, the Embassy's decision –

a decision that was not recommended solely by Tual – to limit her connectivity to the public in

the last weeks of her one-year contract (after her position had been eliminated) was due to

discriminatory animus.  Importantly, Ashraf did not rebut the Embassy's evidence of this

legitimate business decision.

Specifically, the Embassy demonstrated that, upon learning in December 2006 that her

contract would not be renewed, Ashraf began leading students interested in the program to

believe that the *program* had been terminated (not just that her *position* had been terminated or

that the program had been reorganized) and that her incorrect communications with the students

caused at least three Embassy personnel, one of whom was Tual, to subject her to three separate

questionings and that thereafter she was isolated from her team in a small office.  (Ex. 7 at 21:18

– 35:4).[11] Indeed, based on her conduct, the Embassy determined to limit Ashraf's connectivity

to ensure that she would not be able to talk to the public, i.e. the U.S. students applying to

---

[10] The Court also found that Tual told Ashraf "why don't you work for the Pakistani Embassy, you'll be happier there." (Ex. 2 at 11).

[11] In her deposition, which was read into the record, Ashraf stated that students understood from her that the program was terminated and they were very upset to hear this news.  (Ex. 7 at 24:11 – 25:1).

internships in France and the businesses in France interested in taking interns.  Although she

represented in her Amended Complaint that she was moved into a small room without a

computer or a telephone (Dkt. 5 ¶114) and reiterated the same in her answer to the

interrogatories (Def. Ex. 27 at 12), she admitted at trial that the office had a computer and a

phone, although connectivity with the general public was limited, which is consistent with the

Embassy's legitimate business decision.  (Ex. 6 at 121: 21- 122:22).

The Court did not expressly find the Embassy's business decision to be pretextual.  A

legitimate business decision does not, as a matter of law, provide evidence of a hostile

environment.  See Asghar, 2010 U.S. App. LEXIS 13030, at *4 (finding no hostile work

environment because plaintiff did not allege or proffer evidence that employer lacked a

nondiscriminatory basis to launch an investigation against plaintiff); Baloch v. Kempthorne, 550

F.3d 1191, 1201 (D.C. Cir. 2008) (finding no hostile work environment in part because

plaintiff's "allegations of insult are undercut by the legitimate reasons and constructive criticism

offered in the letters of counseling and reprimand."); Ramseur v. Perez, 80 F. Supp. 3d 58, 78

(D.D.C. 2015) (finding that the denial of a bonus "cannot contribute to plaintiff's hostile work

environment claim.  Defendant has provided legitimate, nondiscriminatory reasons for giving

plaintiff an 'effective' rating and denying her a bonus, which plaintiff has failed to rebut.");

Childs-Pierce v. Utility Workers Union of Am., 383 F. Supp. 2d 60, 78-79 (D.D.C. 2005)

(finding plaintiff could not rely on a suspension as evidence of hostile work environment when

the suspension "was a legitimate non-discriminatory act brought about by plaintiff's *own*

misconduct.") (emphasis in original).  See also Fischbach, 86 F.3d at 1182-1183 (warning

against using hindsight to judge an employer's business decision and emphasizing that the issue

is not the correctness of the decision but whether the employer "honestly believes in the reasons it offers.") (internal citations and other marks omitted).

Moreover, there is no evidence that Tual intended Ashraf to see the email containing the "Pashtoun" reference.  (Ex. 2 at 13).  See Matta v. Snow, 2005 U.S. Dist. LEXIS 36194, at *94-96 (D.D.C. Dec. 16, 2005) (finding insufficient evidence of hostile work environment in part because certain negative comments about plaintiff "were made outside of his presence; as a matter of law, such comments cannot be considered particularly severe – especially where, as here, the comments were not explicitly discriminatory" and citing cases to the same effect); see also Dandy v. UPS, 388 F.3d 263, 271-272 (7th Cir. 2004) (finding it relevant, in hostile work environment analysis, that plaintiff heard remarks about her only second-hand).  In fact, it is uncontested that Ashraf sought Tual's support when she felt harassed by others, and in contemporaneous emails, expressed gratitude for that support.  Ashraf admitted that her communications demonstrated that Tual was cordial with her, was supportive, and did the maximum to encourage her to continue to work for him.  (Ex. 3, at 129:19- 133:14) (See also Ex. 6 at 194:12 – 194:16; 199:11 – 199:13).

