**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAIMA ASHRAF-HASSAN,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 11-805 (JEB)** |
| **EMBASSY OF FRANCE,** | |
| **Defendant.** | |

**<u>MEMORANDUM OPINION</u>**

Blaise Pascal, the seventeenth-century mathematician and philosopher, once opined, "Contradiction is not a sign of falsity, nor the lack of contradiction a sign of truth." The Embassy of France in the United States, the Defendant in this long-running employment-discrimination case, begs to differ with its citizen's observation. It is instead convinced that a particular contradiction in Plaintiff Saima Ashraf-Hassan's testimony renders her an entirely incredible and possibly deceitful witness in the just-completed bench trial. In Defendant's view, that contradiction, which is now highlighted by what it characterizes as newly discovered evidence, casts such a pall over the plausibility of her account as to render suspect the Court's verdict, which credited much of her testimony in finding Defendant liable for creating a hostile work environment.

The Embassy now moves to supplement or reopen the record, or, alternatively, for a new trial. In so doing, it largely proffers myriad factual and legal arguments that it previously raised – and the Court rejected – at or before trial. Because Defendant has failed to identify any clear errors in the Court's factual findings, and because no "manifest injustice" or prejudice was

1

worked on the Embassy as a result of Plaintiff's testimonial inconsistency, the Court will deny the two post-trial Motions currently before it.

## I.   Background

This five-year-old lawsuit has endured many rounds of briefing, a trip to the Court of Appeals, and a three-day bench trial before the present Motions were filed.  The Court will briefly address the procedural history of the case before recounting its factual findings articulated at the conclusion of the trial.

### A.  Procedural History

Ashraf-Hassan, formerly employed by the French Embassy as its intern coordinator, filed this lawsuit against the Embassy in April 2011.  Her Amended Complaint alleged various forms of workplace discrimination and harassment due to her national origin, race, religion, and pregnancy, and in retaliation for protected activity, in violation of Title VII of the Civil Rights Act of 1964.  See ECF No. 5.  The Embassy initially moved to dismiss the Complaint, see ECF No. 11, and the Court granted its Motion as to four counts pertaining to Plaintiff's termination but denied it as to the remaining four counts, which raised hostile-work-environment claims.  See Ashraf-Hassan v. Embassy of France, 878 F. Supp. 2d 164, 175 (D.D.C. 2012).

Following several months of discovery, the Embassy moved for summary judgment on August 26, 2013.  See ECF No. 32.  The Court denied that motion on November 19.  See Ashraf-Hassan v. Embassy of France, 999 F. Supp. 2d 106, 117 (D.D.C. 2013).  The Embassy then moved for reconsideration, which the Court also denied, on January 16, 2014.  See ECF Nos. 38, 45.  While briefing continued on the parties' dueling motions in limine, the Embassy moved to dismiss the suit for lack of jurisdiction, arguing that it had withdrawn its prior waiver of immunity.  See ECF No. 51.  The Court denied that Motion, see ECF No. 56, and the Embassy

filed an interlocutory appeal.  See ECF No. 59.  The D.C. Circuit affirmed the Court's Order, see ECF No. 65, and, at long last, a bench trial was scheduled.

That trial on the remaining hostile-work-environment counts began on January 27, 2016, and lasted three days.  On February 11, the Court reconvened the parties to deliver an oral verdict.  See Minute Order of Feb. 11, 2016.

B.  Oral Verdict

1.  *Findings of Fact*

The Court commenced by summarizing the evidence presented at trial and making credibility determinations regarding the five witnesses who had testified – Plaintiff herself and four defense witnesses.  See Verdict Transcript at 4:10-12.  The Court initially found that three of the defense witnesses – Jean Claude Marfaing, Phillip Righini, and Gilles Cottet-Dumoulin – "are really inconsequential."  Id. at 4:12-16.  While the Court found them generally credible, their testimony did not "shed any light on the facts" in the case.  See id. at 4:17-18.  This left two key witnesses: Plaintiff and Chantal Manes, her manager.  At trial, Manes testified via videoconference from Paris, and the Court also agreed to view a recording of her full, three-hour deposition, after the parties stipulated to its admissibility.  See id. at 5:2-6.  The Court determined that Manes was a "fairly credible witness," as "[h]er demeanor and the contents of her answers generally struck [the Court] as reasonable."  Id. at 5:7-9.  The Court did not, however, find her credible as to "the attempted termination issue" – more on that later – or as to "other facts that she was never asked to rebut."  Id. at 5:10-11.  As for Plaintiff, who testified at length, the Court found that "she had a good recall for events, and appeared largely credible in her recounting of them," though she occasionally exaggerated some incidents "or construed them to be more offensive than they were."  Id. at 5:14-20.

With these credibility determinations as its foundation, the Court then relayed its factual findings: Plaintiff, a Muslim, was born in Pakistan, moved to France as a child, and became a French citizen in the 1990s. See id. at 6:6-8. She got a job at the French Embassy in the District of Columbia in 2001, arriving in the United States in October of that year on an A-2 visa. See id. at 6:12-14. At the Embassy, her department supervisor was Chantal Manes, a white non-Muslim, who was the head of the cultural program. See id. at 6:15-16. Ashraf-Hassan worked as an intern on a probationary contract from October 2001 to February 2002, during which time she managed the Embassy's internship and exchange program. See id. at 6:19-23. She was later hired as a local employee and became an interim program officer in February 2002. See id.

The Court found that during Ashraf-Hassan's probationary employment, Manes asked her, multiple times, why "your people are doing this," in relation to terrorism. See id. at 7:1-8. The Court found that Manes knew that Plaintiff was a Muslim, as she asked for leave on Muslim religious holidays and indicated on her contract that her country of origin was Pakistan. See id. at 7:9-12.

The Court next discussed the "much disputed pregnancy" incident, which resulted in the brief termination and subsequent reinstatement of Plaintiff in the spring of 2002. See id. at 7:13-14. This was an event central to the lawsuit, though the parties differed in their accounts of the incident. According to Plaintiff, in March 2002, she went to the doctor and learned she was pregnant. See id. at 7:14-15. Upon returning to work, she told Manes's secretary about her pregnancy, and Manes, who overheard their conversation, told Ashraf-Hassan, "[W]e need to talk." Id. at 7:16-17. The next day, Manes "lectured her for 40 minutes on family planning and said she should not be pregnant when starting a new job." Id. at 7:19-20. Then, "on April 16, Manes summoned the plaintiff to her office to say that she was being fired." Id. at 8:1-2.

