**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAIMA ASHRAF-HASSAN,<br><br>　　Plaintiff,<br><br>　　　v.<br><br>EMBASSY OF FRANCE IN THE UNITED STATES,<br><br>　　Defendant. | Civil Action No. 11-805 (JEB) |

**MEMORANDUM OPINION**

　　Saima Ashraf-Hassan, a French citizen of Pakistani origin, recently obtained a favorable verdict after a bench trial in her workplace-discrimination suit against the Embassy of France, her former employer.  She now seeks attorney fees and costs totaling $271,786.15, which accounts for many – but not all – of the hours and expenses her attorneys incurred over five years of litigation.  The Embassy opposes those fees, both because it believes the verdict to be in error and because it views the fees as unwarranted for various reasons.  Concluding that Plaintiff has met her burden of proving that the fees and costs are reasonable, the Court will award the full sum requested.

**I.　Background**

　　Because the fees cover numerous stages of this protracted suit, the relevant background facts largely consist of its procedural history.  The Court will also identify the different attorneys who represented Plaintiff throughout the litigation, as their hours and rates form the basis of her fee calculation.

1

A. Procedural History

Ashraf-Hassan is a Muslim woman who was born in Pakistan, moved to France as a child, and obtained French citizenship in the 1990s. See Ashraf-Hassan v. Embassy of France (Ashraf-Hassan VI), No. 11-805, 2016 WL 2626833, at *2 (D.D.C. May 6, 2016) (reciting the Court's oral findings of fact). In the early 2000s, she obtained a job at the French Embassy in Washington, D.C., and arrived in the United States on an A-2 visa in October of 2001 to begin working as an intern. Id. After her probationary period ended in February 2002, she was hired as a local employee and became an intern-program coordinator under the supervision of Chantal Manes, the head of the Embassy's cultural program. Id. According to Plaintiff, over the next four years, she suffered ill treatment and harassment from her supervisors. Late in 2006, the Embassy informed her that her contract would not be renewed, requiring her departure at the end of January 2007. Id. at *4.

Over four years later, in April 2011, Plaintiff brought suit in this court, alleging a throng of wrongful-termination and hostile-work-environment claims under Title VII – on the basis of race, religion, national origin, pregnancy, or retaliation for her engaging in protected activity. See generally Am. Compl. The Embassy subsequently filed a motion to dismiss, which the Court granted as to four counts (pertaining to Plaintiff's termination) but denied as to the remaining four counts (which raised hostile-work-environment claims). See Ashraf-Hassan v. Embassy of France (Ashraf-Hassan I), 878 F. Supp. 2d 164, 175 (D.D.C. 2012).

After several months of discovery, the Embassy moved for summary judgment in the summer of 2013, arguing that it was entitled to prevail as a matter of law given the record adduced by the parties. See ECF No. 32. It claimed that Plaintiff had failed to develop sufficient proof of a hostile work environment and that its various affirmative defenses entitled it to

judgment. See Ashraf-Hassan v. Embassy of France (Ashraf-Hassan II), 999 F. Supp. 2d 106, 113-17 (D.D.C. 2013). The Court denied that motion in full in November 2013, id. at 117, and scheduled a bench trial for mid-April 2014. See Minute Order of 12/17/2013. The Embassy moved for reconsideration, see ECF No. 38, which the Court also denied on January 16, 2014. See ECF No. 45 (Ashraf-Hassan III).

Having not achieved success on the substance of the dispute, the Embassy next took a different tack, filing an eve-of-trial motion to dismiss in which it argued – for the first time – that the Court lacked subject-matter jurisdiction under the Foreign Sovereign Immunities Act. See ECF No. 51. The Court promptly denied that motion, concluding that the case fell "squarely within multiple exceptions to the [FSIA]." Ashraf-Hassan v. Embassy of France (Ashraf-Hassan IV), 40 F. Supp. 3d 94, 97 (D.D.C. 2014). Defendant then filed an interlocutory appeal with the D.C. Circuit, see ECF No. 59 (Notice of Appeal), which affirmed this Court's opinion in a summary unpublished order on May 1, 2015, approximately one year after the Embassy filed the appeal. See Ashraf-Hassan v. Embassy of France (Ashraf-Hassan V), 610 F. App'x 3 (D.C. Cir. 2015).