Finally, the Court found that the term "Pashtoun" could be construed as equivalent to being called a terrorist.  (Ex. 2 at 13:3 - 13:8).  The D.C. Circuit has held, however, that off-hand incidents referencing the term "terrorist" without more does not constitute a hostile work environment.  See Asghar, 2010 U.S. App. LEXIS 13030, at *4 (finding that comment made by supervisor that plaintiff "could be a terrorist" and name-calling by a co-worker did not constitute hostile work environment as a matter of law because they were isolated and not "severe or pervasive").  See also Faragher, 524 U.S. at 788 ("offhand comments" not actionable as hostile work environment).

C.      The Court Cannot Aggregate The Manes Conduct with the Tual Conduct to Find Hostile Work Environment

As the D.C. Circuit has made clear, a plaintiff may not combine discrete acts of discrimination to form a hostile work environment claim without meeting the required hostile work environment standard.  Baird v. Gotbaum ("Baird I"), 662 F.3d 1246, 1252 (D.C. Cir. 2011).  That is, the "acts giving rise to a hostile work environment claim must collectively meet the independent requirements of that claim" by being both (1) "adequately connected to each other (i.e., all acts which constitute the claim are part of the same unlawful employment practice. . .), as opposed to being an array of unrelated discriminatory or retaliatory acts" and (2) "sufficiently severe or pervasive." Id.

On this record, and in particular considering the new evidence and proposed additional findings, Ashraf cannot satisfy this test.  Ashraf has cobbled together disjointed testimony on disparate events spread out over many years involving different personnel and different protected characteristics.  Under binding authority, and on this record, hostile work environment cannot be sustained. See George, 407 F.3d at 416-417 (finding that, even where plaintiff was thrice told "to go back where she came from," the incidents were "isolated" and did not rise to the level of hostile work environment);  Freedman v. MCI Telecomm. Corp., 255 F.3d 840, 848 (D.C. Cir. 2001) (finding "a singular stray comment" – even one overtly religious in nature – "does not a hostile environment make."); Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753-754 (4th Cir. 1996)  (holding that, "as a matter of law the conduct of which Hopkins complains, spread over seven years with significant time gaps between incidents, does not create a sufficiently hostile environment on which to rest a Title VII claim.").  See also Frett v. Howard Univ., 2016 U.S. Dist. LEXIS 15061, at *18-19 (D.D.C. Feb. 8, 2016) (finding "smattering of isolated offenses over the course of . . .employment" did not amount to hostile work environment, even

where singular use of epithet in plaintiff's presence was "undoubtedly offensive"); Childs-Pierce, 383 F. Supp. 2d at 79 (finding no hostile work environment where plaintiff "attempts to cobble together a hostile work environment claim from discrete acts of alleged discrimination against her that are neither severe nor widespread.").  At best, Ashraf has proven just the sort of "'isolated incidents' that the Supreme Court has held cannot form the basis for a Title VII violation."  George, 407 F.3d at 417.

## III.   Conclusion

For all the foregoing reasons, the Embassy respectfully asks the Court to make certain additional findings of fact and accordingly to reconsider and amend its judgment.[12]

DATED: March 10, 2016               Laina Lopez

                                    Laina Lopez (D.C. Bar No. 477412)
                                    BERLINER CORCORAN & ROWE LLP
                                    1101 Seventeenth Street NW, Suite 1100
                                    Washington, D.C. 20036
                                    LCL@BCR-DC.COM
                                    202-293-5555
                                    Fax: 202-293-9035

                                    Pierre Chone
                                    LAW OFFICE OF PIERRE CHONE
                                    206 9th Street SE
                                    Washington, D.C. 20003
                                    202-543-3066
                                    pchone@cabinetchone.com

                                    *Attorneys for Defendant the Embassy of France in the United States*

---

[12] If necessary, the Embassy also intends to show, on appeal, that the Embassy cannot be liable for the alleged harassment because there is no evidence in the record that it was or should have been on notice of it, and there is also no evidence in the record that the alleged harassers had the necessary authority under Vance v. Ball State Univ., 133 S.Ct. 2434 (2013) to make the Embassy liable as a matter of law.  For appeal purposes, the Embassy also renews its motion for negative inferences.  (Dkt. 48).