Manes, in contrast, testified that Ashraf-Hassan had first brought up her pregnancy that day –
April 16 – and Manes had told her that this was "late to mention it given the start of her new
job." Id. at 8:2-6. According to Manes, Plaintiff then rejoined that she had told Manes about her
pregnancy a month earlier. See id. at 8:6. Manes, believing her to be lying about sharing the
news of her pregnancy in March, declared that she had lost trust in Ashraf-Hassan and was firing
her for that reason. See id. at 8:7-9. At trial, Manes also denied that the lecture on contraception
had ever taken place. See id. Both parties agreed that although Manes did fire her, Ashraf-
Hassan returned to work a week after this incident, as a result of the Ambassador's decision to
countermand Manes's termination order. See id. at 9:19-21.

The Court noted that the pregnancy incident is "hard to get a handle on," see id. at 8:10,
given the key witnesses' conflicting testimony. While Plaintiff's account at trial was
corroborated by her contemporaneous statement in an April 16 letter she wrote to the Secretary
General of the Embassy, her deposition testimony was "somewhat confusing and seems to agree
that she didn't tell Manes until April 16 about her pregnancy." Id. at 8:15-17; see also Pl. Trial
Exh. 2 (April 16, 2002, Letter from Plaintiff to Secretary General). Ultimately, the Court found
that Plaintiff's account of the pregnancy incident was more believable than Manes's version of
the event. See Verdict Trans. at 8:22-24.

A key factor in that determination was that because Plaintiff was the third employee in a
small department to disclose her pregnancy in a short window of time, Manes was "frustrated
that she would lose these employees as they took pregnancy leave . . . [and] put an undue burden
on her department." Id. at 8:24-9:4. Critically, the Court was not persuaded by Manes's
explanation of why she terminated Ashraf-Hassan on April 16, 2002: "Her account of firing the
plaintiff solely for loss of trust doesn't seem to hold water. It seems a very odd and

disproportionate response if that is really the reason.  The reason seems to me much more clearly that she fired her because she was pregnant."  See id. at 9:5-19.  The Court also stated that Plaintiff was "generally credible" when testifying about the family-planning lecture, which, furthermore, seemed "an unusual thing to make up," so the Court found that it likely had occurred – though Plaintiff's account of it was probably somewhat exaggerated.  See id. at 9:14-18.  The Court ultimately concluded, therefore, that the evidence showed that Manes had lectured Ashraf-Hassan about contraception when she learned about the pregnancy and then subsequently fired Plaintiff for being pregnant.

After Plaintiff returned to work, Manes generally treated her professionally, and they worked together at the Embassy until Manes left in September 2005.  Id. at 9:22-24, 10:16-17.  Those years were not entirely without incident, however.  On one occasion, an assistant said, within earshot of Plaintiff, "Now we hire terrorists," and Manes appeared to Plaintiff to assent.  See id. at 10:1-7.  On another occasion, Manes told Plaintiff not to accept an intern from France at the Embassy named Nabil because the Embassy "should not hire people like him," and the Court inferred that Manes did not think a Muslim or potential Muslim should be hired by the Embassy.  See id. at 10:11-16.  These were the Court's key findings about Ashraf-Hassan's relationship with Manes.

In addition, the Court made findings about Plaintiff's relationship with another one of her supervisors, Christian Tual.  In October 2004, Ashraf-Hassan began working for Tual in part, see id. at 10:21-24 – she was still also working under Manes – and the Court found that unlike Manes, Tual was something of a "mercurial figure, prone to outbursts and anger."  Id. at 11:1.  Tual, on repeated occasions, expressed hatred for "Chinese, Indians and Pakistanis," and once suggested that Plaintiff should work for the Pakistani Embassy, where he thought she would "be

happier," notwithstanding her French citizenship.  Id. at 11:2-10.  The Court did find that Plaintiff had exaggerated various aspects of her account of her interactions with Tual – *e.g.*, that he called her children dogs or inappropriately forced her to make coffee and perform other personal tasks for him.  See id. at 11:11-24.  It nevertheless concluded that her testimony about some of Tual's hostile conduct was bolstered by her letters to various supervisors "to complain . . . regarding Tual particularly."  Id. at 12:1-11 (citing Plaintiff's Trial Exhibits 5, 6, 16, and 17 as corroborating evidence).

One specific incident with Tual took center stage at trial.  On January 3, 2007, Tual wrote an email to another Embassy employee, who showed it to Ashraf-Hassan, in which he twice referred to Plaintiff as "the Pashtun" and stated that he hoped she would have her phone and computer taken away from her and would "be confined in a box room for interns" until she left her position.  See id. at 12:15-13:9.  The Court found that this email "demonstrates . . . Tual's attitude, and it was also a fact Plaintiff was aware of, having seen it."  Id. at 13:10-11.  It determined that Ashraf-Hassan could "justifiably feel that [the term 'Pashtun'] had a negative connotation and was again along the same lines of calling her a terrorist."  Id. at 13:6-8.  The Court found, furthermore, that Ashraf-Hassan was, in fact, moved to a room for interns and denied access to her telephone and computer toward the end of her time at the Embassy.

Shortly after the "Pashtun" incident, Ashraf-Hassan was terminated.  She was told in December 2006 that her contract would not be renewed, and her time at the Embassy concluded at the end of January 2007.  Id. at 12:12-14.  The Court found that the mistreatment she suffered before her ultimate termination "caused her to lose her appetite, not sleep well, and to have nightmares," although she never sought medical treatment for such ailments.  See id. at 13:17-20.