After the mandate issued, this Court held a three-day bench trial in January 2016, which proceeded apace notwithstanding an ongoing snowstorm. See Minute Order of 1/25/16. On February 11, 2016, the Court reconvened the parties to deliver its oral verdict. See Minute Order of 2/11/16. It provided its findings of fact and conclusions of law, ultimately holding that Plaintiff had succeeded on her hostile-work-environment claim. See Verdict Trans. at 15:8-17. It next considered her damages claim, awarding her $30,000. See id. at 18:19-20. The Court then addressed Plaintiff's counsel on the issue of attorney fees, pointedly requesting that they file a "careful and thoughtful" petition. Id. at 19:1.

Shortly after the verdict was announced, the Embassy filed two post-trial motions, one seeking to amend the judgment and add new findings under Federal Rule of Civil Procedure 52(b), see ECF No. 86, and a separate "Motion for Estoppel and, in the Alternative, Motion for a New Trial." ECF No. 87. A central focus of both was Defendant's position that Plaintiff had misled the Court by providing inconsistent testimony on the date of one event that the Court concluded was a contributing factor in her hostile work environment. See Ashraf-Hassan VI, 2016 WL 2626833, at *3. The Court ultimately denied the motions, concluding that the Embassy had identified no "clear errors in [its] factual findings," and that "no 'manifest injustice' or prejudice was worked on the Embassy as a result of Plaintiff's testimonial inconsistency," which had already been taken into account by the Court in its factual findings. See id. at *1, *7. All matters of substance having been decided, the Court is free to move on to fees.

   B.  Ashraf-Hassan's Representation

Plaintiff has been represented by counsel since the filing of her Complaint. On March 5, 2011, she contacted the Law Firm of Gary M. Gilbert and Associates, P.C. (GMGA) and signed a deferred-fee retainer agreement. See Mot. for Fees, Exh. E at Bates Nos. 1-4 (Initial Retainer Agreement). From 2011 to 2015, Plaintiff was represented primarily by two attorneys: Zachary Wright, a newly barred GMGA associate, and Ari Wilkenfeld, a more seasoned practitioner. See Mot., Exh. H (Affidavit of Zachary L. Wright); id., Exh. F (Affidavit of Ari Wilkenfeld). Another then-GMGA attorney, Rosalind Herendeen, also contributed to Plaintiff's representation. See Mot. at 4.

In 2013, Wilkenfeld and Herendeen left GMGA to start the Wilkenfeld Law Group, which subsequently became Wilkenfeld Herendeen Law. See Wilkenfeld Aff., ¶ 4; Mot., Exh. J

(Affidavit of Rosalind Herendeen), ¶ 4. The new firm joined GMGA as co-counsel for Ashraf-Hassan in February 2014. See Mot., Exh. E at Bates Nos. 14-20 (Co-Counsel Agreement) at 20.

After the Embassy brought its interlocutory appeal, Gary M. Gilbert, GMGA's principal, assigned one of his then-junior associates, Katherine Atkinson (formerly Katherine Atkinson Dave), to argue the case before the D.C. Circuit, with assistance from GMGA senior counsel Valencia Rainey. See Mot., Exh. G (Affidavit of Katherine R. Atkinson), ¶ 16; Mot., Exh. I (Affidavit of Gary M. Gilbert), ¶ 10. Prior to oral argument, Wright left GMGA, and Atkinson took over as co-lead counsel with Wilkenfeld. See Atkinson Aff., ¶¶ 16-18. Atkinson then took the helm in preparing for trial in 2016, with Wilkenfeld and, to a lesser extent, Gilbert providing supervisory assistance. See id., ¶¶ 16-17; Gilbert Aff., ¶ 9; Wilkenfeld Aff., ¶ 10. These three attorneys were present throughout the trial. See Mot. at 19. Atkinson also took the lead in all post-trial work, which included Court-directed briefing on a question of law, responding to Defendant's two post-trial motions, and drafting the fee petition. Id. at 19-20.

**II.     Analysis**

Title VII grants federal courts discretion to award "the prevailing party . . . a reasonable attorney's fee . . . as part of the costs . . . ." 42 U.S.C. § 2000e-5(k). In determining whether to award fees and what amount is appropriate under the statute, the Court must make two inquiries. First is to determine whether the party seeking fees is "the prevailing party" and is thus eligible to receive fees. If so, the next question is whether the fee sought is reasonable. A "reasonable" fee is one that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case," Perdue v. Kenny A., 559 U.S. 542, 552 (2010), "but that does not produce windfalls to attorneys." Blum v. Stenson, 465 U.S. 886, 897 (1984). Defendant argues both that Ashraf-Hassan is not – or rather, should not be – the prevailing party, and that at least

5

some of the fees sought are not reasonable.  The Court will address each objection in turn and will then turn to the issue of costs.