2.   *Conclusions of Law*

Although the Court had already set forth the legal principles governing Title VII claims in its prior Opinions, see Ashraf-Hassan, 999 F. Supp. at 113-17, it summarized the relevant standards before offering its conclusions of law in its verdict.  The Court began by noting Title VII's broad prohibition on discrimination against any individual with respect to her compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or natural origin.  See Verdict Trans. at 14:1-6; see also 42 U.S.C. §§ 2000e *et seq.*  Further, "[d]iscrimination on the basis of pregnancy is considered discrimination on the basis of sex."  Verdict Trans. at 14:5-6; see also Ashraf-Hassan, 999 F. Supp. 2d at 113.  The Supreme Court has held that Title VII's discrimination prohibition makes it unlawful for an employer to require people to work in discriminatorily hostile or abusive environments.  See Verdict Trans. at 14:7-9; see also Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

To prevail on a hostile-work-environment claim, an employee must demonstrate that her employer subjected her to "discriminatory intimidation, ridicule[,] and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment."  Verdict Trans. at 14:9-14; see also Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  In determining whether the employee has made such a showing, courts look to "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with [the] employee's work performance."  Verdict Trans. at 14:15-19; see also Baloch, 550 F.3d at 1201 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  Although a plaintiff may not combine discrete acts to form a hostile-work-environment claim without meeting the required hostile-work-environment standard, neither can a court dismiss such a claim merely because it contains a number of discrete acts that are actionable on their

own.  See Verdict Trans. at 15:1-7 (citing Baird v. Gotbaum, 662 F.3d 1246, 1252-53 (D.C. Cir. 2011)).  At the same time, Title VII is not a license for "courts to police the ordinary tribulations of the workplace."  Id. at 14:23-25.

Applying these standards to its findings of fact, the Court then concluded that, although "this is a reasonably close case, largely because the standard for hostile work environment is very high," Plaintiff had nevertheless succeeded in establishing that the discriminatory conduct of Manes and Tual "was sufficiently pervasive to change the terms and conditions of [her] employment."  Id. at 15:8-17.  One key fact that weighed heavily on this conclusion was the attempted termination, accompanied by the contraception lecture, shortly after Plaintiff announced her pregnancy.  Id. at 15:18-25.  The Court ultimately agreed with Ashraf-Hassan's theory of the case: "that her pregnancy was treated differently from that of her white non-Muslim French origin coworkers who were not temporarily fired" after informing Manes of their pregnancies.  See id. at 16:3-6.  Manes's prior behavior toward Ashraf-Hassan – including her disparaging comments about Muslims – confirmed that the attempted firing was "an event based on race, national origin and/or religion," and was "part and parcel of a hostile work environment based on those protected characteristics."  Id. at 16:7-11.  Other contributors to that hostile environment included Manes's making or endorsing a number of "derogatory comments about Plaintiff being linked to terrorists because of her race, national origin, [and/or] religion," as well as "Tual's repeated comments," which were "similarly insulting and . . . occurred over the course of years."  Id. at 16:14-20.  Last, "the relegation of the plaintiff to lesser facilities without a proper computer" toward the end of her tenure at the Embassy also contributed to the hostile work environment.  Id. at 16:25-17:2.

After finding the Embassy liable for violating Title VII, however, the Court noted that damages should not be significant for various reasons: Manes treated Plaintiff "in a professional manner" after her attempted termination; Plaintiff "exaggerated some of the slights" she suffered and "embellished" some of her accounts of her supervisors' conduct; and Plaintiff neither sought medical treatment for the harm she incurred as a result of that conduct nor testified that her familial relationships were thereby harmed. See id. at 17:9-18:18. The Court concluded that the appropriate amount of damages in this case was $30,000. See id. at 18:19-20. Finally, the Court provided that Ashraf-Hassan would be able to file a "careful and thoughtful" petition for attorney fees. See id. at 19:1.

Shortly after the Court delivered its oral verdict, the Embassy filed two post-trial motions – a Rule 52(b) Motion, see ECF No. 86, and a "Motion for estoppel and, in the alternative, Motion for a New Trial." See ECF No. 87. While emphasizing certain contradictions in Plaintiff's testimony, Defendant also points to new documentary evidence – in the form of Manes's datebook – that it claims supports its request for a different outcome.

## II.        Analysis

In its companion Motions, Defendant has invoked the doctrine of judicial estoppel and the provisions of Rules 52(b) and 59(a)(2). Although these various forms of relief are somewhat overlapping, their governing legal standards differ in important ways. At the same time, a single disputed issue lies at the center of all of them: the date in 2002 on which Plaintiff learned that she was pregnant.

At the very beginning of its oral verdict, the Court flagged this "threshold legal issue." Verdict Trans. at 3:10. In fact, at the conclusion of the evidence, it had sought input from the parties on whether "Plaintiff's position in the pretrial statement that she discovered her

pregnancy on April 16, 2002, precludes her from introducing at trial evidence inconsistent with that date." Minute Order of Jan. 28, 2016. The Court in its verdict reached the following conclusion:

> I want to rule on . . . the effect of plaintiff's statement in the pretrial statement that she learned she was pregnant in April 2002. I hold that that does not preclude her side from arguing that she learned actually in March 2002. The reason essentially is there is no surprise or prejudice to the defense. The testimony on this issue has been confused and has gone back and forth in different pleadings in discovery during the whole context of the case. The amended complaint, for example, alleges that it happened in March, as does the letter that the plaintiff sent to the Ambassador when she was temporarily fired in April [2002]. She says in that letter that she learned in March [2002]. She also said that in other discovery responses, even though her deposition appears to indicate to the contrary, it is somewhat confused. And even though the pretrial statement says this, I don't find the defense in any way relied on it or is in any way surprised or prejudiced by the fact that she testified that it occurred in March. So I will not preclude her from arguing that. I will consider the statement in the pretrial statement when I weigh all the evidence in terms of finding the facts.

Verdict Trans. at 3:11-4:7.

Later, after weighing all of the evidence and the credibility of the various witnesses, the Court determined that Ashraf-Hassan's version of events – including the fact that she had learned of her pregnancy in March 2002, see id. at 7:15-18 – was the more likely one. See id. at 8:24-25. Whether these rulings were appropriate or whether Plaintiff's change in position warrants post-trial relief is, fundamentally, the question that these two Motions pose. In discussing separately each legal basis upon which Defendant relies – judicial estoppel, Rule 52(b), and Rule 59(a)(2) – the Court will first set forth the legal standard and then analyze the parties' arguments.