    A.  <u>Fee Eligibility</u>

The prevailing-party inquiry is, at least in this case, a straightforward one.  "[A] 'prevailing party' is one who has been awarded some relief by the court . . . ."  <u>Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.</u>, 532 U.S. 598, 603 (2001).  Defendant does not dispute this standard, nor that Ashraf-Hassan emerged as the victor in the Court's February 2016 verdict, obtaining a judgment that the Embassy violated her Title VII rights and receiving $30,000 in damages.  See <u>Ashraf-Hassan VI</u>, 2016 WL 2626833, at *5.  In other words, it does not contest that, assuming the Court's verdict remains undisturbed, Plaintiff is a prevailing party.

Instead, the Embassy reverts to its oft-repeated tactic of attacking the substance of the Court's judgment, arguing that Plaintiff misled the Court about certain dates, and that the Court must necessarily disavow its initial factual findings, enter new findings comporting with the Embassy's version of events, and vacate the verdict.  See Opp. at 1-2.  Once that happens, Defendant reasons, "the Court should find the Embassy, not Ashraf, to be the prevailing party and permit the Embassy to file a fee petition."  <u>Id.</u> at 2.

Like Tantalus stooping to drink from an ever-receding pool, Defendant remains perennially optimistic that this argument will eventually succeed, despite the Court's reiterated recognition of its futility.  The Court has already addressed and rejected the assertion that Ashraf-Hassan misled it and has accordingly denied Defendant's post-trial motions, <u>see Ashraf-Hassan VI</u>, 2016 WL 2626833, at *8, *11, as well as its motion for sanctions.  See ECF No. 103 (Order Denying Mot. for Sanctions).  The Court declines to wade back into those waters once

more. With the original verdict for the Plaintiff still intact, there is no question that Ashraf-Hassan is a "prevailing party" here. See Select Milk Producers, Inc. v. Johanns, 400 F.3d 939, 954 (D.C. Cir. 2005) ("[P]revailing party means a party in whose favor a judgment is rendered, regardless of the amount of damages awarded.") (citations, internal quotation marks, and alterations omitted). She is thus eligible for fees under Title VII.

> B. Reasonableness of Fee

The next question is whether the fee amount sought – here, $207,789.10 to GMGA (not $207,807.10 as mistranscribed by Plaintiff) and $52,281.00 to Wilkenfeld Herendeen – is reasonable. "The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). The product of those two numbers yields what is known as the "lodestar" amount. See Bd. of Trustees of Hotel & Rest. Employees Local 25 v. JPR, Inc., 136 F.3d 794, 801 (D.C. Cir. 1998).

The D.C. Circuit has set forth a uniform "three-part analysis" for evaluating the reasonableness of fee requests. See Eley v. Dist. of Columbia, 793 F.3d 97, 100 (D.C. Cir. 2015) (evaluating fees under the Individuals with Disabilities Education Act); Salazar v. Dist. of Columbia, 809 F.3d 58, 61 (D.C. Cir. 2015) (applying framework to § 1983 fee request). "A court must: (1) determine the 'number of hours reasonably expended in litigation'; (2) set the 'reasonable hourly rate'; and (3) use multipliers as 'warranted.'" Salazar, 809 F.3d at 61 (quoting Eley, 793 F.3d at 100). The burden lies with the fee-seeking party to "'document[] the appropriate hours[] and justify[] the reasonableness of the rates,' with the opposing party remaining 'free to rebut [the] fee claim.'" Id. (quoting Covington v. Dist. of Columbia, 57 F.3d 1101, 1107-08 (D.C. Cir. 1995)).

7

The Court will first discuss the question of rates generally and will then determine whether the rates should reflect the price of services <u>when incurred</u>, or whether, as requested by Plaintiff here, Defendant should compensate her counsel for any delays by applying <u>current</u> prevailing rates. It will then address the number of hours billed and conclude with an examination of the Embassy's various challenges to the fee request.