A.  Judicial Estoppel

1.  *Legal Standard*

"Courts may invoke judicial estoppel [w]here a party assumes a certain position in a legal proceeding, . . . succeeds [by] maintaining that position, . . . [and then,] simply because his interests have changed, assume[s] a contrary position." Comcast Corp. v. FCC, 600 F.3d 642, 647 (D.C. Cir. 2010) (internal quotation marks and citation omitted).  Because "judicial acceptance of an inconsistent position in a later proceeding creates the perception that either the first or the second court was misled," doing so "pos[es] a threat to judicial integrity." Moses v. Howard Univ. Hosp., 606 F.3d 789, 792 (D.C. Cir. 2010) (alterations and quotation marks omitted) (citing New Hampshire v. Maine, 532 U.S. 742, 750 (2001)).  Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." Maine, 532 U.S. at 749 (internal quotation marks and citation omitted).  The D.C. Circuit has instructed that "[t]here are at least three questions that a court should answer in deciding whether to apply judicial estoppel: (1) Is a party's later position clearly inconsistent with its earlier position? (2) Has the party succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled? (3) Will the party seeking to assert an inconsistent position derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped?" Moses, 606 F.3d at 798.

2.  *Merits*

Defendant contends that Plaintiff should be judicially estopped from taking a position at trial inconsistent with one she took during the course of this litigation.  See Estoppel Mot. at 1. The Embassy asserts that "[f]or more than two years before the trial, Ashraf and her attorneys

unambiguously maintained and argued that her statement in the Amended Complaint that she discovered her pregnancy on March 15, 2002[,] and was lectured the following day, March 16, was incorrect, instead insisting in discovery and court filings that she discovered it on April 16, 2002[,] and was lectured a few hours later." Id. Because Ashraf-Hassan stated, in many of her filings before trial, that she discovered her pregnancy on April 16, she cannot "thereafter assum[e] a contrary position simply because [her] interests have changed." Id. at 2-3 (citing Moses, 606 F.3d at 798). Although the Embassy does not clearly state what remedy would be appropriate should the Court find its estoppel argument persuasive, the Court presumes that what Defendant seeks is a new trial. Plaintiff, for her part, insists that she did not mislead the Court and that "conflicting testimony about an immaterial date" does not warrant judicial estoppel. See ECF No. 89 (Estoppel Opp.) at 1.

The Court believes Ashraf-Hassan has the better argument. Revisiting the parties' filings throughout this case reveals that Plaintiff has never demonstrated great certainty about the date she discovered her pregnancy and told Manes about it; on the contrary, she has "not dispute[d] that she was confused about the date . . . during the course of the litigation." Id. at 2. As such, it is certainly not clear that she intentionally assumed one position – what Defendant calls the "April Position" – and later changed that position at trial – adopting what Defendant terms the "mid-March Position." Estoppel Mot. at 4. Plaintiff's conduct throughout the course of litigation, including her statement of one date in the Amended Complaint, another in later briefings and deposition testimony, and the first again at trial, evinces ongoing confusion about the date she learned she was pregnant. See Verdict Trans. at 9:10-13 (finding that any self-contradiction about pregnancy-discovery date by Plaintiff was "explainable as natural confusion or sloppiness by counsel as opposed to misleading or deceptive").

Confusion, moreover, is not the kind of "intentional self-contradiction" the doctrine of judicial estoppel is intended to prevent.  See Maine, 532 U.S. at 751 (quotation marks and citation omitted).  Rather than "deliberately changing positions according to the exigencies of the moment," it appears that Ashraf-Hassan was simply unsure about facts occurring fourteen years prior to the trial at which she was testifying about them.  Id. at 750 (quoting United States v. McCasey, 9 F.3d 368, 378 (5th Cir. 1993)); see also Comcast Corp., 600 F.3d at 647 ("'Doubts about inconsistency often should be resolved by assuming there is no disabling inconsistency, so that the second matter may be resolved on the merits.'") (quoting Wright & Miller, Fed. Prac. and Proc. § 4477, at 594 (2d ed. 2002)).

Even had there been intentional factual see-sawing on the part of Plaintiff, the Court does not believe that she has benefited in any way therefrom.  In concluding that Plaintiff had labored in a hostile work environment, the Court did not rely specifically on the date she discovered her pregnancy.  It explained in its ruling that although the pregnancy incident "is hard to get a handle on," and although Plaintiff's deposition testimony and interrogatory answers were "somewhat confusing" as to the date, the Court ultimately found that Ashraf-Hassan's account of the entire pregnancy "incident" was more believable than Manes's.  See Verdict Trans. at 8:10-16 (citing Plaintiff's Trial Exhibit 2).  Its legal conclusion flowing from this finding – that Manes's account of firing Plaintiff solely for loss of trust "doesn't seem to hold water" – in no way relied on the date Plaintiff discovered her pregnancy, but rather on the Court's belief that Manes's account would have been "a very odd and disproportionate response if that [was] really the reason" for her termination.  Id. at 9:5-7.  The Embassy thus cannot point to any actual advantage Ashraf-Hassan derived by testifying to one date at her deposition and another at trial.  And while the Supreme Court has declined to offer "an exhaustive formula for determining the applicability of

judicial estoppel," a key consideration it has identified is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." <u>Maine</u>, 532 U.S. at 751.

Defendant nonetheless offers two <u>potential</u> advantages Ashraf-Hassan could have gleaned from her supposed change in position. First, it argues that had the Court found that Plaintiff discovered her pregnancy on April 16, it "would mean that Ashraf lied to Manes and the Secretary General when she claimed and wrote on that same day that she had disclosed her pregnancy in mid-March." Estoppel Mot. at 4. Yet the Court's liability determination did not rely on a factual finding that Plaintiff did not lie to Manes about the date she informed her of her pregnancy. It found that <u>even if</u> she had lied to Manes, termination would have been a disproportionate response to such a lie, and it concluded that the "attempted firing was an event based on race, national origin and/or religion, in no small part because of Manes'[s] prior behavior toward plaintiff." Verdict Trans. at 16:7-9. Whether Plaintiff actually lied about the date she discovered her pregnancy does not alter this conclusion.

Defendant's second argument is that it would have had a better case for its motion to discover Plaintiff's medical records had it known that she would testify to a different date at trial from what she did in her deposition. <u>See</u> Estoppel Mot. at 5; <u>see also</u> ECF No. 40 (Motion to Reopen Discovery). In its view, the medical records could have been used to show that the mid-March position was in fact correct, which would, in turn, have meant that her deposition testimony "was a fabrication." Estoppel Opp. at 5. This, the Embassy believes, "would tend to show that Ashraf was not merely confused or mis-remembered but that she had purposefully intended to deceive the Embassy." <u>Id.</u> The Court finds this argument unavailing.