    1. *Rates*

"Whether an hourly rate is reasonable turns on three sub-elements: (1) 'the attorney['s] billing practices,' (2) 'the attorney['s] skill, experience, and reputation' and (3) 'the prevailing market rates in the relevant community.'" <u>Eley</u>, 793 F.3d at 100 (quoting <u>Covington</u>, 57 F.3d at 1107). Surprisingly, Defendant does not attack any of these foundational elements, but because the burden lies with Plaintiff to justify the rate, the Court must nonetheless determine for itself whether she has done so. It will begin with the third element and then address the first two together.

The rates sought here mirror those listed in the 2015-2016 District of Columbia U.S. Attorney's Fee Matrix, which provides prevailing hourly rates for D.C. attorneys based on years of experience. This fee matrix was originally compiled by the government in the early 1980s in a Title VII and Equal Pay Act case, <u>Laffey v. Northwest Airlines, Inc.</u>, 572 F. Supp. 354, 371 (D.D.C. 1983), which is why it is now known as the <u>Laffey</u> Matrix. As the D.C. Circuit explained in <u>Eley</u>, the original <u>Laffey</u> Matrix spawned a variety of competing matrices that purport to establish prevailing rates. <u>See</u> 793 F.3d at 101. It is sufficient for the Court's purposes here to note that of the two potentially relevant <u>Laffey</u> matrices – the USAO <u>Laffey</u> Matrix and the Legal Services Index <u>Laffey</u> Matrix – Plaintiff relies on the former, which is the

lower of the two. See id. at 101-02 & n.4 (explaining methodological differences between USAO and LSI rates).

As Plaintiff's counsel attest in the affidavits attached to the fee Motion, "[T]he hourly rates sought here are the same hourly rates charged to clients" – *i.e.*, rates consistent with, and in some cases lower than, the USAO Laffey rates. See Mot. at 8; see generally Exhs. F-J. Several of the affidavits – including two from attorneys unaffiliated with Plaintiffs' counsel – also explain that the USAO Laffey rates represent a reasonable, if conservative, estimate of prevailing rates in the D.C. area for similar services. See, e.g., Gilbert Aff., ¶ 13; Mot., Exh. K (Declaration of Debra S. Katz), ¶¶ 9, 12-16; id., Exh. L (Affidavit of Kristen Alden), ¶ 17 ("[T]he rate structure identified in the [current USAO] 'Laffey Matrix' reflects the Market Rate and is very reasonable for attorneys who handle employment discrimination cases in the Washington, D.C. area."). The Court concludes that the attached affidavits and explanations provide adequate justification for using the USAO Laffey Matrix to set Plaintiff's attorneys' rates. See, e.g., Hansson v. Norton, 411 F.3d 231, 236 (D.C. Cir. 2005) (agreeing that "the 'reasonable hourly rate' [in a Title VII case] is guided by the Laffey matrix prepared by the U.S. Attorney's Office").

These rates are also consistent with the attorneys' historical billing practices and take into consideration counsel's varying skill, experience, and reputation. The attached affidavits all affirm a consistent practice of using and recovering USAO Laffey rates (or, in the case of attorneys Wilkenfeld and Herendeen, a slightly lower rate). See Wilkenfeld Aff., ¶¶ 7-9; Atkinson Aff., ¶ 14; Wright Aff., ¶¶ 7-8; Gilbert Aff., ¶ 14; Herendeen Aff., ¶ 6. The affidavits also detail each attorney's work history, experience, and customary billing rates, which helps to both situate them in the various "experience" categories provided in the matrix – *e.g.*, "2-3

9

years," "4-5 years," "6-7 years" – and to confirm that these rates represent what they customarily charge their clients. See Mot., Exh. D (2015-2016 USAO Laffey Matrix) at 1; see also Wilkenfeld Aff., ¶¶ 2, 4, 7; Atkinson Aff., ¶¶ 1-8, 15; Wright Aff., ¶¶ 2-8; Gilbert Aff., ¶¶ 2-6; Herendeen Aff., ¶¶ 2-6. Finally, all of the attorneys involved work at law firms with an established reputation in the field of employment law. The affidavits provide additional details concerning each individual's particular skills and expertise in the field, confirming that the USAO Laffey rates need not be adjusted downward to account for any deficit in skill or experience.