First, if she had discovered her pregnancy in March, then Ashraf-Hassan's trial testimony to that effect would have been <u>accurate</u>.  Second, while the contradiction <u>itself</u> – of which the Court was well aware when it rendered its decision – may undermine Plaintiff's credibility, the confirmation of the March or April date by other evidence would not.  In other words, the damage inflicted by her inconsistencies has already been done and been considered by the Court.  The Court nevertheless found Ashraf-Hassan's account of the attempted termination credible, despite noting numerous times during its verdict that some of the precise facts surrounding the event remained unclear in that account.  There is no reason to believe the Court's credibility determination would have been different had it granted the Embassy's discovery request and admitted her medical records into evidence.

Nor does the Court believe, contra Defendant's suggestion otherwise, that it necessarily would have granted the Embassy's motion to discover Ashraf-Hassan's medical records, had it known that she would testify as she did at trial.  The Court denied Defendant's first oral motion to discover Plaintiff's medical records at a status conference on June 19, 2013.  <u>See</u> ECF No. 87, Exh. 3 (June 19, 2013, Hearing Transcript) at 7:10-13.  At that hearing, Defense counsel stated that it required those records to demonstrate that Plaintiff had not satisfied her obligation under French law to inform her employer of her pregnancy as soon as possible.  <u>Id.</u> at 4:4-10. Plaintiff's counsel countered first, that no such obligation exists under American law and, second, that "[t]he question of when she became pregnant is simply not relevant to this case."  <u>Id.</u> at 4:13-5:1.  Under her theory of the case, the relevant fact regarding the pregnancy was that Plaintiff "was fired the minute she said I'm pregnant."  <u>Id.</u> at 4:20.  Defense counsel then explained that its position was that she was fired for lack of truthfulness.  <u>See id.</u> at 5:9-10.  But when the Court asked whether "anyone would testify at trial that . . . at least one of the reasons

she was fired was lack of truthfulness regarding pregnancy," Defense counsel answered in the

negative.  Id. at 7:4-6.  It was for that reason alone that the Court denied the Embassy's request

to discover the records, ruling that absent such testimony of untruthfulness, "the intrusion

outweighs [the] relevance" of the records.  Id. at 7:11-12.  The Court thus denied the motion to

discover medical records based on its lack of relevance to the Embassy's proof at the time it

moved.

When, later, the Embassy was able to reach Manes and obtain her testimony in support of

the untruthfulness theory, it filed a written motion to discover Plaintiff's medical records.  See

Mot. to Reopen Disc.; see also ECF No. 43, Attach. 1 (Affidavit of Secretary General Gilles

Cottet-Dumoulin) at 2  (explaining that December 7, 2013, was the first time the French

Embassy was able to contact Manes regarding Ashraf-Hassan's case).  Because the discovery

motion was filed without leave of court, in violation of the Court's Scheduling Order, the Court

denied that motion without prejudice.  See Minute Order of Dec. 16, 2013.  There is no record

that the Embassy later requested leave in order to re-file the motion, and the Embassy never

explains in its current Motions why it decided not to do so.  The Court is therefore not persuaded

by the suggestion that Ashraf-Hassan was advantaged, since the reasons the Court denied the

discovery motion related to the Embassy's conduct.

When applied properly, the doctrine of judicial estoppel "generally prevents a party from

prevailing in one phase of a case on an argument and then relying on a contradictory argument to

prevail in another phase."  Maine, 532 U.S. at 749 (quoting Pegram v. Herdrich, 530 U.S. 211,

227 n.8 (2000)) (emphasis added).  Here, Ashraf-Hassan cannot be said to have "prevailed" in an

earlier "phase," since trial was one unified proceeding.  To the extent she would argue that

discovery is a separate "phase," Plaintiff did not defeat the Embassy's motion to discover her

medical records as a result of this "change in position," as just explained.  See Zedner v. United States, 547 U.S. 489, 504-05 (2006) (no judicial estoppel where plaintiff did not "succeed[] in persuading" the District Court to adopt an earlier position).  Nor did Plaintiff succeed in persuading the Court to accept the April position at any earlier time in this litigation; indeed, in its 2013 Opinion denying Defendant's summary-judgment motion, the Court stated that Plaintiff learned she was pregnant in "March or April of 2002" and expressly noted that inconsistencies regarding "the exact date Ashraf-Hassan discovered she was pregnant . . . are not material to this case." Ashraf-Hassan, 999 F. Supp. 2d at 109, 115.  In sum, "[t]he Supreme Court has indicated that judicial estoppel 'is an equitable doctrine invoked by a court at its discretion,'" Moses, 606 F.3d at 797 (quoting Maine, 532 U.S. at 750), and the Court does not believe it appropriate to exercise such discretion in this case.

    B.  Rule 52(b)

        1.  *Legal Standard*

Pursuant to Federal Rule of Civil Procedure 52(b), a party may, within 28 days of the entry of judgment after a bench trial, move the Court to "amend its findings – or make additional findings – and . . . amend the judgment accordingly."  The Rule "permits the trial court to correct manifest errors of law or fact, make additional findings or take other action that is in the interests of justice." Bigwood v. Defense Intelligence Agency, 770 F. Supp. 2d 315, 318 n.2 (D.D.C. 2011) (internal quotation marks and citation omitted).  "The decision to alter or amend findings or judgment is combined [*sic*] to the sound discretion of the trial judge and is not an avenue for relitigating issues upon which the moving party did not prevail at trial.  Therefore, the party bringing a Rule 52 motion bears a heavy burden in seeking to demonstrate clear error of manifest injustice [necessitating] amend[ment of] the judgment." Material Supply Int'l, Inc. v. Sunmatch

Indus. Co., Ltd., No. 94-1184, 1997 WL 243223, at *2 (D.D.C. May 7, 1997) (citing Nat'l Metal

Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc., 899 F.2d 119, 123 (1st Cir. 1990)).