Having established that Plaintiff may obtain USAO Laffey rates, a related question is what to do about any delays in payment. "[I]n Title VII cases like this one, attorneys are often not paid until long after services are rendered, and 'payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use . . . is valuable.'" West v. Potter, 717 F.3d 1030, 1034 (D.C. Cir. 2013) (quoting Copeland v. Marshall, 641 F.2d 880, 893 (D.C. Cir. 1980)). Where compensating attorneys for such a delay "is necessary to provide a reasonable fee, it may be made 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.'" Id. (quoting Perdue, 559 U.S. at 556 (internal quotation marks omitted)); see also Missouri v. Jenkins, 491 U.S. 274, 283 (1989) ("Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed . . . .").

Following this logic, although counsel's work spanned five years, Plaintiff asks the Court to apply only those rates reflected in the current 2015-2016 USAO Laffey Matrix. See Mot. at

12 ("Plaintiff seeks calculation of the fees incurred at the prevailing market rate in place at the time this Petition is being filed, rather than the historic hourly rates initially charged."). Paying attorneys at current rates is certainly one permissible method of compensating for delay, as is "adding interest to the historic rate so that the amount paid today reflects the approximate value of the historical rates charged at the time services were rendered." West, 717 F.3d at 1034 (citing 42 U.S.C. § 2000e–16(d), which makes interest available in Title VII litigation). Indeed, Defendant seems to agree. See Opp. at 7 n.6 ("The Court has the discretion to apply either the historical or the current hourly rates under the Laffey Matrix.").

The Court concurs with Plaintiff that compensation for delay is warranted here, particularly given the Embassy's unsuccessful and, in this Court's opinion, frivolous appeal on the issue of sovereign immunity. See Verdict Trans. 19:14-18 ("I advised [counsel for Defendant] that" his immunity argument "seemed a frivolous position of his."); accord Ashraf-Hassan IV, 40 F. Supp. 3d at 97 ("Defendant may delay these proceedings, but it may not evade trial by means of this transparent ploy."). That detour alone resulted in a fourteen-month delay, with another seven months tacked on at the end to account for rescheduling a trial date acceptable to the parties and the Court. See Minute Order of 8/17/15 (setting bench trial for January 2016). In short, litigation delays starting from Spring 2014 onward are almost entirely attributable to Defendant, meaning that delay-related compensation is warranted here. The Court will also grant Plaintiff's request to use current USAO Laffey rates "[i]n lieu of seeking interest" as the method of accounting for these delays. See Mot. at 12.

    2. *Hours*

Moving from rates to the other component of the lodestar figure – hours – Plaintiff must also "document[] the appropriate hours" claimed by counsel. Covington, 57 F.3d at 1107.

Satisfactory documentation in this circuit consists of "contemporaneous time records of hours worked . . . plus a detailed description of the subject matter of the work with supporting documents, if any." In re Donovan, 877 F.2d 982, 994 (D.C. Cir. 1989) (*per curiam*).

Plaintiff's billing records are demonstrably adequate. She includes with her fee application a detailed log of hours billed, which includes the date, billing attorney's name, duration (in 10-minute intervals), and a reasonably detailed description of services performed. See Mot., Exh. A (Invoice for District Court Fees); id., Exh. B (Invoice for Appellate Fees). Defendant argues that the record is "reconstructed," protesting that "Ashraf was billed on a monthly basis," but that "the bills . . . attached to the Petition apparently were not the bills she received." Opp. at 10. The Court sees no flaw in Plaintiff's presentation of the records. In any event, to the extent Defendant is concerned that the records are not "contemporaneous," the invoices reflect daily and hourly logging of time. See also Wilkenfeld Aff., ¶ 8 ("All attorneys . . . record time on a daily basis, describing the services performed and indicating the time spent on each task.").

The quantity of hours is also reasonable. Notably, in an effort to reduce the fee amount, Plaintiff's counsel "regularly 'no charged' duplicative or unnecessary time, . . . review[ing] the over five years of billing entries to delete or 'no charge' additional entries with the benefit of hind-sight and in response to the Court's instructions during the verdict" to submit a careful and thoughtful fee request. See Mot. at 1-2. Indeed, the invoices reflect large numbers of entries that counsel have not sought as part of their fee award – an amount that, according to Plaintiff's calculation, totals $237,802.30, which does not include other entries that have been omitted from the invoices. See id. at 2. Exemplary of Plaintiff's caution in seeking fees is its decision to bill

for only 1.2 hours of Gilbert's time, even though he sat through the entire trial and spent upwards of 50 hours on this matter. See District Court Invoice at 1; Appeal Invoice at 1.