Moreover, "[a] party who failed to prove his [or her] strongest case is not entitled to a second

opportunity to litigate a point, to present evidence that was available but not previously offered,

or to advance new theories by moving to amend a particular finding of fact or conclusion of

law." Salazar v. District of Columbia, 685 F. Supp. 2d 72, 75 (D.D.C. 2001) (internal quotation

marks and citation omitted); see also 9C Wright & Miller, Fed. Prac. and Proc. Civ. § 2582 (3d

ed.) (A Rule 52(b) "motion must raise questions of substance by seeking reconsideration of

material findings of fact or conclusions of law to prevent manifest injustice or reflect newly

discovered evidence."); Johnson v. Greater Se. Cmty. Hosp. Corp., No. 90-1992, 1996 WL

377147, at *3 (D.D.C. June 24, 1996) ("Rule 52(b) ensures the adequacy of fact-finding by

providing a trial court the opportunity to cover or clarify the essential factual and legal points so

that they might be better understood by the parties and a reviewing court.").

Rule 52(b) motions may be made in conjunction with a motion for new trial. Id. They

may not, however, "break the most fundamental rule of fairness that should attend the trial

process" by denying the nonmoving party "the opportunity to cross examine" or "meet [the

amended findings] with proof of their own." Draim v. Virtual Geosatellite Holdings, Inc., 241

F.R.D. 48, 51 (D.D.C. 2007). "The court's decision to alter or amend" its findings under Rule

52(b) "should not be dictated either by the impact of its initial ruling, or by the projected

consequences of the anticipated modifications. If the errors discovered in its opinion require

dramatic revision of its first judgment, a court is not obliged to remain shackled to that

judgment." Johnson, 1996 WL 377147, at *3 (internal quotation marks and citation omitted).

2.  *Merits*

The Embassy invokes Rule 52(b) in asking the Court to make additional findings of fact

beyond those discussed in its oral verdict and then, based on such new findings, to revisit its

ruling on liability.  See ECF No. 86 (Rule 52(b) Motion) at 1.  Specifically, the Embassy wishes

the Court to make the following additional factual findings:

> 1.  Ashraf-Hassan learned of her pregnancy in mid-March 2002 but made
>     representations to the Court about that date, for more than two years before trial,
>     that she knew to be false, id. at 3;
>
> 2.  During those two years, Ashraf-Hassan implicitly admitted that her written
>     statement to the Secretary General on April 16, 2002, was false, id. at 4;
>
> 3.  Ashraf-Hassan's version of the story that she told at trial, which hews closely to
>     her Amended Complaint, cannot be true based on new evidence that Chantal
>     Manes was in Paris on March 15 and 16, 2002, and, further, that March 16, 2002,
>     was a Saturday on which none of the Embassy employees at issue worked, id. at
>     4-5;
>
> 4.  Plaintiff did not mention the alleged lecture on family planning and contraception
>     in her January 2007 letter to the Ambassador, her EEOC complaint, or her EEOC
>     request for reconsideration, id. at 5;
>
> 5.  Plaintiff called her supervisor Christian Tual "for support when she felt harassed
>     by others," and there was no evidence adduced at trial that Tual and Plaintiff
>     exchanged hostilities in emails to one another, id. at 5;
>
> 6.  The Embassy's decision to isolate Plaintiff from her team during her last days
>     working there was a legitimate business decision resulting from her propagation
>     of false information, id. at 6; and
>
> 7.  Ashraf-Hassan produced no evidence contradicting the Embassy's defense that
>     she was terminated for a legitimate business reason – namely, the reorganization
>     of the Embassy's activities – of which Plaintiff was aware.  Id. at 6.

The Embassy asserts that it is in the interests of justice for the Court to make these

findings of fact, which, once made, will "necessarily require the Court to reconsider inferences

made from the findings and to amend [its] . . . judgment."  Id. at 2.  In Defendant's view, these

supplemental facts reveal that Ashraf-Hassan's story is "internally inconsistent" and

"contradicted by objective evidence," such that it "is insufficient to sustain a finding of a hostile work environment." <u>Id.</u> at 6.

Unfortunately, while Defendant devotes substantial time to its arguments about the <u>effect</u> these new factual findings should have on the verdict, it only cursorily attempts to justify its request that the Court should make such findings in the first place. Defendant simply insists that the Court should make these new findings because Plaintiff's testimony is confusing and "implausible." <u>Id.</u> at 11. The Embassy thus urges the Court to make the factual findings it advanced at trial, for essentially the same reasons it advocated there. Such a rationale cannot support amended findings under Rule 52(b), which, courts have long emphasized, is "not an avenue for relitigating issues upon which the moving party did not prevail at trial." <u>Material Supply Int'l, Inc.</u>, 1997 WL 243223, at *2.

Rather, the Rule provides the Court discretion to amend its findings only in the limited circumstance when it has made "manifest errors of law or fact." <u>Bigwood</u>, 770 F. Supp. 2d at 318 n. 2. In <u>Johnson</u>, for instance, amendment of factual findings was warranted because the district court had "overlooked" a "critical fact" that was "clearly relevant . . . to the justiciability of plaintiff's antitrust claims." 1996 WL 377147, at *3. Here, however, the Court does not believe it has made any inadvertent errors or accidental omissions of key facts, but has been able to assess the totality of the evidence presented at trial. That Defendant may not like its conclusions or might still believe certain testimony to be inconsistent or implausible hardly rises to the level of manifest error. A brief look at each of Defendant's proposed supplemental findings confirms this. The Court will generally consider them in order; as the third – relating to new evidence about Manes's schedule – is the most substantive, it will be examined last.

The first two proposals concern, once again, the dates of Plaintiff's pregnancy, which the Court has just discussed in detail.  See Section II.A, *supra*.  These new findings are thus unwarranted.

As to the fourth proposed finding, although the Court did not specifically refer in its verdict to Plaintiff's failure to mention the contraception lecture in certain documents, it was aware of such absence because Defendant emphasized the point at trial.  The Court nonetheless concluded that the lecture had likely happened because it would be "an unusual thing to make up," and plaintiff "was generally credible when testifying about it."  Verdict Trans. at 9:14-18.  Those determinations are neither disturbed nor undermined by the absence of any mention of the lecture elsewhere.  This finding is thus unnecessary.