With one limited exception discussed *infra*, the Embassy does not argue that the hours spent litigating the case are unreasonable. In so doing, they have effectively "conceded . . . the reasonableness of the hours claimed," Covington, 57 F.3d at 1106, although the Court is independently satisfied that the hours sought reasonably and fairly reflect the work that Plaintiff's counsel performed in securing a favorable outcome for their client.

### 3. *Defendant's Objections*

As the Court has presaged, Defendant's Opposition to the fee Motion raises few direct objections pertaining to how Plaintiff calculated and substantiated her fee request. It does not, for instance, argue that reliance on the USAO Laffey Matrix for rates is improper, that Plaintiff's counsel improperly billed for any given task, or that the Court cannot augment the rates to account for delayed compensation. Instead, it uses its Opposition brief to once again impugn Plaintiff's honesty and make yet another futile attack on the validity of the verdict. The Court will take each of these objections in turn, concluding that none warrants a reduction in the amount of fees to be awarded.

The Embassy's first convoluted argument is as follows. Plaintiff's counsel did not request Ashraf-Hassan's administrative EEOC file until discovery was underway. See Opp. at 3. In Defendant's view, "Had they requested [that file] prior to filing the complaint, they would have discovered that one of their client's most damaging allegations" – namely, that she was lectured by a superior on the need to use contraception – "might have been unfounded." Id. (emphasis added). Apparently, this failure "significantly reduc[ed] the probability of settlement," id. at 2, although Defendant does not explain why that is so, nor does it suggest how

such alleged failure should influence the fee award. Unwilling to fashion coherence where none exists, the Court concludes this objection is meritless.

Defendant next argues that because Plaintiff "ma[de] . . . public" certain "grave . . . allegation[s]" – by filing a Complaint – it was justified in refusing to settle. Id. at 3-4. Once again, its logic is hard to follow. The Embassy seems to suggest that some of her allegations were tolerable, see Opp. at 3-4 (noting that it "conceded from the start" that her supervisor's calling her a "Pashtun" "might have created the perception of discrimination"), but that others, such as the contraception lecture, or that she was referred to as a dog, see Compl., ¶ 2, were simply beyond the pale. See Opp. at 4. As a result, "settlement became very remote" because the Embassy had to make "clear to everyone that these grave allegations never occurred." Id.

Regardless of what motivated the Embassy to eschew settlement, it has no bearing here. Ashraf-Hassan alleged violations of Title VII, and she succeeded on her hostile-work-environment claim. Indeed, this Court found that some of the allegations the Embassy views as "grave" did, in fact, occur. See Verdict Trans. at 7:1-8, 10:1-10, 11:2-4, 16:14-24 (describing events when Plaintiff was referred to as a "terrorist," learned her supervisor hated Indians and Pakistanis, and was otherwise insulted on the basis of race, religion, or national origin). That she "likely exaggerated some events or construed them to be more offensive than they were" does not undermine her ultimate success or her entitlement to fees. See Verdict Trans. at 5:18-20. In other words, even if the Embassy were willing to settle – which it insists it would not – Plaintiff was justified in continuing to litigate.

Defendant next argues that Plaintiff's counsel failed to tease out various testimonial inconsistencies that apparently undermined Ashraf-Hassan's credibility. See Opp. at 5 ("Ashraf's attorneys did not engage in any meaningful efforts to prevent [her] exaggerations.");

id. at 6 (attorneys did not spend any time trying "to sort out [Plaintiff's alleged] inconsistencies"). This is the same argument Defendant made in motions to amend the judgment and for a new trial, see ECF Nos. 86, 87, and the same argument it made in seeking sanctions against Plaintiff's counsel. See ECF No. 97. The Court found that position unconvincing then, see Ashraf-Hassan VI, 2016 WL 2626833, at *6-7; ECF No. 103 (Order Denying Mot. for Sanctions), just as it does now. For similar reasons, the Court will not entertain Defendant's fanciful speculation that because Plaintiff's counsel omitted certain time entries from the attached invoices, those omissions "might . . . reveal time Ashraf's attorneys spent investigating her inconsisten[cies]." Opp. at 9. This is pure guesswork, untethered to reality and wholly unrelated to whether the fee claimed here is reasonable.