As to the fifth proposed finding, similarly, the Court was aware of such facts related to Tual but did not find them of such significance as to warrant inclusion in its verdict.  Defendant, moreover, does not explain what "manifest error" would be corrected by the finding that Plaintiff turned to Tual for support, as the Court neither made nor relied on a finding that they had an openly hostile relationship.  Nor would a finding that Tual and Plaintiff did not exchange hostilities via email be particularly relevant for liability purposes.  The "Pashtun email," it should be remembered, was not an email to Ashraf-Hassan.  The Court's conclusions about Tual's conduct – that the email reflected Tual's "attitude" and that Plaintiff was aware of it – thus would not be affected by this proposed finding.

The last two proposed findings concern the Embassy's decision to isolate Plaintiff at the end of her tenure there, which Defendant asks the Court to find was a legitimate business decision.  The Court, by way of reminder, concluded that "the relegation of the plaintiff to lesser facilities without a proper computer and a worse office" was relevant to the establishment of a

hostile work environment and was therefore not a legitimate business decision.  Id. at 16:25-

17:2.  Defendant's last two findings are not supplemental; the Embassy simply seeks to relitigate

legal issues on which the Court has already ruled.

Turning now to the Embassy's third proposed finding – which relates to Manes's absence

from Washington in mid-March 2002 – the Court is not persuaded that such facts warrant a

reopening of the record.  To begin, this factual finding directly contradicts Defendant's first

proposed finding; the Court thus could not find both.  More important, while the Court is aware

of its resemblance to a broken record, it must again underscore that the precise date on which

Ashraf-Hassan discovered her pregnancy or told Manes, as well as the precise date of the

contraception lecture, were not facts critical to the Court's determination of what occurred in that

incident or, more generally, of the Embassy's liability.  In addition, although the Embassy

believes its new evidence will show that Ashraf-Hassan's "version of events in March 2002 . . .

is an impossibility," it admits that Manes returned to Washington on March 22, 2002, see ECF

No. 92 (Rule 52(b) Reply) at 2 & n.1, meaning that Plaintiff could still have relayed her

information thereafter, even if not on March 15 or 16.  In other words, even were the Court to

reopen the record to admit "the new evidence showing that Manes was in Paris on March 15 and

16, 2002 and that March 16 was a Saturday," Rule 52(b) Mot. at 13, it does not follow that

Plaintiff's "version of the story that she told at trial" – and specifically the Court's finding that

she learned she was pregnant in "March 2002" – cannot be true.  See Verdict Trans. at 7:14,

8:22-24.  Last, the Embassy never explains why this evidence is "new" – viz., why it could not

have introduced it at trial.  The Court, consequently, will decline to make any supplemental

finding regarding the March dates.

In the final analysis, Defendant simply disagrees with the Court's credibility determinations in this case. It points to <u>Jackson v. United States</u>, 353 F.2d 862 (D.C. Cir. 1965), in which the D.C. Circuit explained that "credibility involves more than demeanor. It apprehends the overall evaluation of testimony in light of its rationality or internal inconsistency and the manner in which it hangs together with other evidence." <u>Id.</u> at 866. According to Defendant, the "overall evaluation of testimony" reveals that Plaintiff's account was "riddled with unexplained inconsistencies, and contradicted by the objective evidence," and "her story is unlikely." Rule 52(b) Mot. at 13. The Embassy appears convinced that a single inconsistency must, as a "matter of law," render a witness incredible. <u>See id.</u> at 15. But the law says no such thing. In this case, the Court has acknowledged that portions of Ashraf-Hassan's testimony were confusing or unclear, and it nevertheless found by a preponderance of the evidence that her hostile-work-environment claims succeeded.

To be sure, it is no easy task for any court to make credibility determinations and factual findings in trials as confusing as this one. As another court in this district has explained,

> The importance of thorough and accurate fact-finding at the trial court level of the judicial process cannot be overstated. In the words of Judge Jerome Frank: . . . 'To ascertain the facts is not a mechanical act. It is a difficult art, not a science. It involves skill and judgment. As fact-finding is a human undertaking, it can, of course, never be perfect and infallible.'

<u>Johnson</u>, 1996 WL 377147, at *3 (quoting <u>United States v. Forness</u>, 125 F.2d 928, 943 (2d Cir. 1942)). In trials, as in life, much of the truth is painted in muted hues of gray, not in stark blacks and whites. While another fact finder might disagree with the Court's credibility determinations, the possibility of such disagreement is not a sufficient basis to grant a Rule 52(b) Motion. Rule 52(b) imposes a "heavy burden" on the moving party "to demonstrate clear error," <u>Material Supply Int'l</u>, 1997 WL 2432233, at *2, and the Embassy has not carried that burden.

C.  Rule 59(a)(2)

   1.  *Legal Standard*

Federal Rule of Civil Procedure 59(a)(2) permits a court, on a motion for a new trial after

a nonjury trial, to "open the judgment if one has been entered, take additional testimony, amend

findings of fact and conclusions of law or make new ones, and direct the entry of a new

judgment."  A motion to reopen the trial record to submit additional proof "is addressed to [the

court's] sound discretion."  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331

(1971); see also Solmitz v. United States, 640 F.2d 1089, 1091 n.1 (9th Cir. 1981) ("'The

decision whether to amend findings of fact or conclusions of law in light of newly discovered

evidence rests within the discretion of the district court.") (citing Fed. R. Civ. P. 59(a)(2) and

Thomas v. S.S. Santa Mercedes, 572 F.2d 1331, 1336 (9th Cir. 1978)).

   "Rule 59(a)(2) permits a rehearing in nonjury actions for any of the reasons for which

rehearings have heretofore been granted in suits in equity in the courts of the United States.

Among the reasons most often cited are verdicts which are against the weight of the evidence,

excessive damages, evidentiary flaws, the discovery of important new evidence, and the

prevention of injustice."  Azevedo v. Hous. Auth. of City of Sarasota, 147 F.R.D. 255, 257

(M.D. Fla. 1993) (internal quotation marks and citations omitted).  "A court should grant a

motion under Rule 59(a)(2) only to correct manifest errors of law or fact, or, in some limited

situations, to present newly discovered evidence.  The purpose of Rule 59(a)(2) is not to

introduce new evidence that was available at the time of trial but was not proffered, to advance

new theories, or to secure a rehearing on the merits."  Chavez v. City of Albuquerque, 640 F.