Taking an even more aggressive (and undiplomatic) approach, the Embassy next argues that Plaintiff's counsel violated various D.C. ethics rules – including that they ostensibly failed to show their client a purported "settlement offer" made by Defendant. See Opp. at 4 n.3. The offer it refers to is an email from Embassy counsel to Wilkenfeld and Wright that (1) rejects Plaintiff's proposed settlement "because [the Embassy] wants to make sure that Ms. Ashraf does not receive any benefit from a law suit she should have known, and maybe knew, to be without merits," and (2) states that "the French government would not object to pay a modest amount for your [*i.e.*, counsel's] time investigating this case because i[t] feels that you were also a victim of Ms. Ashraf's actions." Opp., Exh. 2 (Dec. 11, 2012, Email). To put a finer point on it, the email explains that Defendant would "settle this case for a modest sum of money on the condition that all of it be paid to you [the attorneys] and no part could be distributed to her or used to pay any expenses that she is legally responsible for." Id. (emphasis added).

The Embassy believes that Ashraf-Hassan was never shown the email because there was no log of such a discussion in the billing records attached to her fee Motion. See Opp. at 4 n.3. This failure, it believes, violates D.C. Rule of Professional Conduct 1.4(c). Defendant, however, never articulates whether such violation should vitiate all fees, merit a reduction in amount, or yield some other outcome. In any event, the basis for this argument is unsound. The Court assumes that the Embassy believes that had counsel shown Ashraf-Hassan the email, she likely would have settled. This strains credulity on its face, as an offer that included a zero recovery for Plaintiff had no chance of acceptance. But the Embassy's position is all the more galling given that it also insists that the very same "offer created" a "conflict of interest" between Plaintiff and her counsel. Id. In other words, Defendant asserts that its take-the-money-and-run proposal was both a good-faith settlement offer to Plaintiff and an irresistible enticement to her counsel that created a conflict between the two. It fails to recognize, however, that these two arguments cancel each other out. If the Embassy did, in fact, make the offer in the hopes that it would conflict her attorneys off of the case, it cannot plausibly claim to have made Plaintiff an offer in good faith. Defendant will not obtain a reduction in fees on this basis.

At long last, Defendant makes a not-wholly specious argument that attorney time spent on certain unsuccessful motions should be excluded. First is the "time spent on the briefing, research, and legal argument of the unlawful termination claims." Opp. at 10. Second is billing for several pre-trial motions made by Plaintiff that the Court ultimately denied. Id. at 11. To begin, "[f]ees for time spent on claims that ultimately were unsuccessful should be excluded only when the claims are 'distinctly different' in all respects, both legal and factual, from plaintiff's successful claims." Williams v. First Gov't Mortgage & Inv'rs Corp., 225 F.3d 738, 746 (D.C. Cir. 2000) (internal citation and quotation marks omitted). Plaintiff's unlawful-termination

claims, which this Court dismissed early on, grew out of the same set of facts as her hostile-work-environment claim, which suggests they are not so "distinctly different" as to render unavailable any fees pertaining to the former. In any event, the vast majority of fees claimed here have nothing to do with the termination claims, which, as noted, vanished from the litigation in its incipient stages. Rather, the bulk of fees begin in discovery and relate exclusively to the claim on which Plaintiff succeeded.

The Court will similarly decline to reduce the fee award on account of Plaintiff's lack of success in certain pre-trial motions. "[A] litigant 'who is unsuccessful at a stage of litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage.'" Air Transp. Ass'n of Canada v. FAA, 156 F.3d 1329, 1335 (D.C. Cir. 1998) (quoting Cabrales v. Cty. of Los Angeles, 935 F.2d 1050, 1053 (9th Cir. 1991)). After all, it is a rare litigant indeed "who doesn't lose some skirmishes on the way to winning the war. Lawsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is part of winning." Cabrales, 935 F.2d at 1053. The Court concludes that the hours spent on these motions were not "excessive, redundant or otherwise unnecessary," Hensley, 461 U.S. at 434, and thus may form a part of Plaintiff's reasonable fee award.

   C. Costs

The final issue is that of costs, which Plaintiff seeks to the tune of $11,716.05. See District Court Invoice at Bates Nos. 3 (summary) & 89-95 (line items); Appeal Invoice at Bates Nos. 2 (summary) & 16-17 (line items). The Court has reviewed the costs billed and concludes

that they are reasonable and appropriate. With no objection from Defendant about any of them, they will be awarded in full.

## III. Conclusion

For these reasons, the Court will grant Plaintiff's Motion for Fees. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: May 24, 2016