Supp. 2d 1340, 1343 (D.N.M. 2008) (internal quotation marks and citations omitted).  A court

faced with a Rule 59(a)(2) motion after a nonjury trial "should be most reluctant to set aside that

which it has previously decided unless convinced that . . . refusal to revisit the earlier decision

would work a manifest injustice. . . .   Rule 59 is not a vehicle for relitigating old issues . . . or

otherwise taking a 'second bite at the apple.'"   <u>Barnes v. Alves</u>, 304 F.R.D. 363, 366-67

(W.D.N.Y. 2015) (internal quotation marks and citations omitted); <u>see also</u> Wright & Miller, 11

<u>Fed. Prac. and Proc</u>. § 2804 (3d ed.) ("A motion for a new trial in a nonjury case or a petition for

rehearing should be based upon manifest error of law or mistake of fact, and a judgment should

not be set aside except for substantial reasons.").

      2.   *Merits*

      In this case, Defendant has identified no error in the Court's findings, <u>see</u> *supra* Section

II.B, and it does not argue that there has been a change in the law governing Title VII claims

since issuance of the verdict.   It instead wishes the Court to hold a new trial or to "reopen the

trial so that it can present newly discovered evidence [Manes's datebook] and if necessary take

additional testimony that will unequivocally demonstrate that Ashraf's final version of the facts"

must be false.  <u>See</u> Estoppel Mot. at 12.  The Embassy argues that it "had no reason to anticipate

that it needed to gather evidence to show at trial that the alleged [contraception] lecture could not

have occurred on March 16 or even in mid-March 2002" because "Ashraf insisted for more than

two years that she was mistaken in her [C]omplaint and that the date of the alleged lecture was

April 16, 2002."  <u>Id.</u>  The Embassy, alternatively, requests a new trial so that it may have an

opportunity to discover Ashraf-Hassan's medical record.  But, as the Court has already explained

in detail, the Embassy simply cannot show a likelihood that anything in the Court's verdict –

either findings of fact or conclusions of law – would be altered by including Manes's datebook

and Plaintiff's medical records.  There is therefore no "manifest injustice" worked on the

Embassy by its failure to present this material at trial, and certainly no need for a new hearing or trial.

In any event, as noted before, the Court is not convinced that the Manes information may fairly be considered "newly available" evidence.  First, Defendant clearly knew all along that March 16 was a Saturday.  Second, it was on notice – from earlier pleadings, the April 16 letter, and especially from Plaintiff's trial testimony – that she was asserting that she told Manes of her pregnancy in March 2002.  The Embassy could have asked Manes about this and learned of her datebook entries.  Relatedly, the Court has already explained that its denial of Defendant's last motion to discover Plaintiff's medical records was without prejudice, and the Embassy was free to re-file a motion that complied with the Court's Scheduling Order.  As previously noted, Defendant's decision not to re-file is the reason it was not able to gather and present Plaintiff's medical records at trial – not Ashraf-Hassan's "change in position."  For this reason, the Court is not convinced that the medical records, any more than Manes's datebook, can reasonably be considered "newly available."

The evidence the Embassy now seeks to present is thus not the sort for which courts typically grant Rule 59(a)(2) motions.  For instance, in <u>Planned Parenthood of Wisconsin, Inc. v. Van Hollen</u>, 94 F. Supp. 3d 949 (W.D. Wis.), <u>aff'd sub nom.</u> <u>Planned Parenthood of Wisconsin, Inc. v. Schimel</u>, 806 F.3d 908 (7th Cir. 2015), the district court permitted the plaintiffs, on a 59(a)(2) motion, to supplement the bench-trial record with documents they had identified as exhibits before trial but "inadvertently" failed to move into evidence at trial, and with documents obtained via subpoena whose late admission the defendants did not oppose.  <u>See</u> <u>id.</u> at 961.  The court denied, however, the plaintiffs' request to supplement the record with documents "which were only collected after trial," "could and should have been obtained sooner," and would

possibly prejudice the defendants, who would have wanted to present counterevidence.  Id.  The

evidence the Embassy seeks to admit here falls into the latter category of evidence; it was

obtained after trial but could have been obtained before trial, and Ashraf-Hassan objects to its

late admission.  And, critically, the Embassy still has not succeeded in establishing the

materiality of this evidence to the Court's liability determination.  Cf., California Research Corp.

v. Ladd, 356 F.2d 813, 820-22 & n.21 (D.C. Cir. 1966) (holding that where "issues were injected

. . . after trial," remand to permit presentation of evidence relating to those issues "and to conduct

such further proceedings as the court may deem advisable" was appropriate because "the

information seems sufficiently material on the issue . . . to warrant consideration by the District

Court").

      The Court, accordingly, cannot conclude that either additional testimony or a new trial is

warranted here.  A motion under Rule 59(a)(2) "must be based upon manifest error of law or

mistake of fact and 'a judgment should not be set aside except for substantial reasons.'"

Burzynski v. Travers, 111 F.R.D. 15, 17 (E.D.N.Y. 1986) (quoting Wright & Miller, 11 Fed.

Prac. & Proc. § 2805, at 37); see also Chavez, 640 F. Supp. 2d at 1343 ("Motions for a new trial

are generally disfavored, and should only be granted with great caution.").  Where, as here, the

movant has failed to identify an error of fact or law or other "substantial reason" to disturb the

record or verdict, the decision of the Court at the conclusion of the trial should remain

untouched.

      Finally, the Court briefly notes that Rule 54(b) makes a cameo appearance in a footnote

in one of Defendant's Motions.  See Estoppel Mot. at 1 n.1 ("[G]iven that judgment has not

formally been entered, this Court also could rely on Rule 54(b). . . .")).  The Court, however,

does not agree that it may properly consider the Motion under Rule 54(b).  That Rule permits

reconsideration only if the Court's order "adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties" at issue.  That is not the case here, as the Court's verdict conclusively addressed all of the claims as to all of the parties.  In any event, even if the Court did believe a Rule 54(b) motion were permissible in this instance, reconsideration would not be warranted for the same reasons that the Court finds the Embassy's Rule 59(a)(2) Motion without merit.

## III.    Conclusion

For the foregoing reasons, the Court will deny Defendant's two Motions for post-trial relief.  A contemporaneous Order will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  May 6, 2016